## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **COMMON CAUSE and** | * | |
| **GEORGIA STATE CONFERENCE** | * | |
| **OF THE NAACP,** | * | |
| | * | **Civil Action No.** |
| **Plaintiffs,** | * | **1:16CV00452-TCB** |
| | * | |
| **v.** | * | |
| | * | |
| **BRIAN KEMP, individually and in** | * | |
| **his official capacity as Secretary of** | * | |
| **State of the State of Georgia,** | * | |
| | * | |
| **Defendant.** | * | |
| _____ | * | |

## DEFENDANT KEMP'S BRIEF IN SUPPORT OF
## MOTION TO DISMISS

COMES NOW BRIAN KEMP, Georgia Secretary of State, by and through

his attorney of record, the Attorney General of the State of Georgia, and files this

Brief in Support of his Motion to Dismiss.

### Introduction

Plaintiffs, two non-profit organizations, challenge the State of Georgia's

voter registration list maintenance program as a violation of Sec. 8(b) of the

National Voter Registration Act (NVRA), 52 U.S.C. § 20507(b), and the First

Amendment.  Doc. 1 ¶¶ 41, 43.  Plaintiffs seek only equitable relief, but have

1

brought this action against the Secretary Kemp, in both his official and individual capacity.  Doc. 1 ¶¶ 3, 45-52.

Plaintiffs' complaint fails to state a claim and should be dismissed.  First, the claims against Defendant Kemp, in his individual capacity, should be dismissed because equitable relief is not available against a state official in his *individual* capacity.  Second, Georgia's list maintenance program, as outlined in O.C.G.A. §§ 21-2-234 and 21-2-235, is consistent with both the express language and the congressional intent of the NVRA, as amended.  Third, Plaintiffs' First Amendment claim fails because Georgia law does not severely burden Plaintiffs' right "not to vote," and the State's interest in maintaining accurate registration lists sufficiently justifies the restriction.

## I.  Plaintiffs' Claims for Equitable Relief, Against Secretary Kemp, in his Individual Capacity, Should be Dismissed.

Plaintiffs filed this complaint, seeking only equitable relief, against Secretary Kemp in both his individual and official capacity.  Doc. 1 ¶¶ 3, 45-52. When the relief sought is an order concerning official duties, a claim for injunctive relief may be brought against government officials only in their official capacity. *Wu v. Thomas*, 863 F.2d 1543, 1550 (11th Cir. 1989); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 n. 9 (11th Cir. 1995) (explaining that "claims for injunctive or declaratory relief . . . are considered to be official capacity

claims against the relevant governmental entity."); *See also Santhuff v. Seitz*, 385 Fed. Appx. 939, 642 n. 9 (11th Cir. 2010) (affirming dismissal of claims for injunctive relief where Defendant was only sued in his individual capacity). Since Plaintiffs have sought only equitable relief, the claims against Secretary Kemp, in his individual capacity, should be dismissed.

## II.    Georgia's List Maintenance Program is Consistent With the Requirements of the National Voter Registration Act.

In 1993 Congress passed the NVRA, Pub. L. No. 103-31, 107 Stat. 77, to establish a uniform system for voter registration. The NVRA, despite establishing a uniform system for registration, did not require states to maintain a centralized voter registration system. In 2002, Congress passed the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666-1730. HAVA imposes on states the obligation to maintain a centralized voter registration system. 52 U.S.C. § 21083. HAVA requires states to maintain a "single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). The statute also requires the states to make reasonable efforts in maintaining *accurate* voter registration records. States are specifically required to maintain:

> A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter

3

Registration Act of 1993 (42 U.S.C. § 1973gg et seq.) [currently codified at 52 U.S.C. § 20501], registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office *shall* be removed from the official list of eligible voters, except that no registrant may be removed *solely* by reason of a failure to vote.

52 U.S.C. § 21083(a)(4)(A) (emphasis added).[1]  In other words, states are *required* to remove from their voter registration lists those voters that do not respond to a notice and do not vote, or appear, in the following two (2) federal elections. Congress amended the NVRA in Sec. 903 of HAVA to make clear its intent that states could, pursuant to a list maintenance program, remove voters from their lists *if* the voter failed to respond to a notice *and* failed to vote in two subsequent federal elections.  The amendment provides that Sec. 8(b) of the NVRA now reads as follows:[2]

(b) Confirmation of voter registration. Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

---

[1] HAVA provides further that "[t]he specific choices on the methods of complying with the requirements of [Title III, i.e., 52 U.S.C. §§ 21081-21084] shall be left to the discretion of the State."  52 U.S.C. § 21085.  In other words, federal law requires the states to design their own list maintenance plans, consistent with HAVA and the NVRA.

[2] The language added in 2002 is underlined.

4

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 *et seq*. [52 USCS §§ 10301 et seq.]); and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

> (A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

> (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

Sec. 903, Pub. L. No. 107-252, 116 Stat. 1728, codified at 52 U.S.C. § 20507(b).

Thus, the obligations imposed by the NVRA and HAVA are of a dual nature, requiring states to both register all eligible applicants *and* to remove all ineligible registered voters from the registration lists.  The 2002 Amendment to the NVRA made explicit what Congress had implicitly authorized in 1993, that is, that states could and should remove voters from their registration lists, pursuant to a list maintenance program, where a voter both failed to return a postage prepaid

forwardable notice and then also failed to vote for two additional federal election cycles.

The "subsections (c) and (d)" referenced in the text of Sec. 8(b)(2) above, refer to sections 8(c) and 8(d) of the NVRA.  Section 8(c) describes one *possible* voter removal program, use of change-of-address information supplied by the Postal Service, that a State *could* adopt in satisfaction of that State's obligation to conduct a program of list maintenance under Sec. 8(a)(4) of the NVRA.  In Paragraph Sixteen of the Complaint (and elsewhere), Plaintiffs imply that Sec. 8(c) requires that a State may *only* use change-of-address information supplied by the Postal Service to remove voters from the voter registration list. *See* Doc. 1 at ¶ 16. Plaintiffs' position misapprehends both the text of Sec. 8(c) and the language in both the House and Senate Reports preceding the NVRA. *See* H.R. REP. NO. 103-9, at 15 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 119 (1993); S. REP. NO. 103-6, at 32 (1993).  First, under the actual the language in § 20507(c)(1)(A), a State *may* use change-of-address information supplied by the Postal Service to meet the NVRA's requirement that each state establish a voter roll maintenance program: "A State *may* meet the requirement of subsection (a)(4) by establishing a program under which — (A) change-of-address information supplied by the Postal Service

6

through its licensees is used to identify registrants whose addresses may have changed . . . ." § 20507(c)(1)(A) (emphasis added).

Second, both the House and Senate Reports state that subsection (c) is merely meant "to provide some guidance to the States" on how they can meet the NVRA's requirement in §20507(a)(4) (as currently codified) that states must establish a program to remove the names of ineligible voters from official voter lists by reason of death or a change in residence. H.R. REP. NO. 103-9 at 15; S. REP. NO. 103-6 at 32. The House and Senate Reports further state that a maintenance program's use of the U.S. Postal Service's National Change of Address database "could be deemed to be in compliance with the requirements that the program be uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965." *Id.*

Based on the text of the NVRA and the language in the House and Senate Reports, the Plaintiffs' argument that Georgia can only use change-of-address information provided by the Postal Service to comply with the voter roll maintenance program requirement is incorrect.

Sec. 8(d) of the NVRA, as amended, sets forth requirements for any voter removal program established by the states.  More specifically, Sec. 8(d) provides that states "shall not" remove voters from their rolls due to a change of residency

7

unless the voter either confirms in writing that they have moved outside of the jurisdiction, *or* the voter fails to return a "notice" and "has not voted *or appeared to vote*" in the next two federal elections.  52 U.S.C. § 20507(d)(1) (emphasis added).[3]  The "notice" must be a "postage prepaid and pre-addressed return card, sent by forwardable mail" and provide the information set out in detail in the statute. 52 U.S.C. § 20507(d)(2).  Plaintiffs do not contend that Georgia's confirmation postcard fails to comply with the notice requirements in 52 U.S.C. § 20507(d)(2).  *See* Doc. 1 generally.

### A. No Georgia Voter is Removed From the Voter Registration List Unless They Have Had No Contact Over Four (4) General Elections And Have Failed to Respond to a Confirmation Postcard.

Georgia's list maintenance program is set forth in O.C.G.A. § 21-2-234.

Pursuant to O.C.G.A. § 21-2-234(a)(2), during the first six months of an odd-numbered year, the Secretary of State identifies the persons on the voter registration list with whom there has been *no contact* during the preceding three (3) calendar years.[4] The term "no contact," as defined in the statute, means:

---

[3] The requirement in the NVRA, like the requirement in O.C.G.A. § 21-2-234, is not that voters vote but that they have some contact with election officials.  *See* 52 U.S.C. § 2507(d)(1)(B)(ii).

[4] Because this process is only conducted in odd-numbered years, looking back three (3) years at a voter's contacts necessarily includes considering two even numbered years and therefore includes two prior general elections.

> that the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, and has not confirmed the elector's continuation at the same address during the preceding three calendar years.

O.C.G.A. § 21-2-234(a)(1). The Secretary then creates an address confirmation notice that includes a postage prepaid, preaddressed return card that follows the requirements of both O.C.G.A. § 21-2-234(c) and 52 U.S.C. § 20507(d)(2). Those cards are provided to county election officials who send them to the voters at their last known addresses. The voter can return the card and confirm that address, or indicate that he or she has moved, or that some other update is needed. *See* O.C.G.A. § 21-2-234(d), (e) and (f). However, if the card is not returned within the 30 days outlined in the notice, the person's name is moved from the list of "active" voters to "inactive" voters. O.C.G.A. § 21-2-234(c)(2) and (g). On the other hand, as noted above, if the card is returned with the confirmation or with new information, then the voter's registration is updated appropriately. O.C.G.A. § 21-2-234 (d), (e) and (f).

Consistent with the NVRA, movement from the "active" to the "inactive" list does not mean the person has been removed from the registration lists. The person is still registered to vote, and if the voter has any contact with the electoral system including voting, which the voter is still eligible to do, the voter will move

back to the "active" voters list.  O.C.G.A. § 21-2-235.  However, if two more

federal general election cycles pass and there is still no contact of any kind from

the voter, then the voter is removed from the registration list.

O.C.G.A. § 21-2-235(b).  Therefore, voters are only removed from Georgia's voter

registration list if they have not had *any contact* with election officials in Georgia

for a minimum of seven years, including four federal election cycles, *and* they

have not returned a postage prepaid, preaddressed return card to confirm their

residence.  This procedure complies with both the confirmation of voter

registration requirements of the NVRA, Sec. 8(b), and the voter removal

requirements of the NVRA, Sec. 8(d).

### B. Plaintiffs' Statutory Interpretation Ignores the 2002 Amendment to the NVRA.

Plaintiffs' complaint completely ignores the 2002 amendment to the NVRA,

quoting only from the 1993 statute and the House and Senate Reports.  *See* Doc. 1

¶ 8 (quoting from 1993 Senate Report in support of right not to vote); ¶ 11 (same);

¶ 12 (quoting language from statute but only as it existed *prior* to 2002

amendment); ¶ 13 (quoting from House Report on purpose of Sec. 8(b) in *1993*

enactment); and ¶ 19 (quoting language from statute but only as it existed prior to

2002 amendment).

The starting point in any case involving statutory construction is the language of the statute itself. *Watt v. Alaska*, 451 U.S. 259, 265 (1981); *Iberiabank v. Beneva 41-I, LLC*, 701 F.3d 916, 924 (11th Cir. 2012). "[S]tatutory analysis must begin with the language of the law. . . [and] [w]hen the statutory language is clear, [the Court's] analysis ends with it as well." *United States v. Feaster*, 798 F.3d 1374, 1378 (11th Cir. 2005) (internal citation omitted). Here, the statute's language is clear. The 2002 amendment to the NVRA expressly allows states to remove from their registration lists those voters who (1) fail to respond to the statutory notice, i.e., Georgia's confirmation postcard, and (2) fail to vote in two additional federal elections. "In evaluating the language, we assume that Congress employed the common and ordinary meaning of the terms in the statute, and we give full effect to each of the provisions." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). The Court should assume that Congress used the words in a statute as they are commonly and ordinarily understood, and the Court should read the statute to give full effect to each of its provisions. *Harrison v. Benchmark Electronic Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010). Plaintiff's reading of Sec. 8(b) of the NVRA would render the 2002 amendment meaningless. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no

clause, sentence, or word shall be superfluous.  *United States v. Diveroli,* 729 F.3d

339, 1343 (11th Cir. 2013) (quoting *United States v. Julian*, 633 F.3d 1250, 1255

(11th Cir. 2011) (internal quotation marks omitted)).

According to Plaintiffs, Sec. 8(b) of the NVRA prohibits states from sending

a confirmation postcard to voters simply because they have not voted in the two

prior federal elections.[5]  Plaintiffs' interpretation is contrary to the statute for two

reasons.  First, Sec. 8(b) does not address *when* a confirmation postcard may be

sent.  Rather, Sec. 8 (b) sets out standards for a State's list maintenance program.

Those standards expressly provide that states *may* remove from their lists

registered voters who have 1) failed to return a confirmation postcard; and 2) have

not voted in two subsequent federal election cycles.  Second, Georgia does *not*

send confirmation postcards based on a voter's failure to vote.  Georgia sends out

confirmation postcards when there has been "no contact" with voters for more than

three (3) years.  Voters do not have to vote in order to be in "contact" with election

officials.  Thus even if Plaintiffs' interpretation of the NVRA were correct, which

it is not, Georgia's statute would still not violate the NVRA because the State does

---

[5] Plaintiffs repeatedly assert that Georgia law targets voters who have *not voted* to
receive the confirmation postcard.  Doc. 1 ¶¶ 19-23, 26.  Georgia law actually
*never* refers to voting, but rather whether the voter has had any *contact* with
elections officials.  Voters who have not voted in more than three years, but who
have updated their address, or had contact with election officials in other ways, do
*not* get confirmation postcards.  *See* O.C.G.A. § 21-2-234(a).

not send out confirmation postcards on the basis of whether a voter has voted.

O.C.G.A. § 21-2-234(a).

Even if the language of the NVRA were not clear, congressional intent in 2002 was clear.  Senator Dodd, the principal Senate author of the Help America Vote Act 2002 Conference Report, described how the provisions for list maintenance are meant to maintain accurate, clean voter registration lists.

> The conference report retains the Senate-passed provisions of section 303(a)(2) regarding list maintenance of the computerized list.  Those provisions provide that any name that is removed from the list must . . . [not] have responded to a notice mailed by the appropriate election official and then have not voted in the subsequent two Federal general elections.
>
> . . .
>
> While many of us have read of allegations of massive duplicate registrations, the fact is that even though alleged duplicate names appear on more than one jurisdiction's list, the vast majority of voters only live in one place and only vote in one place.  In a highly mobile society likes [sic] ours, voters move constantly.
>
> . . .
>
> The conference report also added a new minimum standard for ensuring the accuracy of the centralized computerized registration list. . . . Consistent with section 303(a)(2), this provision parallels language in the NVRA that requires States to make a reasonable effort to remove registrants who are ineligible to vote, consistent with the provisions of NVRA, specifically the requirement that such voters fail to respond to a notice and then fail to vote in the subsequent two general Federal elections.

148 Cong. Rec. S10509 (daily ed. Oct. 16, 2002) (statement of Sen. Dodd).

Georgia's list maintenance program is consistent with this congressional mandate

and consistent with the Supreme Court's recognition that "[i]n the [NVRA],

Congress established procedures that would both increase the number of registered

voters *and* protect the integrity of the electoral process." *Crawford v. Marion

County Election Bd.*, 553 U.S. 181, 192 (2008).

In passing HAVA, Congress was concerned about cleaning up voter

registration lists and with protecting registered voters who were eligible to vote.

> Election officials shall perform list maintenance with respect to the computerized list on a regular basis.  If individuals are to be removed from the computerized list, they shall be removed in accordance with the provisions of NVRA.  Consistent with NVRA, registrants who have not responded to a notice and have not voted in two consecutive general elections for federal office *shall be removed* from the official list of registered voters except that no registration may be removed *solely* by reason of failure to vote.

H.R. Rep. No. 107-730, at 75 (2002) (Conf. Rep.).  Plaintiffs' reading of Sec. 8(b)

of the NVRA is inconsistent with the mandate in HAVA.  Congress amended the

NVRA to make clear that nothing in the NVRA prohibits the mandate contained in

HAVA.  The Committee Report clarifies that the 2002 amendment to the NVRA,

> Amends the National Voter Registration Act of 1993 to clarify the ability of election officials to remove from the voter registration list the name of an individual who has not responded to a notice from the registrar of voters and who has not voted in two or more consecutive general elections for Federal office.

14

H. Rep. No. 107-730, at 81 (2002) (Conf. Rep.).  Senator Bond explained the need

for cleaning up voter registration lists.

> The legislation also requires states to set up a computerized,
> statewide voter registration system to maintain the names of all
> registered, eligible voters.  It has been discovered that in states across
> the country, registration lists contains [sic] the names of people who
> have left the jurisdiction, who are not eligible to vote because of their
> status as a felon, who are deceased or who are not eligible to vote in
> that jurisdiction for any number of reasons.

> As I prepared to draft this legislation, I reviewed the voting lists
> in two jurisdictions in my State, St. Louis City and St. Louis County.
> In the city, I found that one in ten voters were also registered
> somewhere else in the State and at the time of the November 2000
> election, there were more registered voters than there were city
> residents of voting age.  In St. Louis County, I found nearly 35,000
> people who were registered somewhere else in the State.  It was not
> unusual to find people who were registered four times in the state.

148 Cong. Rec. S10491 (daily ed. Oct. 16, 2002) (statement of Sen. Bond).

Plaintiffs' interpretation of Sec. 8(b) of the NVRA is inconsistent with the voter

registration list problems that Congress was addressing in 2002 when enacting

HAVA and amending the NVRA.

**C. The Department of Justice's 1994 Objection, Pursuant to Section 5 of the Voting Rights Act, to Georgia's *Former* Statute, Has no Relevance to Whether Current Georgia Law Violates the Current Language of the NVRA.**

Plaintiffs' complaint draws attention to a 1994 objection from the U.S.

Department of Justice, under Sec. 5 of the Voting Rights Act, 52 U.S.C. 10304,

*formerly* 42 U.S.C. 1973c, to provisions of Act No. 1207, 1994 Ga. Laws 1443.

Doc. 1-1 at 2.  The legislation consisted of Georgia's initial implementation of the

NVRA.[6]  Plaintiffs suggest that Secretary Kemp has been enforcing this law

despite the Department of Justice's objection.  Doc. 1 ¶¶ 27-29.  Contrary to

Plaintiffs' assertion, in 1997, the Georgia Legislature amended the Georgia

election code, striking O.C.G.A. §§ 21-2-234 and 21-2-235 in their entirety and

replacing them with new statutory language.  1997 Ga. Laws 649, 650-653.  The

1997 statute was precleared by the Department of Justice on July 29, 1997.  *See*

Exhibit 1 attached hereto.[7]  The preclearance letter from the Department of Justice

describes the legislation being reviewed as changes to "[p]rocedures for voter

registration list maintenance, including *revised* procedures for the placement of

registrants on an inactive registration list and the removal of names from the list of

eligible registered voters."  Exhibit 1 at 1 (emphasis added).  Thus, the concerns

the Department of Justice had with the 1994 legislation were remedied by the 1997

---

[6] The Department of Justice objected to Georgia's former procedures for removing voters from registration lists.  *Id.* These old procedures were codified at former O.C.G.A. § 21-2-234, 1994 Ga. Laws 1443.

[7] Courts may consider "matters of which a court may take judicial notice" when ruling on a 12(b)(6) Motion to Dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007).  "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

legislation, which is the law currently in effect. *See* O.C.G.A. §§ 21-2-234 and 21-2-235. Moreover, the Department of Justice's 1994 objection provided the Department's interpretation of the NVRA *prior to* passage of HAVA, which amended Sec. 8(b) of the NVRA in 2002. After the amendment, it is clear that states *may* remove from their lists voters who have been sent a notice and have failed to return it, *and* have failed to vote in two subsequent federal elections. Therefore, Plaintiffs' reliance on the Department of Justice's 1994 objection to Georgia's *former* statute provides no support for their position that current Georgia law violates the NVRA, as amended.

## III. Georgia's List Maintenance Provisions Do not Violate Plaintiffs' First Amendment Rights.

### A. Georgia's List Maintenance Provisions do Not Interfere With Plaintiffs' First Amendment Right Not to Vote.

Plaintiffs complain that Georgia's list maintenance program, as discussed above, interferes with voters' First Amendment right not to vote.[8] Doc. 1 ¶¶ 8, 41-42. Assuming arguendo that Georgia voters have such a right, O.C.G.A. § 21-2-234 does not require them to vote. Any registered voter is free not to vote in any election they so desire. Plaintiffs have not identified any requirement in O.C.G.A. § 21-2-234 that requires a registered voter to vote, and therefore there is

---

[8] Plaintiffs' complaint cites only the *dissenting* opinion in *Colon-Marrero v. County-Perez*, 703 F.3d 134, 145 (1st Cir. 2012), in support of their contention that there is a constitutional right not to vote.

no interference with any First Amendment right not to vote. *Hoffman v. Maryland*, 928 F.2d 646, 648 (4th Cir. 1991) (explaining that "even if there is a right not to vote of constitutional significance, it is not infringed upon by [a State's] purge statute.").

### B. Georgia's List Maintenance Program Does Not Unconstitutionally Interfere With Plaintiffs Asserted First Amendment Right Not to Vote *and* to Remain on Georgia's Voter Registration List.

To the extent Plaintiffs assert a right to not vote *and* to remain on Georgia's voter registration list, and assuming arguendo that such rights exist, state law does not unconstitutionally interfere with those rights. Again, assuming arguendo that voters have those rights, Georgia's list maintenance program does not require any voter to vote in order to remain on the statewide voter registration list. Rather, Georgia's list maintenance program requires only that voters either have contact with election officials once every four (4) election cycles or respond to a postage prepaid postcard inquiring about their residence. However, even if voters had a right not to vote *and* remain on the voter registration rolls, *and* state law burdened that right, the burden of responding to a confirmation postcard or having some contact with election officials once every three (3) years is reasonable and viewpoint neutral. Therefore, Georgia's important regulatory interests are sufficient to justify the restriction.

18

"[T]he government's power to restrict speech 'depends on the nature of the relevant forum' at issue."  *Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

> Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property  without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.

*Cornelius*, 473 U.S. at 799-800.  In *Cornelius* the Court explained that "in defining the forum [the Court has] focused on the access sought by the speaker."  473 U.S. at 801.  The Supreme Court has identified three categories of forums.

> First, in traditional public forums, such as public streets and parks, "any restriction based on the content of . . . speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 129 S. Ct. 1125, 172 L. Ed. 2d 853, 862 (2009). Second, governmental entities create designated public forums when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose"; speech restrictions in such a forum "are subject to the same strict scrutiny as restrictions in a traditional public forum." *Id.*, at 469-470, 129 S. Ct. 1125, 172 L. Ed. 2d 853, 858. Third, governmental entities establish limited public forums by opening property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.*, at 470, 129 S. Ct. 1125, 172 L. Ed. 2d 853, 858 As noted in text, "[i]n such a forum, a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Ibid.*

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679

n. 11 (2010).[9]  Here, the voter registration lists would be at best a non-public or

limited public forum.  The voter registration lists are not maintained for the

purpose of public expression.  Rather, they are maintained for use by election

officials in the administration of elections.  Therefore, the restrictions need only be

reasonable and viewpoint neutral.  *Cornelius*, 473 U.S. at 806; *Martinez*, 561 U.S.

at 679 n. 11.  Here, the restriction easily passes both a reasonable and viewpoint

neutral test.  All voters, regardless of viewpoint, must have contact with

registration officials once every three years *or* return a postage prepaid

confirmation post card.  Georgia is required, pursuant to both HAVA and the

NVRA to maintain accurate voter registration lists.  O.C.G.A. § 21-2-234 is a

reasonable legislative measure designed to accomplish those goals.

The Fourth Circuit, in rejecting a First Amendment challenge to Maryland's

purge statute, premised on a right not to vote, applied a different standard.  That

Court held that "the act of not voting when registered involves, at the very least,

both speech and non-speech." *Hoffman*, 928 F.2d at 648.[10]  The Court held that

---

[9] The Court has at times referred to a limited public forum as a non-public forum.
*See Cornelius*, 473 U.S. at 805.

[10] The Fourth Circuit never squarely addressed whether a constitutional right not to
vote exists. 928 F.2d at 648.

"[w]here both [speech and non-speech] elements are involved, a regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 928 F.2d at 648 (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). The Court then analogized the *O'Brien* test to a time, place, and manner restriction. 928 F.2d at 948 (citing *Clark v. Community for Creative Nonviolence*, 468 U.S. 288, 298 (1984)). Under this standard, regulations need only be "designed to serve a substantial governmental interest and [ ] not unreasonably limit alternative avenues of communication." 928 F.2d at 648-649 (quoting *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47 (1986)). Applying this standard, Georgia's statute again easily passes constitutional scrutiny. Like the Maryland statute in *Hoffman*, the Georgia statute:

> does not unreasonably limit alternate avenues of communication. . . .
> the statute [does not] block[] other means of communicating  . . .
> [and] nothing prevents the affected party from re-registering and then
> choosing not to vote to express [his message]. . . . Even considering
> that re-registration may be somewhat burdensome, it is a small price
> to pay for the prevention of vote fraud. *See Rosario v. Rockefeller*,
> 410 U.S. 752, 761, 36 L. Ed. 2d 1, 93 S. Ct. 1245 (1973).

21

*Hoffman*, 928 F.2d at 649.

Finally, even where election laws burden the right *to vote*,[11] the Supreme Court has held that the standard to be applied in First Amendment challenges is a balancing test. "[W]e weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations and quotation marks omitted). The Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Here, Georgia's regulatory scheme imposes only reasonable nondiscriminatory restrictions that do

---

[11] While Plaintiffs assert that a right "not to vote" exists under the First Amendment, they cite only a dissenting opinion for support of that proposition. Regardless of whether Plaintiffs are right or wrong, there can be no doubt that the right *to vote* is afforded greater constitutional protection.

not severely burden any voter's constitutional rights.  Moreover, Georgia's interest in maintaining accurate voter registration lists, as required under federal law, is compelling.

Under any of the above standards, Georgia's list maintenance program, requiring only that voters either make contact with election officials once every three years, i.e., after two federal election cycles, or respond to a confirmation postcard, is constitutional.

## CONCLUSION

For the foregoing reasons, Secretary Kemp prays that Plaintiffs' complaint be dismissed in its entirety.

Respectfully submitted,

SAMUEL S. OLENS      551540
Attorney General

DENNIS R. DUNN        234098
Deputy Attorney General

RUSSELL D. WILLARD   760280
Senior Assistant Attorney General
rwillard@law.ga.gov

/s/Julia B. Anderson
JULIA B. ANDERSON      017560
Senior Assistant Attorney General
janderson@law.ga.gov

/s/Cristina Correia
CRISTINA CORREIA        188620
Assistant Attorney General
ccorreia@law.ga.gov

/s/Josiah Heidt
JOSIAH HEIDT        104183
Assistant Attorney General
jheidt@law.ga.gov

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
(404) 656-7063
 Fax:  404-651-9325

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendant's Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## Certificate of Service

I hereby certify that on March 4, 2016, I electronically filed Defendant Brian Kemp's Brief in Support of Motion to Dismiss using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

> Emmet J. Bondurant, II
> Jason J. Carter
> Chad Lennon
> Bondurant Mixson & Elmore, LLP
> 1201 West Peachtree Street, N.W.
> 3900 One Atlantic Center
> Atlanta , GA  30309-3417

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  NONE

This 4th day of March, 2016.

/s/Cristina Correia
Cristina Correia            188620
Assistant Attorney General

26