COMMON CAUSE and GEORGIA STATE
CONFERENCE OF THE NAACP,

      Plaintiffs,

v.

BRIAN KEMP, individually and in his
official capacity as Secretary of State of
the State of Georgia,

      Defendant.

CIVIL ACTION NUMBER
1:16-CV-452-TCB

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS[1]

Congress enacted the National Voter Registration Act of 1993 "to establish procedures that will *increase* the number of eligible citizens who register to vote," and to "*enhance[] the participation of eligible citizens* as voters." 52 U.S.C. § 20501(b) (emphasis added). Congress was particularly concerned with preventing the removal of voters for failure to vote. *See* S. REP. NO. 103-6, at 17 (criticizing States that "penalize . . . non-voters by removing their names from the [voter rolls] merely because they have failed to cast a ballot in a recent election").

The NVRA includes three provisions aimed at preventing the removal of voters for failure to vote: First, it requires that States "conduct . . . general

---

[1] Plaintiffs respectfully request oral argument on this motion. *See* Instructions ¶ 18.

program[s] . . . to remove the names of *ineligible* voters." 52 U.S.C. § 20507(a)(4)

(emphasis added). It does not authorize the removal of *eligible* voters who fail to

vote. Second, it requires that voter-removal programs "be uniform,

nondiscriminatory, and in compliance with the Voting Rights Act of 1965."

§ 20507(b)(1). As an example of a compliant program, Congress provided a safe-

harbor, which uses reliable change-of-address data from the U.S. Postal Service,

and which uniformly applies to an entire jurisdiction. Third, to remove any

possible doubt, section 8(b)(2) of the NVRA expressly prohibits States from using

voter-removal programs that "***result in*** *the removal of the name of any person from*

*the official list of voters registered to vote in an election for Federal office by*

*reason of the person's failure to vote.*" § 20507(b)(2) (emphasis added).[2]

    In 1994, Georgia revised its Election Code in an effort to conform to the

NVRA. The Code contains comprehensive procedures to remove *ineligible voters*

by reason of death, felony, incompetency, moving to another jurisdiction, or

registration in another State. O.C.G.A. §§ 21-2-231 to -233. These procedures are

---

[2] Similar to the discriminatory-effects test in section 2 of the Voting Rights Act, if a State's voter-removal program **results in** the removal of a voter for failure to vote, the State's intent is irrelevant. *See* H.R. REP. NO. 103-9, at 15 (1993) ("It is the intent of this section to impose the uniform, nondiscriminatory and conforming with the Voting Rights Act standards on any activity *that is used to start, or has the effect of starting*, a purge of the voter rolls, without regard to how it is described or to whether it also may have some other purpose." (emphasis added)).

exhaustive; they encompass every reason that a voter may legitimately become ineligible to vote. None of these procedures is at issue here.

Georgia's section 21-2-234 ("Section 234") is different: it targets *eligible* voters for removal *solely on the basis of their failure to vote* (or have other "contact" with the voting system) for three years. Section 234 initiates a removal process against such voters, despite there being no reason to think these voters are ineligible. It requires Georgia's Secretary of State (*i.e.*, Defendant, Brian Kemp) to identify such voters and send them notices demanding that they confirm their addresses within 30 days. O.C.G.A. § 21-2-234(a)(2), (c). Even "if the [non-voter] has not changed address[]"—and, therefore, is still eligible to vote—the non-voter must still confirm her address within 30 days. *Id.* § 21-2-234(c)(1). If she fails to do so, she is placed on an "inactive" list and will be removed from the voter rolls if she fails to vote in the next two general elections. *Id.* §§ 21-2-234, -235.[3]

This Section 234 voter-removal procedure violates both the letter and the intent of the NVRA. The intent of the NVRA is to "increase" the number of eligible citizens who are registered to vote, and to "enhance" voting among eligible citizens. § 20501(b). Section 234 does the opposite. It *reduces* the number of citizens who are eligible to vote, and it *diminishes* voting among eligible citizens.

---

[3] *See infra* sections I.A–.B (describing the federal statutory framework); *infra* section I.C (describing Georgia's voter-removal program).

Section 234 also violates the letter of the NVRA: because it expressly targets for removal voters based on their failure to vote, it "result[s] in the removal of . . . [eligible voters] from the official list of voters . . . by reason of [their] failure to vote." *See* § 20507(b)(2).

In his motion to dismiss, Kemp makes several arguments in support of the lawfulness of Georgia's voter-removal program. None persuades. Kemp insists that Georgia's voter-removal program complies with the NVRA, as well as another federal statute, the Help America Vote Act. He's wrong about that for five reasons. *First*, the relevant portions of those statutes specify the method by which States may *finally remove* voters from the rolls; neither statute permits States to *target* voters for removal based on their failure to vote. Just the opposite: the NVRA explicitly forbids targeting voters for removal based on failure to vote, yet Georgia's voter-removal program does just that. *Second*, NVRA and HAVA permit only the removal of *ineligible* voters who have changed addresses, but Georgia's voter-removal program targets *eligible* voters who have *not* in fact changed addresses. *Third*, Kemp ignores the NVRA's safe-harbor voter-removal program, which exemplifies the type of program a State may use to remove voters. Georgia's program does not adhere to that example. *Fourth*, Georgia's voter-removal program is not lawful merely because it targets for removal voters who

make "no contact." It is undisputed that the program's definition of "no contact" includes failing to vote. Targeting voters for removal on this basis violates the NVRA. **Fifth**, the Department of Justice warned Georgia that its voter-removal program violates the NVRA. Kemp argues that the DOJ's objection to Georgia's program has been remedied. It has not. Georgia's program has not been materially amended. Nor has the DOJ changed its view. The DOJ's preclearance of Section 234 *under the Voting Rights Act* says nothing about its compliance *with the NVRA*—a point the DOJ has made explicitly.[4]

Kemp has removed hundreds of thousands of Georgia voters "by reason of [their] failure to vote," in violation of the NVRA and the First Amendment.[5] *See* § 20507(b)(2). His motion to dismiss should be denied.[6]

## I. BACKGROUND

## A. Section 8 of the National Voter Registration Act of 1993

Subsection 8(a)(4) of the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of *ineligible* voters . . . by reason of . . . a change in . . . residence . . . ." § 20507(a)(4) (emphasis

---

[4] *See infra* subsections II.A.1–5.

[5] *See infra* section II.B.

[6] Plaintiffs have properly sued Kemp in his individual capacity. *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1288 (11th Cir. 2015) ("[W]hen a state official violates federal law, he is stripped of his official or representative character and no longer immune from suit." (citing *Ex Parte Young*, 209 U.S. 123 (1908))).

added). But such programs must be conducted "in accordance with subsections [8](b), (c), and (d)." *Id.* Subsection 8(b) provides that voter-removal programs "(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965; and (2) *shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.*" § 20507(b) (emphasis added). Congress emphasized the importance of prohibiting the removal of voters for failing to vote:

> [W]hile voting is a right, people have an equal right not to vote, for whatever reason. However, many States continue to penalize such non-voters by removing their names from the voter registration rolls merely because they have failed to cast a ballot in a recent election[,] [even though] [s]uch citizens may not have moved or died or committed a felony. Their only "crime" was not to have voted in a recent election. . . . No other rights guaranteed to citizens are bound by the constant exercise of th[ose] right[s]. We do not lose our right to free speech because we do not speak out on every issue.

S. Rep. No. 103-6, at 17 (1993) (internal quotation marks omitted).

## B.  The NVRA's Section 8 Safe-Harbor Procedure

To provide guidance on conducting lawful voter-removal programs, the NVRA contains a safe harbor. The safe-harbor procedure, set forth in subsections 8(c) and (d), is straightforward. It contains three parts: *First*, subsection 8(c)(1) defines a set of voters against whom a State may initiate a voter-removal program: voters whose addresses have changed according to data supplied by the U.S. Postal

Service's change-of-address database. § 20507(c)(1). *Second*, subsection 8(d)(2) describes the address-confirmation notice States may send to voters *within that set*. § 20507(d)(2). *Third*, subsection 8(d)(1) establishes necessary conditions that must be met before a voter may be removed: to be removed, a voter who has changed address must then fail to respond to the address-confirmation notice and fail to vote in two consecutive general federal elections. § 20507(d)(1). This safe harbor is an exemplar procedure that makes a "reasonable effort" to remove voters who have changed addresses, without targeting voters for failure to vote. § 20507(a)(4), (b)(2). This is one lawful way a State can conduct a voter removal program.

**C.    Georgia's Voter-Removal Program**

In 1994, Georgia enacted its voter-removal program in an effort to comply with the NVRA. 1994 Ga. Laws 1443. Parts of that program are lawful, but one part—Section 234—targets voters for removal based on their failure to vote, which violates the NVRA. Under Georgia's program, *ineligible voters* are removed by reason of death, felony, incompetency, move to another jurisdiction, or registration in another State. §§ 21-2-231 to -233. These procedures, which are not at issue here, encompass every reason that a voter may legitimately become ineligible.

In addition to these procedures, Kemp maintains a list of "inactive" voters; voters who remain on the inactive list for two consecutive general federal elections

are removed. O.C.G.A. § 21-2-235. Voters are placed on the inactive list if they do not respond within 30 days to an address-confirmation notice. § 21-2-234(c).

Kemp sends address-confirmation notices for two reasons; only one is lawful. *First*, the lawful reason. O.C.G.A. § 21-2-233 authorizes Kemp to compare the list of registered voters "to the change of address information supplied by the United States Postal Service." If the USPS information shows that a voter has changed address, Kemp sends an address-confirmation notice. This procedure is lawful because it codifies the NVRA's safe harbor. *See* § 20507(c), (d).[7]

Section 234 provides the *second* reason for sending address-confirmation notices. It requires Kemp to send address confirmation notices to all voters who have not been removed by reason of death, felony, change of address, etc., *and who have not voted in the previous three calendar years*. § 234(a)(2). Section 234 thus targets for removal eligible voters because they have failed to vote, without any reason to presume they have become ineligible. This violates the NVRA.[8]

---

[7] *See also supra* section I.B.

[8] Plaintiffs refer to "failure to vote" as the trigger for Section 234. It is true that Section 234 targets voters who have made "no contact" with the election system. While the definition of "no contact" includes failure to vote, it also includes other criteria. *See* § 234(a)(1) (*e.g.*, signing a verified petition). But the fact that Section 234 targets voters based on additional criteria beyond failure to vote does not affect its illegality. Targeting voters for failure to vote violates the NVRA, whether or not nonvoters must also meet additional criteria. *See also infra* subsection II.A.4.

## II.  ARGUMENT AND CITATION OF AUTHORITY

## A.  Section 234 Does Not Comply with the NVRA.

Kemp argues that Section 234's voter-removal procedure complies with the NVRA and HAVA. Kemp is wrong for five reasons: (1) the NVRA and HAVA prohibit *targeting* voters for removal for failing to vote, which is precisely the effect of Section 234; (2) the NVRA and HAVA require States to implement a general program to remove *ineligible* voters who have changed addresses, but Section 234 by its terms targets *eligible* voters who have not changed addresses; (3) the USPS safe-harbor procedure—while not mandatory—exemplifies the characteristics that voter-removal programs must embody: uniformity and reliability, and Section 234's voter-removal procedure is neither; (4) Section 234's targeting of voters who make "no contact" is no different from targeting voters who fail to vote; and finally, (5) the DOJ agrees that Section 234 violates the NVRA, and nothing has changed on that point since the DOJ stated its position.

1. *Section 234 Violates the NVRA Because It **Targets** Voters Based on Their Failure to Vote.*

Kemp's primary argument is that the NVRA and HAVA give him permission to remove voters who have failed to (1) respond to an address-confirmation notice; and (2) vote in two consecutive elections. [Doc. 10-1 at 4, 5–8, 10–14]. This is only partially true. The NVRA and HAVA permit the removal of

voters who have failed those two tests, but only if those voters have changed

addresses—not simply by reason of their failure to vote. *See* § 20507(d)(1) ("A

State shall not remove [voters] *on the ground that the [voter] has changed*

*residence* unless the [voter]" fails the two tests above (emphasis added)). Section

234 *initiates* a removal process against eligible voters—*targets* them expressly—

based on their failure to vote. This violates the NVRA and HAVA.

Subsection 8(b)(2) of the NVRA prohibits voter-removal programs that

"*result in* the removal of the name of any person from the official list of voters . . .

by reason of the person's failure to vote." (Emphasis added). It would be absurd to

conclude that a voter-removal program like Georgia's, which, on its face, *expressly*

*targets* voters based on their failure to vote, does not "result in" the removal of

voters for failure to vote. *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476

F.3d 1261, 1268 (11th Cir. 2007) (statutes should be read to avoid absurdity).

Moreover, the NVRA's safe harbor—which permits the final removal of

voters only *after* they have failed to respond to an address-confirmation notice and

vote in two elections, § 20507(d)(1)(B)—establishes the prerequisites for the *final*

*removal* of voters. But these prerequisites, which form the basis of Kemp's

argument that Section 234 is lawful, say nothing about the *initiation* of a voter-

removal program. Section 8(b)(2), which prohibits voter-removal programs that

"result in" the removal of voters for failure to vote, tells us everything we need to

know: voter-removal programs cannot be initiated based on voters' failure to vote,

and voter-removal programs cannot target voters based on their failure to vote.

The NVRA's legislative history buttresses this conclusion. Congress

intended to prohibit States from initiating voter-removal programs based on voters'

failure to vote. The House Report states that the NVRA's strictures apply to every

step of voter-removal programs, including initiation and targeting of voters:

> It is the intent of this section [*i.e.*, section 8] to impose the uniform,
> nondiscriminatory and conforming with the Voting Rights Act
> standards on any activity *that is used to start, or has the effect of
> starting*, a purge of the voter rolls, without regard to how it is
> described or to whether it also may have some other purpose.

H.R. REP. NO. 103-9, at 15 (emphasis added). Both the text and legislative history

of the NVRA confirm that States may not *initiate* voter-removal programs simply

because voters have failed to vote, and may not *target* voters for removal simply

because they have failed to vote. This is exactly what Section 234 does.

Section 234 *targets* voters for removal based on their failure to vote, and it

*initiates* the removal program against voters based on their failure to vote. It

provides that Kemp "shall identify all electors" who, among other things, have not

voted in the previous three years, and a confirmation notice "shall be sent to each

such elector." Section 234's voter-removal process is *initiated* by a voter's failure

to vote; it *targets* for removal voters who fail to vote; and it "*result[s] in*" the removal of voters by reason of their failure to vote. This violates the NVRA.

Kemp's argument that HAVA altered the relevant portions of the NVRA is meritless. While HAVA may have mandated that States maintain a centralized voter-registration system, that mandate has nothing to do with the allegations in this case. Kemp's own quotation from HAVA shows that it did not amend or repeal the NVRA's requirements: HAVA requires States to make "a reasonable effort to remove [voters] who are *ineligible* to vote[,] . . . *consistent with the National Voter Registration Act*." [Doc. 10-1 at 3–4 (quoting 52 U.S.C. § 21083(a)(4)(A)) (emphasis added)]. HAVA made no change to the NVRA's prohibition on targeting voters for removal based on their failure to vote.[9]

2. *Section 234 Violates the NVRA Because It Targets **Eligible** Voters Based on Their Failure to Vote.*

Kemp also emphasizes that the NVRA and HAVA "requir[e] states . . . to remove all *ineligible* registered voters from the registration lists." [Doc. 10-1 at 3–5 (emphasis added)]. Again, this is true. § 21083(a)(4)(A) (States must "remove registrants who are ineligible to vote"). But again Kemp is mistaken when he says

---

[9] Nor does HAVA's requirement that States maintain "*accurate* voter registration records," affect Section 234's illegality under the NVRA. [*See* Doc. 10-1 at 3]. Kemp makes no effort to even argue that removing voters who have failed to vote for three years aids in maintaining accurate voter records. That is because failure to vote simply does not indicate that a voter has become ineligible.

Section 234 complies with this Congressional mandate. [*See* Doc. 10-1 at 10]. Section 234 targets voters who *remain eligible to vote*, making the NVRA's and HAVA's requirements—which relate to *ineligible voters*—inapplicable.

Section 234 by its express terms requires that address-confirmation notices be sent to registered voters who are eligible to vote, based on their failure to vote in the previous three years. These voters have not become ineligible to vote since they registered. We know that because ineligible voters are already removed from the rolls by operation of other Georgia statutes. Georgia has other procedures for the removal of all categories of registered voters who have become ineligible since they registered. Georgia removes voters by reason of: death, O.C.G.A. § 21-2-231(e); felony conviction, *id.* § 21-2-231(a); incompetency adjudication, *id.* § 21-2-231(b); or registration to vote in another jurisdiction, *id.* § 21-2-232. Section 234 also necessarily excludes all voters who have actually changed addresses according to the USPS's change-of-address database. *See* § 21-2-234 (Section 234 procedure applies only to voters "who were not identified as changing addresses under Code Section 21-2-233 [*i.e.*, the USPS system]"). Removal of every category of ineligible voters is already accomplished by other Georgia statutes.

So who is left? Which voters receive address-confirmation notices under Section 234? Only *eligible* voters: those who have not died, have not committed a

felony, have not been adjudicated incompetent, have not registered to vote in another jurisdiction, and have not changed addresses with the USPS.

Indeed, the very content of the Section 234 address-confirmation notice confirms that the section targets *eligible* voters who have in fact not changed addresses. The notice warns that if a voter "has not changed addresses," she must still respond to the notice within 30 days. § 234(c)(1), (2). What has such a voter—who, by the terms of the notice itself, "has not changed addresses"—done to have her voter registration threatened? She hasn't died, or changed address, or committed a felony, etc. This much we know because if she had died, or changed address, or committed a felony, etc., she would have already been removed by one of the various other Georgia statutes listed above. All she has done to be targeted under Section 234 is not vote for three years.

The Section 234 voter-removal procedure thus targets *eligible* voters about whom Kemp has no information whatsoever suggesting they have moved or otherwise become ineligible to vote. While the NVRA and HAVA certainly do require Kemp to remove *ineligible* voters from Georgia's voter rolls, they do not countenance the targeting of voters who remain eligible. They do not permit Kemp to initiate a voter-removal process against a voter who has not moved or otherwise become ineligible for no reason other than the fact that she has not voted.

3. *Section 234 Is Not a Suitable Alternative to the NVRA's Safe Harbor.*

Kemp also dismisses comparisons of Section 234 to the NVRA's safe-harbor voter-removal program, which applies only to voters who have changed their address with the USPS. He argues that the USPS safe-harbor program is not mandatory, and its existence in the NVRA does not prevent Georgia from implementing its own program. [Doc. 10-1 at 5–6.] Again, this argument is true as far as it goes, but it doesn't go very far. It is true that the USPS safe harbor is but one way the State can conduct a voter removal program. Nevertheless, its presence in the NVRA as an exemplar indicates that Congress intended for States to either use the USPS program or to implement a similar program: one that is based on reliable information and is uniform, nondiscriminatory, and in compliance with the Voting Rights Act. *See* § 20507(b)(1). Section 234 is none of those things.

The NVRA's safe-harbor is based on reliable information: the USPS change-of-address database. *See Welker v. Clarke*, 239 F.3d 596, 599 (3d Cir. 2001) (explaining that the safe-harbor program uses "*reliable* information from . . . the Postal Service's change of address records" (emphasis added)). Congress extolled the benefits of the USPS safe-harbor, described it as "uniform and objective," and "strongly encourage[d] all States to implement the [USPS] program" S. REP. NO. 103-6, at 19. The inclusion of this *reliable* safe-harbor as an

exemplar indicates that a State's voter-removal program—even if not the USPS program—must be based on a *reliable* method for identifying voters who have changed addresses. *See Welker*, 239 F.3d at 599 ("[T]he NVRA strictly limited removal of voters based on change of address and instead required that, for federal elections, states maintain accurate registration rolls by using *reliable* information from government agencies such as the Postal Service's change of address records." (emphasis added)).

Legislative history confirms that States must use a *reliable* method to target voters for removal based on changes of address. The Senate Report, S. REP. NO. 103-6, at 18, 20, described another *reliable* exemplar: the motor-voter program. That program gives States another *reliable* method to discover changes of address:

> One of the advantages of the bill is the fact that the motor-voter and agency-based programs are ongoing and that applications and renewals may serve as updating the addresses of registered voters. Thus, the need for large scale purges and list cleaning systems becomes superfluous. . . . While these provisions [requiring States to conduct voter-removal programs] have been included to insure that voting rolls will be free from "deadwood," there will be less need for these mailing[s] because the programs of voter registration include provisions for automatic updating of addresses. Thus, the process of updating registration rolls is an ongoing and continuous process.

The sections of the NVRA work in concert: driver's license applications serve as voter registrations, and because motor-vehicle agencies maintain updated driver information, States can maintain reliable, continuously updated address

databases. In fact, the NVRA expressly intends that States should rely on this information to maintain accurate voter rolls. *See* 52 U.S.C. § 20504(d).

The Department of Justice takes the same view: voter-removal programs for changes of address must be based on *reliable* data like the USPS's change-of-address database. *See* DOJ, "The National Voter Registration Act of 1993 (NVRA)" ¶ 34, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last updated Aug. 6, 2015) (explaining that "[a] State can only remove the name of a person from the voter registration list on grounds of change of residence upon . . . *reliable* . . . information indicating a change of address outside of the jurisdiction *from a source such as the NCOA* [the USPS National Change of Address] *program, or a general mailing to all voters*" (emphasis added)). As specifically relevant here, the DOJ also understands the NVRA to permit States to send address-confirmation notices only *after* they have obtained "*reliable* information indicating a possible change of residence." *Id.* ¶ 35 (emphasis added).

Section 234 is not reliable. Its use of the mere failure to vote for three years as a heuristic for changing address is overbroad: there are many explanations for not voting for three years other than a change of address. It is also underbroad: it fails to identify voters who, for example, change address but return to their previous jurisdiction to vote. And it is intentionally blind to the best data available:

it does not consult or rely on any of the databases that federal and state agencies and nonprofits maintain to track address information. Said simply: the failure to vote for three years (notably, less than a single Presidential election cycle) is not a reliable basis for Georgia to presume that a voter has changed addresses. Using only this inherently unreliable data to remove voters violates the NVRA.[10]

The NVRA's inclusion of the USPS safe-harbor program as an exemplar also indicates that State voter-removal programs must be "uniform." *See also* § 20507(b)(1) (requiring that voter-removal programs be "uniform"). To be uniform, a program "must be applied to the entire jurisdiction." H.R. REP. NO. 103-9, at 15. Section 234, which applies only to a portion of the jurisdiction—those voters who have not voted in three years—does not "appl[y] to the entire jurisdiction."

4. *Targeting Voters Who Make "No Contact" Still Violates the NVRA.*

Kemp says Section 234 does not violate the NVRA because it requires sending address-confirmation notices to voters who have made "no contact" for three years. [*See* Doc. 10-1 at 12 ("Georgia does *not* send confirmation [notices] based on a voter's failure to vote. Georgia sends out confirmation [notices] when there has been 'no contact' with voters for more than three (3) years.")]. This is a

---

[10] *See* EAC Report at 23 (attached to Plaintiffs' complaint) (only ***13.9 percent*** of voters who receive confirmation notices confirmed their registration).

red herring. To be sure, Section 234 targets voters who have made no contact. But its definition of "no contact" includes the failure to vote. A voter makes "no contact" if, in the previous three calendar years, she (1) "has not filed an updated voter registration card"; (2) "has not filed a change of name or address"; (3) "has not signed a [verified] petition"; (4) "has not confirmed [her] continuation at the same address"; and (5) "has not signed a voter's certificate." § 234(a)(1). But, importantly, signing a voter's certificate *is the functional equivalent of voting*: the only time a voter signs a certificate is when she goes to the polls to vote.[11]

Section 234 thus targets voters for failing to vote. The fact that it includes additional criteria—at best, targeting only *some*, but not *all* voters who fail to vote—does not render it lawful: it still targets voters for failure to vote. Would a voter-removal program be lawful if, for example, it removed voters who: (1) have not voted; (2) have not run for public office; and (3) have not applied for Medicaid benefits? Surely not: it would still targets voters for failure to vote. The inclusion of additional criteria, which targets *some* rather than *all* nonvoters, would not change its illegality. The same can be said about Section 234: its inclusion of additional criteria, which at best targets a subset of nonvoters for their failure to

---

[11] Every voter must sign a certificate on election day, at her polling place, after being admitted to vote, certifying that she is eligible. *See* O.C.G.A. § 21-2-402.

vote, does not change the fact that the section does remove voters based on their failure to vote. Doing so violates the NVRA.[12]

### 5. *The DOJ's 1994 Objection to Section 234 Applies Today.*

The Department of Justice agrees that Section 234 violates the NVRA. In 1994, the Assistant Attorney General in the DOJ's Civil Rights Division wrote to Georgia's Attorney General stating that Section 234 violates the NVRA. [Doc. 1-1]. Yet Kemp dismisses out of hand the DOJ's objection. He points to two facts that he says have remedied the DOJ's objection: (1) Section 234 was amended in 1997, after the DOJ objected; and (2) the DOJ precleared Section 234 after the 1997 amendment. [Doc. 10-1 at 15]. Neither fact undermines the DOJ's objection.

*First*, the version of Section 234 enacted in 1994—which the DOJ says violates the NVRA—is identical in all relevant respects to the version of Section 234 in effect today. Section 234 has not been amended in any way that could even arguably remedy the DOJ's objection. A redlined comparison of Section 234 as

---

[12] As a matter of fact, these so-called additional criteria are merely proxies for failing to vote. Discovery will show that the additional criteria have virtually no effect on Section 234's scope. It is highly unlikely that voters fail to vote for three years but are excluded from Section 234 because they sign a verified petition or voluntarily confirm their addresses. And of course, if they update their addresses, they would be covered by Georgia's other statutory schemes and would not be subject to Section 234 in any event. At a maximum, the effect of these additional criteria presents a factual issue that cannot form the basis of a Motion to Dismiss.

enacted, *see* 1994 Ga. Laws at 1481, and the version in effect today, appears

below. It is apparent that Section 234(a)(2) remains substantively unchanged.

> (a)(2) ~~Beginning in 1997, prior to February 1~~ <u>In the first six months</u> of each odd-numbered year, the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233. ~~The Secretary of State shall cause the~~ <u>The</u> confirmation notice described in this Code section ~~to~~ <u>shall</u> be sent to each such elector ~~prior to March 1 of~~ <u>during</u> each odd-numbered year. Such notices shall be sent by forwardable, first-class mail.

*Second*, the DOJ's 1997 preclearance of Section 234, which was "pursuant

to Section 5 of the Voting Rights Act" has nothing to do with the NVRA or the

First Amendment. [Doc. 10-2 at 2]. Preclearance under the Voting Rights Act

merely requires a "covered jurisdiction to demonstrate that its proposed change [to

its election procedures] 'neither has the purpose nor will have the effect of denying

or abridging the right to vote on account of race or color.'" *Perry v. Perez*, 132 S.

Ct. 934, 939–40 (2012) (quoting 42 U.S.C. § 1973c(a)). The DOJ's preclearance

meant one thing and one thing only: it believed Section 234 did not abridge the

right to vote on account of race or color. Preclearance was no indication that the

DOJ believed Section 234 complied with the NVRA or the First Amendment.

Indeed, the DOJ's preclearance letter expressly stated that preclearance has nothing

to do with the NVRA: "the granting of Section 5 preclearance *does not preclude*

*the Attorney General or private individuals from filing a civil action pursuant to*

*. . . the NVRA.*" [Doc. 10-2 at 3 (emphasis added)].

The DOJ's 1994 view that Section 234 violates the NVRA carries as much force today as it did then: neither the NVRA nor Section 234 has changed, and the DOJ has not indicated (by preclearance or otherwise) that it now believes Section 234 complies with the NVRA or the First Amendment. For good reason.

**B.      Section 234 Also Violates the First Amendment.**

Voters have a First Amendment right to be registered without voting. *See Hoffman v. Maryland*, 928 F.2d 646, 648 (4th Cir. 1991); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 145 (1st Cir. 2012) (Torruella, J., dissenting). This right involves both speech and nonspeech conduct. *Hoffman*, 928 F.2d at 648. Regulations governing both speech and non-speech conduct must satisfy the four-part test set forth in *United States v. O'Brien*, 391 U.S. 367 (1968). A regulation is permissible under *O'Brien* if: (1) it "is within the constitutional power of the government"; (2) "it furthers an important or substantial government interest"; (3) "the government interest is unrelated to the suppression of free expression"; and (4) it "is no greater than is essential to the furtherance of that interest." *Curves, LLC v. Spalding Cty., Ga.*, 685 F.3d 1284, 1289 (11th Cir. 2012).

Section 234 fails the second and fourth elements.[13] As to the second element, Kemp has not demonstrated that Section 234 furthers a substantial interest. He identifies the alleged interest as "maintain[ing] accurate voter registration lists." [Doc. 10-1 at 20]. But he does not demonstrate that Section 234 advances that interest. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"). Kemp provides no evidence (or even argument) that removing voters who make "no contact" actually maintains accurate voter registration lists. There is nothing necessarily inaccurate about a voter registration list containing lawfully registered, eligible voters who have made no contact in three years.[14]

Perhaps the (unstated) harm allegedly remedied by Section 234 is the continued registration of voters who have changed addresses. But again Kemp provides no evidence that Section 234 removes voters who have changed addresses. Nor could he. *Section 233*—which removes voters based on USPS information—already remedies the same harm in a more reliable and tailored way. Section 234 thus applies only to voters who have *not* changed addresses. *See supra*

---

[13] Section 234 is no less objectionable if analyzed under a forums framework. [*See* Doc. 10-1 at 19–20.] For the same reasons it fails the *O'Brien* test, it is also an unreasonable restriction on speech.

[14] *See supra* note 9 (only **13.9%** of address-confirmation notices are returned).

1418995.1

section II.A.2. Kemp has not shown that Section 234 advances a governmental interest, and certainly not as a matter of law sufficient to win a motion to dismiss.

As to the fourth element, even pretermitting that Section 234 advances the interest of removing voters who have changed addresses—which it does not—its restriction is far "greater than is essential to the furtherance of [the State's] interest." *O'Brien*, 391 U.S. at 377. A regulation fails this element of the *O'Brien* test if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 662. Section 234 is substantially overbroad in view of this (alleged) governmental interest: there are countless explanations for why a voter may wish to be registered without voting; having changed addresses is but one of them. (For example: dissatisfaction with the political system in general or the available candidates in particular; disaffection, apathy, disinterest; disability or physical impediment to voting; unavailability on election day; etc.) Furthermore, Section 233 *already identifies voters who have changed addresses*. Section 233 is an extant, readily available statutory alternative. Section 233 does not burden expression, and it furthers the exact same (alleged) interest: removing voters who have changed addresses. The existence of Section 233, which remedies the same alleged harm in a less

restrictive and more accurate way, means that Section 234 burdens substantially more speech than necessary.[15] Section 234 thus violates the First Amendment.

## III.   CONCLUSION

Section 234 removes eligible voters because they have failed to vote. This violates the NVRA and the First Amendment. Because Plaintiffs' complaint states claims upon which relief can be granted, Kemp's motion to dismiss should be denied. ***Plaintiffs respectfully request oral argument on this motion.***

Respectfully submitted this 21st day of March, 2016.

BONDURANT MIXSON & ELMORE LLP
3900 One Atlantic Center
1201 West Peachtree Street NW
Atlanta, Georgia  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
*Counsel for Plaintiffs*

*/s/ Emmet J. Bondurant*
Emmet J. Bondurant
Georgia Bar No. 066900
Jason J. Carter
Georgia Bar No. 141669
Chad K. Lennon
Georgia Bar No. 408953

---

[15] As discussed above, *see supra* subsection II.A.3, Section 234 is also underbroad: it fails to identify voters who, for example, change addresses but return to their jurisdiction to vote. Section 234 also purposefully ignores the most reliable data available: it does not consult any of the databases that track address information.

1418995.1

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been prepared with one of the font and point selections approved by the court in LR 5.1(C), NDGa, specifically, Times New Roman, 14 point.

This 21st day of March, 2016.

/s/ Chad K. Lennon
Chad K. Lennon

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF filing system, which will automatically send e-mail notification of such filing to all counsel of record.

This 21st day of March, 2016.

/s/ Chad K. Lennon
Chad K. Lennon