# EXHIBIT A

No. 16-3746

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*,

Plaintiffs-Appellants

v.

JON HUSTED,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFFS-APPELLANTS AND URGING REVERSAL
_____

BENJAMIN C. GLASSMAN
 Acting United States Attorney for the
  Southern District of Ohio

CAROLE S. RENDON
 United States Attorney for the
  Northern District of Ohio

VANITA GUPTA
 Principal Deputy Assistant
  Attorney General

TOVAH R. CALDERON
VIKRAM SWARUUP
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section – RFK 3730
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 616-5633

# TABLE OF CONTENTS

**PAGE**

IDENTITY AND INTEREST OF THE *AMICUS CURIAE*
AND THE SOURCE OF ITS AUTHORITY TO FILE THIS BRIEF......................1

ISSUE PRESENTED .................................................................................3

STATEMENT OF THE CASE..................................................................4

    *A.*    *Factual Background* .............................................................4

    *B.*    *Procedural History*..............................................................6

SUMMARY OF ARGUMENT ................................................................8

ARGUMENT

    THE NVRA AND HAVA PROHIBIT STATES FROM USING
    FAILURE TO VOTE ALONE TO TRIGGER THE SECTION 8(d)
    CONFIRMATION PROCESS FOR REMOVING VOTERS FROM
    REGISTRATION ROLLS BASED ON A CHANGE
    OF RESIDENCE .....................................................................11

    *A.*    *Statutory Background And Agency Guidance* ..........................11

    *B.*    *A Voter's Mere Failure To Vote Is Insufficient To Trigger
        The Section 8(d) Confirmation Process*...................................16

CONCLUSION .....................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**                                                                 **PAGE**

*Association of Cmty. Orgs. for Reform Now* v. *Miller*,
    129 F.3d 833 (6th Cir. 1997) ...........................................................12

*Bell* v. *Marinko*, 367 F.3d 588 (6th Cir. 2004) ......................................11

*Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011)...............16

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ..............................3

*United States* v. *Jicarilla Apache Nation*,
    564 U.S. 162 (2011)............................................................... 23-24

*United States Student Ass'n Found.* v. *Land*, 546 F.3d 373
    (6th Cir. 2008) .....................................................................16

*Welker* v. *Clarke*, 239 F.3d 596 (3d Cir. 2001) .................................... 27-29

**STATUTES:**

Help America Vote Act of 2002,
    52 U.S.C. 20901 *et seq.* ......................................................1
    52 U.S.C. 21083(a)(2)(A)(i)....................................................14
    52 U.S.C. 21083(a)(4)(A)................................................... 15, 23
    52 U.S.C. 21083(b)(4)(a)(iv)..................................................14
    52 U.S.C. 21111.................................................................1
    52 U.S.C. 21145(a) ............................................................22
    52 U.S.C. 21145(a)(4) ................................................... 9, 12, 14

National Voter Registration Act of 1993,
    52 U.S.C. 20501 *et seq.* ......................................................1
    52 U.S.C. 20501(b)...........................................................11
    52 U.S.C. 20507................................................................4
    52 U.S.C. 20507(a)(3) ..................................................... 11-12
    52 U.S.C. 20507(a)(4) ......................................................9, 12
    52 U.S.C. 20507(a)(4)(B) ................................................. 16-19
    52 U.S.C. 20507(b)(1) .......................................................12

**STATUTES (continued):**

52 U.S.C. 20507(b)(2) ....................................................................... 12, 15, 21
52 U.S.C. 20507(c) ...................................................................................9
52 U.S.C. 20507(c)(1)(A) ..................................................................... 13, 19
52 U.S.C. 20507(c)(1)(B)(i) .......................................................................13
52 U.S.C. 20507(c)(1)(B)(ii) ................................................................. 13, 17
52 U.S.C. 20507(d)(1) ...............................................................................13
52 U.S.C. 20507(d)(1)(A).........................................................................17
52 U.S.C. 20507(d)(2) ...............................................................................13
52 U.S.C. 20510.........................................................................................1

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 9, 103d Cong., 1st Sess. (1993) ...................................10, 28
H.R. Rep. No. 730, 107th Cong., 2d Sess. (2002) (Conf. Rep.).............................22
S. Rep. No. 6, 103d Cong., 1st Sess. (1993)................................10, 19, 28

**RULES:**

Fed. R. App. P. 29(a) ...............................................................................1

**MISCELLANEOUS:**

*Confirm Definition*, Black's Law Dictionary (10th ed. 2014)..................................18

Department of Justice, *The National Voter Registration Act of 1993 (NVRA)*,
    https://www.justice.gov/crt/national-voter-registration-act-1993-nvra
    (last visited July 5, 2016).......................................................................*passim*

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

No. 16-3746

OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*,

Plaintiffs-Appellants

v.

JON HUSTED,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFFS-APPELLANTS AND URGING REVERSAL
_____

**IDENTITY AND INTEREST OF THE *AMICUS CURIAE*
AND THE SOURCE OF ITS AUTHORITY TO FILE THIS BRIEF**

The United States files this brief under Federal Rule of Appellate Procedure

29(a).

This case presents important questions regarding interpretation of the

National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq.*, and the

Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq.*, both of which

the Attorney General has authority to enforce.  See 52 U.S.C. 20510 (NVRA),

21111 (HAVA).

The Department of Justice issued guidance under the NVRA in 2010.  That guidance addresses the precise issue presented in this case and articulates the Department's position that States must have reliable evidence indicating a voter's change of address before they initiate the NVRA-prescribed process to cancel the voter's registration based on a change of residence.  See Department of Justice, *The National Voter Registration Act of 1993 (NVRA)*, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited July 18, 2016) (NVRA Guidance).

The Department recently filed a Statement of Interest articulating this interpretation in a Georgia case that raises the same issue confronted here.  See *Common Cause* v. *Kemp*, No. 16-452 (N.D. Ga. May 4, 2016) (ECF No. 19) (Attachment 1).  Appellants in this case discuss the Statement of Interest in their opening brief, and the parties addressed it in their briefing below.  See Appellants' Opening Brief 33-34; (Plaintiffs' Motion for Summary Judgment, RE 39, PageID# 1400-1401); (Defendant's Second Merits Brief, RE 49, PageID# 22337-22339); (Defendant's Third Merits Brief, RE 56, PageID# 22727-22730).

The Department's longstanding interpretation of the NVRA is set forth in a number of enforcement actions and other public documents, including:  (1) a 1994 letter to Georgia objecting, based on NVRA noncompliance, to a statute that was submitted for preclearance under Section 5 of the Voting Rights Act (Attachment

2)[1]; (2) 1994 litigation against Pennsylvania, see Mot. for Summary Judgment at 14-18, *United States* v. *Pennsylvania*, Nos. 95-382, 94-7671 (E.D. Pa. Aug. 7, 1996) (Attachment 3); (3) 1995 litigation against California, see Mot. for Further Relief at 5-9, *Wilson* v. *United States*, Nos. 95-20042, 94-20860 (N.D. Cal. Oct. 23, 1997) (Attachment 4); (4) 1997 notice-of-intent-to-sue letters to Alaska and South Dakota (Attachments 5 & 6); and (5) a 2007 court-approved agreement with Cibola County, New Mexico, see Amended Joint Stipulation ¶ 13, *United States* v. *Cibola Cnty.*, No. 93-1134 (D. N.M. Jan. 31, 2007; approved by court Mar. 19, 2007) (Attachment 7).

The United States therefore has a strong interest in the resolution of this appeal.

## ISSUE PRESENTED

The NVRA and HAVA require removal of a voter from the voter registration list when the voter has become ineligible to vote due to a change of residence, but only after the State has confirmed the move. Both statutes also expressly forbid the removal of voters based on failure to vote. The United States will address only the following issue:

---

[1] Following the Supreme Court's decision in *Reno* v. *Bossier Parish School Board*, 520 U.S. 471 (1997), which held that a violation of Section 2 of the Voting Rights Act could not independently support an objection under Section 5, the Department no longer denies preclearance based on failure to comply with statutory provisions other than Section 5, including the NVRA.

Whether Ohio's Supplemental Process for removing ineligible voters based on a change of residence violates the NVRA's and HAVA's prohibition on removing voters for failure to vote by relying solely on a voter's inactivity, rather than on reliable evidence of a move, to trigger the statutory process for removing such voters from the rolls.

## STATEMENT OF THE CASE

*A.    Factual Background*

This case is about the process States use to remove ineligible voters, such as voters who have moved outside the jurisdiction, from their rolls.  The NVRA requires States to undertake voter list maintenance but also creates limitations on these processes to ensure that they do not arbitrarily or erroneously remove voters. See 52 U.S.C. 20507.

Ohio uses two separate programs to remove voters who may have changed residences.  (Order, RE 66, PageID# 23007).  First, Ohio uses the United States Postal Service's change-of-address database to identify voters who have moved and to trigger the process that ultimately removes voters whom the State confirms are ineligible.  (Order, RE 66, PageID# 23007-23008).  Ohio's use of that program is not at issue here.  Second, Ohio uses a "Supplemental Process," which is at issue.  Under the Supplemental Process, boards of elections compile lists of

individuals who have not engaged in any voter activity for two years.[2]  Ohio then assumes these voters have moved and begins the process that can lead to their removal from the voter rolls.  (Order, RE 66, PageID# 23008).

The voters whom Ohio identifies through either the Postal Service program or the Supplemental Process are sent a confirmation notice.  (Order, RE 66, PageID# 23007-23008).  The confirmation notice requires the voter to either confirm her address or provide a new address.  (Order, RE 66, PageID# 23008).  If an individual confirms her address or provides a new address, her registration remains active and, if necessary, the appropriate board of elections updates the registration record.  (Order, RE 66, PageID# 23009).  If, however, the voter does not return the confirmation notice, then the individual is marked as "inactive" in the registration database.  (Order, RE 66, PageID# 23009).  Inactive voters have all the rights of active voters but are not counted for various election administration procedures (such as the number of ballots printed or the allocation of polling places).  (Amended Complaint, RE 37, PageID# 230).

------

[2]  The Supplemental Process does not precisely define what constitutes voter activity.  Ohio contends that in addition to voting or filing a voter registration form, filing a change of address through a state agency may also be considered "voter activity."  (Defendant's Initial Merits Brief, RE 38, PageID# 257).  Individual boards of elections have further discretion to determine what other activities could also meet the definition of voter activity.  (Defendant's Initial Merits Brief, RE 38, PageID# 257).

If an inactive voter fails to engage in any voter activity for four years (including two federal general elections and any other elections that occur during that period), then the individual's voter registration is canceled. (Order, RE 66, PageID# 23009). Individuals whose registrations are canceled are ineligible to vote until they reregister. (Plaintiffs' Motion for Summary Judgment, RE 39, PageID# 1386).

B.    *Procedural History*

On April 6, 2016, plaintiffs filed this case in the Southern District of Ohio, alleging that the Supplemental Process violated the NVRA and HAVA by basing the confirmation notice on the voter's failure to engage in any voting activity. (See Complaint, RE 1, PageID# 1-17; Amended Complaint, RE 37, PageID# 236-237). Plaintiffs further alleged that the specific confirmation notice that Ohio used did not comply with the NVRA's requirements. (Amended Complaint, RE 37, PageID# 237-238). Plaintiffs alleged that the removal of voters resulting from the Supplemental Process is particularly problematic in the lead-up to the November 2016 federal election because voters who voted in the high-turnout 2008 federal election (but who did not vote in any subsequent elections) were removed from voter rolls in 2015. (Amended Complaint, RE 37, PageID# 235).[3]

---

[3]    An individual who voted in 2008 but did not vote in 2010 would have been sent the confirmation notice in 2011. If she did not receive or respond to that
(continued . . .)

On June 29, 2016, the district court denied plaintiffs' motion for summary judgment and request for injunctive relief.  The court concluded that the NVRA permits States to rely on non-voting to trigger the confirmation process that ultimately results in removing voters from the rolls for changes of residence. (Order, RE 66, PageID# 23015-23016).  Rejecting plaintiffs' argument that the NVRA requires some reliable evidence that a person has moved before triggering the removal process, the court reasoned that the NVRA "does not specifically state who should be sent a confirmation notice or when that confirmation notice should be sent," and that this decision was thus "left to the [S]tates."  (Order, RE 66, PageID# 23015-23016).

The court also held that the "Ohio Supplemental Process is consistent with both the NVRA and HAVA as voters are never removed from the voter registration rolls *solely* for failure to vote."  (Order, RE 66, PageID# 23016).  Rather, according to the court, a voter is removed only if she "*both* (1) fails to respond to the confirmation process, *and* (2) subsequently fails to vote in the following two general federal elections."  (Order, RE 66, PageID# 23016).  In interpreting the NVRA and HAVA, the court disregarded the Department's interpretation of those statutes, concluding that it "need not consider those interpretations where the

---

( . . . continued)

notice or vote during the next four-year period, including two federal election cycles—2012 and 2014—she would have been removed from the rolls in 2015.

NVRA is clear on its face." (Order, RE 66, PageID# 23012). The court rejected plaintiffs' other arguments and entered judgment in favor of Ohio. (Order, RE 66, PageID# 23018-23026); (Judgment, RE 67, PageID# 23027).

## SUMMARY OF ARGUMENT

Section 8 of the NVRA—when construed in light of its text, structure, purpose, and history—requires that before a State can start the confirmation process that leads to removal of voters from its voter registration rolls based on a change of residence, it must have reliable evidence that the voter has moved. Declining to vote does not provide such evidence. To the contrary, triggering the confirmation process based solely on voter inactivity, as Ohio does through its Supplemental Process, inevitably results in the removal of voters based on non-voting, which violates the NVRA and HAVA.

Section 8 permits the removal of voters from the rolls only at the voters' request or if they have become ineligible to vote in the jurisdiction where they are registered. For ineligibility based on a change of residence, Section 8(d) establishes a process that States must follow to confirm ineligibility. Because it is a *confirmation* process, Section 8(d) requires some *initial* evidence that a voter has moved. Without some initial evidence of a change in residence, there would be nothing to confirm.

The question then is what type of initial evidence may a State use to trigger the confirmation process. Congress provided one example: information from the Postal Service's change-of-address registry. 52 U.S.C. 20507(c). Although use of the change-of-address registry is not mandatory, the fact that it is the sole example in the statute suggests that States must have comparably reliable evidence before triggering the confirmation process. The Department's NVRA guidance suggests another example of reliable evidence that a voter has moved: mailings that have been returned as undeliverable. Other evidence may also suffice. But initiating the removal process without *some* reliable evidence to suggest that voters have moved cannot qualify as the "reasonable effort" the statute requires to identify voters who are no longer eligible, 52 U.S.C. 20507(a)(4). It is unreasonable to infer that a voter may have changed residences solely because she has not voted in the last two years.

Regardless of precisely what evidence a State needs to trigger the confirmation process, permitting States to use non-voting, without more, to trigger the Section 8(d) process would violate both the NVRA and HAVA. Section 8(b) and HAVA explicitly prohibit States from removing voters based on a change of residence because of their failure to vote. Section 8(b) also expressly clarifies that this prohibition does not include the Section 8(d) confirmation process. The Section 8(b) bar on the use of non-voting must therefore apply to some part of the

removal process other than Section 8(d) confirmation. In light of this statutory scheme, the best reading of Section 8 is that States cannot use non-voting, without more, as evidence of a change in residence sufficient to *trigger* the confirmation process. Thus, although the NVRA permits a State to rely on non-voting at the back end of the process once Section 8(d) confirmation has begun, it does not permit a State to rely on non-voting alone on the front end to identify voters who may have changed residence.

This interpretation is supported by the only other judicial decision to consider the question, *Wilson v. United States*, Nos. 95-20042, 94-20860 (N.D. Cal. Nov. 2, 1995) (Attachment 8), and by the relevant legislative history, see, *e.g.*, H.R. Rep. No. 9, 103d Cong., 1st Sess. 15-16 (1993) (House Report) (Congress was concerned that voter list removal programs "can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing."); S. Rep. No. 6, 103d Cong., 1st Sess. 19 (1993) (Senate Report) (Congress was concerned that "many States continue[d] to penalize such non-voters by removing their names from the voter registration rolls.").

Ohio's Supplemental Process impermissibly allows the State to remove voters based on their inactivity. Ohio assumes that voters who have not cast a ballot in two years have moved and then sends these voters a confirmation notice to verify a change of address. If the voter does not receive or does not respond to

the notice, and then does not vote in the following two federal elections, she is removed from the voter rolls.  This practice violates the NVRA and HAVA because it triggers the removal process without reliable evidence that a voter has moved, and because it inevitably leads to the removal of voters based on failure to vote.

## ARGUMENT

## THE NVRA AND HAVA PROHIBIT STATES FROM USING FAILURE TO VOTE ALONE TO TRIGGER THE SECTION 8(d) CONFIRMATION PROCESS FOR REMOVING VOTERS FROM REGISTRATION ROLLS BASED ON A CHANGE OF RESIDENCE

A.    *Statutory Background And Agency Guidance*

1.  The NVRA governs how States conduct voter registration and voter list maintenance for federal elections.  Congress enacted the NVRA in part to "increase the number of eligible citizens who register to vote," while protecting "the integrity of the electoral process" by ensuring that "accurate and current voter registration rolls are maintained."  52 U.S.C. 20501(b).

The NVRA "set[s] limits on the removal of registrants from the voter registration rolls," displacing state voter list maintenance regimes that eliminate eligible voters from the rolls without their consent.  See *Bell* v. *Marinko*, 367 F.3d 588, 591 (6th Cir. 2004).  Section 8(a)(3) of the NVRA permits States to remove a voter only when a voter requests removal, when a voter becomes ineligible due to criminal conviction or mental incapacity, or as provided in Section 8(a)(4).  52

U.S.C. 20507(a)(3).  Section 8(a)(4) requires States to "conduct a general program that makes a reasonable effort to remove" voters who have become ineligible due to death or a change of residence.  52 U.S.C. 20507(a)(4).  States' voter removal processes must follow the strictures of Section 8(b).  And when removing voters based on a change of residence, States must further follow the confirmation procedures of Sections 8(c) and 8(d).  52 U.S.C. 20507(a)(4); see *Association of Cmty. Orgs. for Reform Now* v. *Miller*, 129 F.3d 833, 835 (6th Cir. 1997).

Under Section 8(b), voter list maintenance procedures must be "uniform" and "nondiscriminatory."  52 U.S.C. 20507(b)(1).  Moreover, States may not remove voters for not voting:

> Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office  * * *  shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote  * * *  .

52 U.S.C. 20507(b)(2).  Section 8(b) also contains a rule of construction, which clarifies that the general prohibition on removing voters for failure to vote should not "be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters."  *Ibid.*

Section 8(c) provides an example of a general program that makes a reasonable effort to remove voters who have become ineligible because they have

changed residences.  Under Section 8(c), a State may use "change-of-address information supplied by the Postal Service through its licensees  *  *  *  to identify registrants whose addresses may have changed."  52 U.S.C. 20507(c)(1)(A).  If the voter has moved within the same registrar's jurisdiction, the State must update the voter's address.  52 U.S.C. 20507(c)(1)(B)(i).  If the voter has moved to a different jurisdiction, the State must use "the notice procedure described in subsection (d)(2) to confirm the change of address."  52 U.S.C. 20507(c)(1)(B)(ii).

Section 8(d), in turn, creates a confirmation process that States must follow before they can remove from the rolls voters who may have moved to a different jurisdiction.  Specifically, that section provides that a State shall not remove a voter from the rolls based on a change of residence *unless* (i) the voter "confirms in writing that the registrant has changed residence," or (ii) the voter "has failed to respond to a notice described" in Section 8(d)(2) and "has not voted or appeared to vote" by the second federal general election following the notice.  52 U.S.C. 20507(d)(1).  Section 8(d)(2) then describes the form and contents of the notice that States must use.  52 U.S.C. 20507(d)(2).

2.  HAVA, enacted in 2002, imposes minimum standards for States to follow in federal elections but does not alter the NVRA's basic requirements.[4]  Indeed, HAVA emphasizes that States may not undertake list maintenance activities— including removing voters for failure to vote—that the NVRA forbids.  See 52 U.S.C. 21145(a)(4).  For example, HAVA provides that if an individual is to be removed from a State's voter registration list, the voter "shall be removed in accordance with" the NVRA.  52 U.S.C. 21083(a)(2)(A)(i).

In line with the general statement that nothing in HAVA "may be construed to authorize or require conduct prohibited under" the NVRA, 52 U.S.C. 21145(a)(4), HAVA added the following rule of construction to Section 8(b)(2) of the NVRA, which prohibits removing voters from the rolls for failure to vote:

> *  *  *  except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual-- (A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

---

[4]  HAVA includes one exception to this general rule, not applicable here, related to identification requirements for certain voters.  52 U.S.C. 21083(b)(4)(a)(iv).

52 U.S.C. 20507(b)(2).  HAVA's amendment therefore clarified that non-voting may be used in the removal process *after* the Section 8(d) confirmation notice has been sent.  The amendment did not change the NVRA's basic operation.

This rule of construction is reinforced by another HAVA provision, which references the Section 8(d) confirmation process and specifies that "consistent with the [NVRA], registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that *no registrant may be removed solely by reason of a failure to vote*."  52 U.S.C. 21083(a)(4)(A) (emphasis added).

3.  In 2010, the Department issued guidance regarding the NVRA and HAVA that addresses how States must administer voter list maintenance.  That guidance explains that the NVRA's process of removing voters who have moved must be triggered by reliable evidence indicating a change of address outside of the jurisdiction, such as the Postal Service program described in Section 8(c).  See NVRA Guidance ¶ 34 ("A State can only remove the name of a person from the voter registration list on grounds of change of residence upon  *  *  *  reliable second-hand information indicating a change of address outside of the jurisdiction from a source such as the [Postal Service] program.").  The guidance also gives an example of an alternative to the Postal Service program that would constitute sufficient evidence to trigger the Section 8(d) confirmation process.  Specifically,

the guidance provides that States can undertake "a uniform mailing of a voter registration card, sample ballot, or other election mailing to all voters in a jurisdiction" and "use information obtained from returned non-deliverable mail as the basis" to trigger the Section 8(d) confirmation process.  NVRA Guidance ¶ 33.

B.    *A Voter's Mere Failure To Vote Is Insufficient To Trigger The Section 8(d) Confirmation Process*

A close examination of Section 8's text, structure, purpose, and history demonstrates that States must have reliable evidence before launching the process for removing voters from their rolls based on a change of residence, and that States may not trigger the process based solely on a voter's failure to vote.  See *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011) (statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis" (citation omitted)).

1.  The NVRA permits States to remove voters only for a reason enumerated in Sections 8(a)(3) or (4):  "at the registrant's request, due to criminal conviction or mental incapacity as provided by state law, the death of the registrant, or due to a change of the registrant's residence."  *United States Student Ass'n Found.* v. *Land*, 546 F.3d 373, 376 (6th Cir. 2008).  This case concerns the last category:  "a change in the residence of the registrant."  52 U.S.C. 20507(a)(4)(B).  Ohio's Supplemental Process, which relies on non-voting for a two-year period, complies

with the NVRA only if it is used as part of a "general program that makes a reasonable effort" to determine whether a voter has become ineligible to vote based on a change of residence and only if it does not violate any other provision of the NVRA.  See *ibid*.

a.  The language and structure of the NVRA support the Department's conclusion that States must have some reliable evidence indicating that a voter has changed residences before they undertake the removal process.  See NVRA Guidance ¶ 34.

First, the statutory language makes clear that States must use the Section 8(d) process for changes of address to "*confirm*" that the voter has moved out of the jurisdiction and thus is no longer eligible to vote there.  52 U.S.C. 20507(c)(1)(B)(ii) and (d)(1)(A) (emphasis added).  Section 8(c) explains that States using Postal Service information "use[] the notice procedure described in subsection (d)(2) to *confirm* the change of address" of voters flagged as moving for postal purposes.  52 U.S.C. 20507(c)(1)(B)(ii) (emphasis added).  Section 8(d)(1)—which describes the predicate steps to removing from the rolls a voter who has moved—explicitly provides that the voter may not be removed unless she "confirms" the change of address herself or fails to respond to the State's notice in a timely fashion.  52 U.S.C. 20507(d)(1)(A).  The use of the term "confirm" signifies that Congress envisioned that States would have some evidence that a

voter had moved before they used the Section 8(d) process to verify or corroborate that information.  See Black's Law Dictionary (10th ed. 2014) (definition of "confirm" is "verify" or "corroborate").[5]

Second, Congress signaled in Section 8(c) that evidence of a change of residence must be sufficiently *reliable* to trigger the Section 8(d) confirmation process.  As previously noted, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of  *  *  *  a change in the residence of the registrant."  52 U.S.C. 20507(a)(4)(B).  Section 8(c), in turn, provides the only example in the NVRA of a program that will satisfy this "reasonable effort" requirement:  the use of "change-of-address information

---

[5]  The district court effectively held that a State needs no evidence to trigger the Section 8(d) confirmation process.  (Order, RE 66, PageID# 23016-23017).  The remainder of the statute reveals that this conclusion is wrong.  Section 8(a)(4) requires that States make a "reasonable effort" to remove ineligible voters who have died or moved.  But the statute requires Section 8(d) confirmation only for changes in residence, not death.  Because the same "reasonable effort" standard applies to both, a State would need comparably reliable evidence to remove a voter for death as it would to trigger the Section 8(d) process.  Taking the district court's conclusion to its logical end, if no evidence is necessary (or failure to vote is itself sufficient) to trigger Section 8(d) confirmation for change of residence, then no evidence is necessary (or failure to vote is itself sufficient) to remove a voter for presumed death.  That result neither satisfies the obligation to conduct a reasonable effort under Section 8(a)(4) nor complies with Section 8(b)(2), which prohibits removal of voters for failure to vote, as discussed later.

supplied by the Postal Service." 52 U.S.C. 20507(c)(1)(A).[6] Although use of the Postal Service information is not mandatory, Congress's decision to provide it as the only example of an acceptable program strongly suggests that States must have comparably reliable evidence to trigger the process for removing voters based on a change of residence. See Senate Report 19 ("[J]urisdictions which choose not to use the [Postal Service] program should implement another reasonable program."). The Department's guidance provides an additional example of reliable evidence: States can undertake a "uniform mailing of a voter registration card, sample ballot, or other election mailing to all voters in a jurisdiction" and "use information obtained from returned non-deliverable mail as the basis" to trigger the Section 8(d) confirmation process. See NVRA Guidance ¶ 33.

Third, Section 8(a)(3) of the NVRA prohibits a State from removing registrants who have moved out of the jurisdiction, unless it does so pursuant to "a general program that makes a *reasonable* effort to remove the names" of voters who have changed residence. 52 U.S.C. 20507(a)(4)(B) (emphasis added). The

---

[6] In the briefing below, Ohio referred to Section 8(c) as the "NVRA NCOA [National Change of Address] Procedure" and Section 8(d) as the "NVRA Supplemental Process." (Defendant's Initial Merits Brief, RE 38, PageID# 267-268). This erroneously implies that the NVRA authorizes two alternative list maintenance processes. Instead, the statute establishes one process: evidence of a change of residence establishing ineligibility (one version of which is described in Section 8(c)(1)) followed by notice to confirm that ineligibility (described in Section 8(d)).

Ohio Supplemental Process is grossly overinclusive and thus cannot constitute a "reasonable effort" to remove individuals who actually have moved. A mere failure to vote—particularly over a span of just two years—is not reliable evidence suggesting that a person has changed residences. Turnout is typically far lower in midterm elections than in presidential elections; consequently, Ohio sends many eligible voters Section 8(d) notices not because they have moved but simply because they have opted not to vote in a midterm election. Without reliable evidence upfront to suggest that a voter may have moved, the Section 8(d) process by itself is not a reasonable way to identify persons who have changed residence because it will inevitably lead to the removal of individuals who are eligible to vote and who have not in fact changed residence. Where, as here, a State uses a measure that could produce a disproportionate number of false positives, it simply has not made a "reasonable effort" to identify those people who have actually become ineligible by moving outside of the jurisdiction.

b. This Court need not decide what precise evidence would suffice to trigger the Section 8(d) process because the district court's conclusion that non-voting alone can trigger the Section 8(d) confirmation process conflicts with Section 8(b) of the NVRA and with a provision of HAVA.

First, Section 8(b) provides that a State's list maintenance program

shall not result in the removal of the name of any person  *  *  *  by reason of the person's failure to vote, except that nothing in this

> paragraph may be construed to prohibit a State from using the
> procedures described in subsections (c) and (d) to remove an
> individual from the official list of eligible voters if the individual--
> (A) has not either notified the applicable registrar (in person or in
> writing) or responded during the period described in subparagraph (B)
> to the notice sent by the applicable registrar; and then (B) has not
> voted or appeared to vote in 2 or more consecutive general elections
> for Federal office.

52 U.S.C. 20507(b)(2). Ohio contends that it may use voter inactivity to trigger

the confirmation process. But because Section 8(d) permits a State to confirm

ineligibility by relying on further inactivity, Ohio's scheme inevitably will result in

the removal of voters based solely on failure to vote, violating the statute's

operative bar in Section 8(b)(2). This is because under Ohio's Supplemental

Process, Ohio's use of the Section 8(d) confirmation process only "confirms" that

people who have not voted may continue to refrain. It does not confirm, or even

suggest, ineligibility based on a change of residence.

The district court relied heavily on the "except" clause in Section 8(b)(2),

which HAVA added to the NVRA. (Order, RE 66, PageID# 23014-23015). This

exception is not as powerful as the district court and Ohio claim. It is, instead, a

rule of construction: "nothing in this paragraph *may be construed* to prohibit a

State from using the procedures described in subsections (c) and (d) to remove an

individual from the official list of eligible voters." 52 U.S.C. 20507(b)(2)

(emphasis added). As a rule of construction, it does not grant additional

substantive permission for States to remove voters; rather, it merely clarifies that

the status quo (the Section 8(d) process incorporating non-voting as part of the

confirmation process only) was not undermined by the language of Section 8(b).

Allowing the clause to carve out a substantive exception to the ban on removal for

non-voting conflicts with Congress's direction that nothing in HAVA may "be

construed to authorize or require conduct prohibited under" the NVRA.  52 U.S.C.

21145(a).[7]

Second, the district court's conclusion that non-voting, without more, can

trigger the Section 8(d) confirmation process misinterprets another portion of

HAVA, which in turn led to the court's erroneous reading of the NVRA.  In

particular, the court gave special weight to this provision:

> [C]onsistent with the [NVRA], registrants who have not responded to
> a notice and who have not voted in 2 consecutive general elections for
> Federal office shall be removed from the official list of eligible voters,
> *except that no registrant may be removed solely by reason of a failure
> to vote*.

---

[7]  The district court's interpretation also conflicts with the legislative history
of this HAVA amendment, which emphasized that the "[t]he procedures
established by the NVRA that guard against removal of eligible registrants remain
in effect," and that the HAVA amendment "does not undermine [the NVRA] in
any way."  H.R. Rep. No. 730, 107th Cong., 2d Sess. 81 (2002) (Conf. Rep.).

52 U.S.C. 21083(a)(4)(A) (emphasis added).[8]  Rather than supporting Ohio's

interpretation of the NVRA, however, the "except" clause in this provision

confirms the Department's interpretation that a failure to vote cannot trigger the

Section 8(d) process.  This HAVA provision reiterates that States may remove

voters who have changed residence after mailing the Section 8(d) confirmation

notice if the voter has not voted by the second subsequent federal general election.

If the Section 8(d) process were meant to serve as a standalone removal process, as

the district court held, rather than as a process to confirm other evidence of

changed residence, this would render the "except" clause wholly irrelevant.  The

court concluded that Ohio was not removing voters solely for failure to vote

because Ohio also was relying on voters' failure to respond to the notice.  (Order,

RE 66, PageID# 23016).  But under that logic, the Section 8(d) process *always*

involves both the failure to respond to the notice and non-voting thereafter, and

there could be no instance where a voter was removed "solely by reason of a

failure to vote."  Accordingly, the "except" clause must necessarily refer to

something other than the Section 8(d) process.  That something must be the *trigger*

for the Section 8(d) notice.  Any other interpretation renders the "except" clause

mere surplusage.  See *United States* v. *Jicarilla Apache Nation*, 564 U.S. 162, 185

---

[8]  Immediately before this sentence, HAVA offers a reminder that the goal is to make[] a reasonable effort to remove registrants *who are ineligible to vote* from the official list of eligible voters."  52 U.S.C. 21083(a)(4)(A) (emphasis added).

(2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

2.  Although limited, relevant case law supports the Department's interpretation of the NVRA.  *Wilson* v. *United States*—which the district court did not discuss—is the only other decision (of which we are aware) addressing what a State must establish before it can remove a voter for change of residence, and it supports reading the NVRA to require reliable evidence of a move before triggering the Section 8(d) process.  See Order at 5, *Wilson* v. *United States*, Nos. 95-20042, 94-20860 (N.D. Cal. Nov. 2, 1995) (Attachment 8).  In *Wilson*, the court considered a challenge to California's then-existing voter-removal procedures. Under those procedures, a voter who had not voted in the previous six months was sent an initial non-forwardable postcard to confirm his residency.  *Ibid.*  Only if the Postal Service returned this initial non-forwardable postcard as *undeliverable* would California send a subsequent Section 8(d) forwardable confirmation notice and begin the cancellation process.  *Ibid.*  The court found that the California procedure complied with the NVRA specifically because the Postal Service's return of the initial postcard as undeliverable provided reliable evidence, independent from the voter's inactivity, that the voter had in fact moved.  *Id.* at 5-6.  That evidence sufficed to trigger the Section 8(d) confirmation process.  *Ibid.*

The process ratified by *Wilson* contrasts with Ohio's Supplemental Process, which is triggered solely by a voter's inactivity and not by any reliable evidence that the voter has moved. *Wilson* therefore supports the proposition that a removal process triggered by inactivity alone violates the NVRA. See Order at 5-6, *Wilson*, *supra* ("Since the State receives a card which states that the card is undeliverable and then the addressee fails to vote in subsequent elections, [California's removal procedure] does not violate the NVRA.").[9]

Instead of looking to *Wilson*, the district court relied on the Department's later consent decree with Indiana and on a settlement agreement with Philadelphia. The Indiana consent decree provides no support for the district court's interpretation. Under that consent decree, Indiana could only remove voters for whom a mailing had been returned as undeliverable. See Consent Decree and Order at 3-4, *United States* v. *Indiana*, No. 06-1000 (S.D. Ind. June 27, 2006) (Attachment 9). That is precisely the standard the *Wilson* court used, and the standard the United States has advocated in its public guidance and in the Georgia

---

[9] Importantly, as set forth in *Wilson*, non-voting can be *part of* the trigger for the Section 8(d) confirmation process, as long as there is also reliable evidence of a move. For example, a State could adopt a process where it sends every voter who has not voted in the last two elections a non-forwardable initial notice. It can then send a Section 8(d) confirmation notice to any voters for whom the initial notice was returned as undeliverable. Under such circumstances, the intervening, undeliverable mail would be sufficient evidence that the voter has moved to confirm that change of residence using the Section 8(d) process.

litigation, and advocates here.  Indiana's procedures, which require reliable

evidence of a change in residence to trigger the confirmation process (*i.e.*,

undeliverable mail), comply with the NVRA while the Ohio process, which uses

non-voting alone as the trigger, does not.

The Philadelphia settlement agreement is of limited value when considered

in its context.  That case was about Philadelphia's failure to remove voters who

had died (rather than voters who had moved) from its rolls.  See Amended Compl.,

*United States* v. *City of Phila.*, No. 06-4592 (E.D. Pa. Apr. 26, 2007) (Attachment

10).  As part of the settlement, the parties agreed that Philadelphia would

essentially comply with Pennsylvania law, which permits the use of non-voting to

trigger the Section 8(d) process.[10]  The Department has never stated that

Pennsylvania law complies with Section 8 of NVRA; to the contrary, the

Department specifically argued in separate litigation against the Commonwealth

that Pennsylvania's voter list maintenance procedures violated Section 8 for the

same reason Ohio's does.  See Mot. for Summary Judgment at 17, *United States* v.

*Pennsylvania*, Nos. 95-382, 94-7671 (E.D. Pa. Aug. 7, 1996) (Attachment 3)

---

[10]  The agreement—which is no longer in effect—permitted the city to send
a "forwardable confirmation notice to any registered elector who has not voted nor
appeared to vote during any election, or contacted the Board in any manner, and
whose contact resulted in a change in his or her voter record."  Settlement
Agreement ¶ 16, *United States* v. *City of Phila.*, No. 06-4592 (E.D. Pa. Apr. 26,
2007) (Attachment 11).

(contending that "Pennsylvania law runs afoul of Section 8(b)(2)'s prohibition on purges for non-voting and is thus pre-empted").[11]  Of note, the same year the Department settled with Philadelphia, it also reached a settlement with Cibola County, New Mexico, under Section 8 of the NVRA.  That settlement prohibited the County from using non-voting to trigger the purging process for voters who may have changed residences and instead required the County to rely on objective information showing the voter had become ineligible to vote due to a move—such as returned mail or information from the Postal Service.  See Amended Joint Stipulation ¶ 13, *United States* v. *Cibola Cnty.*, No. 93-1134 (D. N.M. Jan. 31, 2007; approved by court Mar. 19, 2007) (Attachment 7).  In short, the Philadelphia settlement resulted from unique circumstances and does not undermine the Department's longstanding position on the proper interpretation of the NVRA.  See pp. 2-3, *supra*.

3.  The Department's interpretation that a State may not use non-voting alone to trigger the Section 8(d) process is further supported by the NVRA's purpose and history.  In passing the NVRA, Congress sought to ensure that "voters could not be removed from the registration rolls by a failure to vote."  See *Welker*

---

[11]  The Pennsylvania case was principally about Section 7 of the NVRA. When the parties settled the United States' claims under Section 7, the parties also agreed not to continue litigating the Section 8 claims, leaving them open for potential resolution later.

v. *Clarke*, 239 F.3d 596, 598-599 (3d Cir. 2001). Congress designed the NVRA to "ensure that once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction," recognizing that "while voting is a right, people have an equal right not to vote, for whatever reason." Senate Report 17; House Report 18.

Indeed, the NVRA was passed, in part, as a reaction to the removal processes based on non-voting that preceded it. Senate Report 17-18. Congress was concerned that "many States continue[d] to penalize such non-voters by removing their names from the voter registration rolls," even though that practice was "inefficient and costly," and, in the view of some, "disproportionately affect[ed] persons of low incomes, and blacks and other minorities." *Ibid.*

To protect the right to vote (and the right not to vote), Congress intended that States use reliable evidence rather than voter inactivity as a trigger for removing voters. Congress was concerned that voters who had not voted or had failed to respond to a mailing would be removed. House Report 15-16 ("The Committee is concerned that [voter removal] programs can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing."); House Report 30 ("Instead of using non-voting as an indication that a voter has changed addresses, an election official could contact only those who have actually moved, and at their new addresses."). Accordingly,

as the Third Circuit has recognized in dicta, "the NVRA strictly limited removal of voters based on change of address and instead required that, for federal elections, states maintain accurate registration rolls by using reliable information from government agencies such as the Postal Service's change of address records." *Welker*, 239 F.3d at 599.

The practical impact of Ohio's Supplemental Process, which removes voters who have done nothing to make themselves ineligible, is troubling when contrasted with Congress's intent in enacting the NVRA. Consider, as an example, a voter who voted in 2008 but who did not vote in the subsequent two years, and who also did not move. Under Ohio's process, the State would have sent a Section 8(d) notice to the voter in 2011 to confirm that she had changed her residence (based solely on her failure to vote between 2008 and 2010). If she did not receive or inadvertently disposed of this notice, and did not vote in any elections between 2010 and 2014, she would have been removed from the rolls and would be unable to cast a valid ballot in the 2016 election, even though she did not become ineligible to vote in the years since the 2008 election. This removal contravenes Congress's intent.

\*   \*   \*

As demonstrated by its text, structure, purpose, and history, the NVRA requires that a State have reliable evidence that a voter has moved before it may set

into motion the process for canceling a voter's registration based on a change of

residence.  Ohio's use of non-voting to trigger that process inevitably results in the

removal of voters based on inactivity, not ineligibility.  The NVRA and HAVA

prohibit this.

## CONCLUSION

This Court should reverse the district court's judgment.

Respectfully submitted,

BENJAMIN C. GLASSMAN
  Acting United States Attorney for the
    Southern District of Ohio

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

s/ Vikram Swaruup
TOVAH R. CALDERON

CAROLE S. RENDON
  United States Attorney for the
    Northern District of Ohio

VIKRAM SWARUUP
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section – RFK 3730
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-5633

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type volume limitation imposed by Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(d).  The brief was prepared using Microsoft Word 2007 and contains no more than 6957 words of proportionally spaced text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).  The type face is Times New Roman, 14-point font.

I further certify that the electronic version of this brief, prepared for submission via ECF, has been scanned with the most recent version of Symantec Endpoint Protection (version 12.1.6) and is virus-free.

s/ Vikram Swaruup

VIKRAM SWARUUP

Attorney

Date:  July 18, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2016, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFFS-APPELLANTS AND URGING REVERSAL with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Vikram Swaruup

VIKRAM SWARUUP

 Attorney

# Attachment 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| COMMON CAUSE and the GEORGIA STATE CONFERENCE OF THE NAACP,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>BRIAN KEMP, individually and in his capacity as the Secretary of State of Georgia,<br><br>　　　　　　Defendant. | Civil Action No. 1:16-cv-452-TCB |

## STATEMENT OF INTEREST OF THE UNITED STATES

## I.    INTRODUCTION

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in any pending suit.  This case presents an important question of statutory interpretation of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 20901 *et seq.* Congress gave the Attorney General broad authority to enforce both the NVRA and HAVA on behalf of the United States.  *See* 52 U.S.C.

§§ 20510, 21111.  Accordingly, the United States has a strong interest in ensuring that both statutes are fully and uniformly enforced.

The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists" of registered voters, a process often referred to as "purging."  52 U.S.C. § 20507(a)(4).  HAVA does the same.  52 U.S.C. § 21083(a)(4)(A).  Such a program must be uniform and nondiscriminatory and in compliance with the Voting Rights Act.  52 U.S.C. § 20507(b)(1).  Among other grounds, the NVRA and HAVA require removal of voters who have become ineligible by virtue of a change of residence, pursuant to a designated purge process.  Both statutes, however, also expressly forbid purging voters merely for not voting.  52 U.S.C. §§ 20507(b)(2), 21083(a)(4)(A).

This case asks whether, consistent with federal law, a state may consider a registered voter's failure to vote to be reliable evidence that the voter has become ineligible to vote by virtue of a change of residence, thus triggering the designated NVRA purge process.  Defendant argues that it can.  In fact, it cannot. Accordingly, the United States submits this Statement of Interest to address proper NVRA and HAVA standards.  The United States respectfully submits that Defendant's motion to dismiss should be denied.

-2-

## II. BACKGROUND

### A. Georgia's Current Purging Procedures

Georgia's purging procedures for voters who may have changed residence are as follows:  First, at the start of each odd-numbered year, the Secretary of State prepares a list of voters who have had "no contact" with election officials in the past three years.[1]  D's Mot. to Dismiss at 8-10; Ga. Code § 21-2-234.  At the Secretary's discretion, he may also include voters who have provided a change of address to the U.S. Postal Service through its National Change of Address (NCOA) program.  *Id.;* Ga. Code Ann. § 21-2-233.  Second, the Secretary must send these voters a notice asking them to confirm whether they still reside at their current address.  *Id.*; Ga. Code Ann. §§ 21-2-233(c); 21-2-234(a).  Next, if the voter does not return the notice confirming her residence within 30 days, she is moved to the "inactive list."  *Id.*; Ga. Code Ann. §§ 21-2-233(c); 21-2-234(g).  Finally, if the voter continues to have "no contact" with election officials through and including

---

[1] "No contact" is a statutorily defined term under state law meaning that the voter "has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, and has not confirmed the elector's continuation at the same address during the preceding three calendar years."  Ga. Code Ann. § 21-2-234(a).

the second federal general election after the notice was mailed, the registration record will be cancelled.  *Id.*; Ga. Code Ann. § 21-2-235.  Any voter whose registration record is cancelled is ineligible to vote in state and federal elections in Georgia until the voter submits a new registration form.  Ga. Code Ann. § 21-2-235(b).

### B. Georgia's Prior Purging Procedures and Preclearance

In 1993, Congress enacted the NVRA.  In 1994, Georgia enacted its first post-NVRA purging procedures, Ga. Code Ann. §§ 21-2-234; 21-2-235.  Georgia submitted those purge procedures to the Department of Justice for preclearance review under Section 5 of the Voting Rights Act.  The Department objected, based on a determination that those procedures violated the NVRA by using non-voting alone to trigger the purge process.  Letter from Deval Patrick, Asst. Att'y Gen'l (USDOJ), to Dennis R. Dunn, Sr. Asst. Att'y Gen'l (Ga.) (Oct. 24, 1994) (Attached as Ex. 1 to P's Compl.).

In 1997, Georgia submitted a slightly revised version of its purge procedures, functionally similar to the procedures currently in Section 21-2-234, for preclearance review under Section 5.  The Department did not object to that submission, but this lack of objection did not reflect or imply any finding regarding

-4-

compliance with the NVRA.[2]  To the contrary, consistent with prevailing law and

Department regulations, however, the Section 5 determination letter expressly

indicated that the non-objection did not bar subsequent litigation to enforce the

NVRA.  Letter from Isabelle Katz Pinzler, Acting Asst. Att'y Gen'l (USDOJ), to

Dennis R. Dunn, Sr. Asst. Att'y Gen'l (Ga.). (July 29, 1997) (Attached as Ex. 1 to

Br. in Supp. of D's Mot. to Dismiss).[3]

## III.   LEGAL STANDARD

### A. The National Voter Registration Act of 1993

The NVRA governs how covered states conduct voter registration and voter

list maintenance for federal elections.[4]  Congress enacted the NVRA in part to

---

[2] Earlier that same year, the Supreme Court decided *Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997).  *Bossier Parish* held that a violation of Section 2 of the Voting Rights Act could not independently support an objection under Section 5 of the Act.  Based on that Supreme Court decision, the Department of Justice determined that a state statute's violation of another federal statute, such as the NVRA, was an insufficient basis to support an objection under Section 5.

[3] Georgia is no longer covered by the preclearance requirement of Section 5 of the Voting Rights Act, by virtue of the decision of the Supreme Court in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013).

[4] A state is covered under the NVRA unless it either has no voter registration requirement for federal elections or has allowed voter registration at the polling place for federal elections continuously since August 1, 1994.  52 U.S.C. § 20503(b).  Georgia is a state covered by NVRA requirements.  Coverage under the NVRA is distinct from coverage under the preclearance requirement of Section 5

"increase the number of eligible citizens who register to vote" while protecting "the integrity of the electoral process" by ensuring that "accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

Section 8 of the NVRA addresses state voter list maintenance procedures for federal elections. 52 U.S.C. § 20507. Among other things, it prescribes the conditions under which voters may be purged and the procedures states must follow before making those purges. 52 U.S.C. § 20507(a).

In Section 8, Congress set forth two new bedrock requirements for state purging programs. First, programs to maintain accurate and current voter registration lists must be "uniform" and "nondiscriminatory." 52 U.S.C. 20507(b)(1). Second, states may not purge voters based on not voting:

> Any State program or activity … ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office-- … *shall not result* in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office *by reason of the person's failure to vote*….

52 U.S.C. § 20507(b)(2) (emphasis added).

The statute does delineate, however, conditions under which states may properly purge registered voters. Those conditions include when the registrant

---

of the Voting Rights Act, and is in no way implicated by the Supreme Court's decision in *Shelby County*.

requests to be removed from the list, or when reliable information reveals that the voter has become ineligible to vote due to death, criminal conviction, mental status, or changed residence.  52 U.S.C. § 20507(a)(3), (a)(4).  As to this last category, the NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … a change in the residence of the registrant…."  52 U.S.C. § 20507(a)(4).  To do so, states must follow specific NVRA procedures.  First, the state must gather reliable evidence that the voter has become ineligible based on a change of residence.  One such process for gathering this evidence, involving use of the U.S. Postal Service's National Change of Address (NCOA) database, is described in Section 8(c).  Second, the state must notify the voter and provide an opportunity to confirm (or rebut) the apparent address change, by means of a specific forwardable confirmation mailing and waiting for two federal general elections, before cancelling a voter's registration, as described in Section 8(d).

## 1. *Evidence of a Change of Residence*

Section 8(c) of the NVRA cites the NCOA database as an objective and reliable source for identifying voters who may have become ineligible to vote by moving outside the jurisdiction.  52 U.S.C. § 20507(a)(4), (c).  The NCOA is

-7-

basically a safe harbor method of gathering address-change information; it is not the only such source, and use of the NCOA is not mandatory. 52 U.S.C. § 20507(c). Likewise, an entry in the NCOA database is not by itself a sufficient basis to purge; for example, the entry may reflect an error, or it may indicate an individual's desire to forward mail, unconnected to a change in voting residence. As the NCOA information on potential address changes is second-hand and does not come directly from the voter, the NVRA requires that states follow the specific process in Section 8(d) to provide the voter with the opportunity to confirm or rebut the evidence of the move.

### 2. *The Notice, Waiting Period, and Cancellation Process*

Once a jurisdiction has reliable evidence that a voter has moved, Section 8(d) of the NVRA describes in detail the process that election officials must follow to give that voter the opportunity to confirm or rebut evidence of a possible change of residence that would render the voter ineligible to vote in the jurisdiction (referred to here as the Section 8(d) notice and cancellation process). Election officials must send the voter a detailed notice by forwardable mail, designed to reach the voter wherever she may be, asking the voter to confirm whether she has in fact moved outside the registrar's jurisdiction. 52 U.S.C. § 20507(d). The voter may affirmatively confirm ineligibility in writing (and may then be purged). *Id.*

-8-

Alternatively, the voter may rebut the evidence of ineligibility either by declaring that she still resides within the jurisdiction or by appearing to vote. *Id.* If the voter does not respond to that notice and does not vote or appear to vote at or before the second federal general election following mailing of the notice, only then may the state properly purge that voter from the voter rolls based on change of residence. *Id.*

### B. The Help America Vote Act of 2002

HAVA, which was enacted in 2002, imposes certain minimum standards for states to follow in federal elections. For instance, Section 303 requires that covered states adopt a computerized statewide database for voter registration purposes. 52 U.S.C. § 21083. But HAVA leaves the NVRA and other federal voting protections intact. HAVA makes clear that states must not undertake list maintenance activities under the statewide database—including purging voters for failure to vote—that are forbidden by the NVRA. Section 303(a)(2)(A)(i) provides that if an individual is to be removed from a state's voter registration list, the voter "shall be removed in accordance with" the NVRA. 52 U.S.C. § 21083(a)(2)(A)(i). And the statute restates the core principle that "no registrant may be removed solely by reason of a failure to vote." 52 U.S.C. § 21083(a)(4)(A).

Section 903 amended the NVRA to clarify that states may use the Section

8(d) notice, waiting period, and cancellation process as part of a general program

to purge voters for whom there exists reliable second-hand evidence of a change in

residence (such as the NCOA database described in Section 8(c)).  52 U.S.C. §

20507(b)(2).[5]

And Section 906 addresses HAVA's effect on other laws.  52 U.S.C. §

21145(a).  It cautions that HAVA neither authorizes nor allows states to do

---

[5] The relevant text of Section 8(b) of the NVRA, with the portion added by HAVA
in underline, is as follows:

(b) Any State program or activity to protect the integrity of the electoral
process by ensuring the maintenance of an accurate and current voter
registration roll for elections for Federal office …

(2) shall not result in the removal of the name of any person from the official
list of voters registered to vote in an election for Federal office by reason of
the person's failure to vote, except that nothing in this paragraph may be
construed to prohibit a State from using the procedures described in
subsections (c) and (d) to remove an individual from the official list of
eligible voters if the individual--

(A) has not either notified the applicable registrar (in person or in writing) or
responded during the period described in subparagraph (B) to the notice sent
by the applicable registrar; and then
(B) has not voted or appeared to vote in 2 or more consecutive general
elections for Federal office.

52 U.S.C. § 20507(b)(2) (emphasis supplied)

-10-

anything prohibited by the NVRA or other federal voting statutes, and that nothing in HAVA repeals, replaces, or limits the protections of those statutes. *Id.*[6]

## IV.  ARGUMENT

### A. Using Failure to Vote to Trigger a Section 8(d) Purge Process Violates Section 8 of the NVRA.

The NVRA and HAVA prohibit using non-voting as a basis to purge registered voters.  52 U.S.C §§ 20507(b)(2), 21083(a)(4)(A).  This is, in part, a reaction to the purge practices of the past.  *See* S. Rep. 103-6 at 17-19 (1993) (explaining that at the time the NVRA was passed, "many States continue[d] to penalize such non-voters by removing their names from the voter registration rolls" even though that practice was "inefficient and costly" and some believe that it tended to "disproportionately affect persons of low incomes, and blacks and other minorities").

The NVRA rejected this historical practice, and instead offered a balanced approach to registration rolls that better reflect the eligible electorate.  It ensured that voters could be validly removed from the rolls upon reliable evidence of their

---

[6] Section 906 includes only one exception to this general rule, not applicable here: it changes some requirements of the NVRA to establish an identification requirement for first-time voters who register by mail.  52 U.S.C. § 21145(a); *see also id.* § 21083.

ineligibility.  But it also established firm procedures to ensure that eligible voters would not be removed from the rolls merely for inactivity, without more.

Sections 8(b), 8(c), and 8(d) help supply this balance.  Election officials must establish a general program that makes a reasonable effort to purge the registration records of individuals who have moved out of the jurisdiction.  52 U.S.C. § 20507(a)(4)(B).  However, the NVRA provides a two-step process for such purges, to minimize error.  First, the jurisdiction must have some reliable evidence that the voter has become ineligible due to a change of residence.  Election officials need not use the NCOA database.  But Congress's explicit endorsement in Section 8(c) of the NCOA process as a safe harbor for identifying changes of residence, paired with the ban on purging based on non-voting in Section 8(b), signals Congress' intent to ensure that any method states use to trigger the Section 8(d) notice and cancellation process must be based upon objective and reliable information of potential ineligibility due to a change of residence that is independent of the registrant's voting history.  *Id.*; *see also Welker v. Clarke*, 239 F.3d 596, 599 (3rd Cir. 2001) (noting in dicta that the NVRA "strictly limited" removals based on changes of address, and that evidence of moves must be "reliable" information such as the NCOA).  Then, and only then, is it appropriate to institute the Section 8(d) process: notifying the voter that there is

-12-

some evidence of ineligibility, and allowing the voter an opportunity to either confirm or rebut that evidence.

Without reliable evidence of a move to trigger the Section 8(d) notice and cancellation process, voters might be purged based purely on inactivity rather than actual ineligibility. Both the NVRA and HAVA clearly state that once registered, an eligible voter's decision not to vote (e.g., based on dissatisfaction with the candidates on offer in particular elections) cannot suffice to place his or her constitutional right to vote in jeopardy. Yet that is precisely the result Defendant advocates in this case. Reliance on non-voting to trigger the Section 8(d) notice and cancellation process—rather than independent, objective, and reliable evidence of a changed residence—means that an eligible voter can be purged solely for declining to participate.

*Wilson v. United States*, the sole court decision interpreting Section 8(b)(2) of which we are aware, supports that view. *See* Order Granting in Part and Denying in Part Plaintiffs Voting Rights Coalition and United States' Motion for Further Relief, *Wilson v. United States*, No. C 95-20042 at 5 (N.D. Cal. Nov. 2, 1995), as modified by Joint Stipulation to Substitute Language (N.D. Cal. Nov. 13, 1995) (attached as Exhibit 1). In *Wilson*, the Court considered a challenge to California's then-existing purging procedures. Under those procedures, a voter

-13-

who had not voted in the previous six months was sent an initial non-forwardable postcard to confirm his residency.  *Id.* at 5 (as modified by joint stipulation).  *Only if* the U.S. Postal Service returned this initial non-forwardable postcard as undeliverable would California send a subsequent Section 8(d) forwardable notice and begin the cancellation process.  *Id.*  The *Wilson* court found the California procedure complies with the NVRA specifically because the Postal Service returning the initial postcard as undeliverable provides objective and reliable evidence, independent from the voter's activity or inactivity, that the voter had in fact moved.  *Id.*  And even though such evidence is not itself dispositive, it is sufficient to trigger the Section 8(d) process.  *Id.*

The process ratified by the *Wilson* court stands in stark contrast to a purge procedure triggered solely by a voter's inactivity, and which does not rely on any objective and reliable evidence that the voter has in fact moved (such as NCOA information or returned undeliverable mail).  A purge premised on inactivity alone violates the NVRA's ban on purging voters for non-voting.  *See id.*  ("Since the State receives a card which states that the card is undeliverable and then the addressee fails to vote in subsequent elections, [California's purging procedure] does not violate the NVRA.").

-14-

In 1997, after *Wilson* was decided, the Department of Justice authorized lawsuits against Alaska and South Dakota under facts similar to those at issue here. *See* Exhibits 2 and 3. Each state had adopted purging procedures that used non-voting to trigger the Section 8(d) notice and cancellation process. The Department notified each state that its purging procedures violated Section 8's ban on purging for non-voting. The states subsequently agreed to stop using non-voting as the trigger for beginning the Section 8(d) notice and cancellation procedure, and instead adopted an undeliverable non-forwardable initial notice trigger similar to that approved by the *Wilson* court. *See* Ak. Stat. 15.07.130(a),(b); S.D. Codified Laws § 12-4-19. The position is consistent with the guidance on the NVRA that the Department of Justice has given after the enactment of HAVA.[7]

---

[7] The Department of Justice guidance stresses that a general program under Section 8 to purge voters who may have moved away should be triggered by reliable second-hand information indicating a change of address outside of the jurisdiction, from a source such as the NCOA program, or a general mailing to all voters. Dep't of Justice, The National Voter Registration Act of 1993 (NVRA) Questions and Answers at ¶¶ 34-35 (available at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra); *see also id.* at ¶ 33 (giving examples of reliable, objective alternatives to the USPS NCOA database); *id.* at ¶ 29 (reiterating that list maintenance must be uniform, non-discriminatory, and in accordance with the NVRA); *cf.* at ¶ 30 (discussing situations where notice and waiting period is required, and using returned mail as an example of second-hand information that triggers the notice and waiting period process before purging).

Defendant argues that the NVRA does not require states to use the NCOA database to determine that a voter has moved. Br. in Supp. of D's Mot. to Dismiss at 6-7; Reply Br. in Supp. of D's Mot. to Dismiss at 9-10. That is true but beside the point. While the NCOA database is the one source Congress specifically mentioned for determining that a voter has moved away, states are free to use analogous information sources and methodologies as long as they yield objective and reliable evidence of a voter's changed residence that is independent of voting history. But states may *not* purge voters based on an impermissible assumption derived solely from a registrant's choice not to vote.[8]

Defendant also incorrectly suggests that because Section 8(d) permits voters to correct erroneous confirmation mailings, states may use any means, including non-voting, to determine which voters have moved away. Reply Br. in Supp. of

---

[8] Because the NVRA's plain text prohibits using non-voting to trigger the purging process, the court need not review the statute's legislative history. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 n. 3 (2010). But that history underscores Defendant's error here. Congress designed the NVRA to "ensure that once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction," recognizing that "while voting is a right, people have an equal right not to vote, for whatever reason." S. Rep. 103-6 at 17 (1993). To protect this right, Congress intended states to use reliable evidence such as the NCOA database *rather than* failure to vote as a trigger for purging. *See* H.R. Rep. 103-9 at 15-16 (1993).

-16-

D's Mot. to Dismiss at 8-9. Although Section 8(d) provides a way for voters to correct inadvertent errors resulting from the targeting process, it does not obviate a state's duty *ab initio* to use a reliable, objective process to target for removal only registrants for whom there is evidence of ineligibility, and in no way allows what the NVRA explicitly forbids: using failure to vote alone to trigger the Section 8(d) notice and cancellation process.

Alternatively, Defendant argues that Georgia's purge procedures are triggered by "no contact," as defined by state statute, and not by a registrant's failure to vote. Br. in Supp. of D's Mot. to Dismiss at 12; Reply Br. in Supp. of D's Mot. to Dismiss at 11, n. 7. This misses the mark. Under Georgia law, the definition of "no contact" for purposes of triggering the purge process is that a voter has not voted, appeared to vote, signed a petition, or otherwise contacted election officials. *Id.*

The absence of these activities is in no way evidence of ineligibility. A voter's decision not to vote or otherwise interact with the political process or election officials says nothing reliable about whether a voter has become ineligible by having moved away. And Congress' intent to protect a citizen's right not to vote surely also encompasses the right not to appear to vote, or sign a petition, or contact an election official if a voter elects not to do so. *See* S. Rep. 103-6 at 17

-17-

(1993).  Purge procedures therefore violate the NVRA regardless of whether they use non-voting or Georgia's definition of "no contact" to trigger the process for purging voters without any reliable evidence of ineligibility.

### B. HAVA's Amendment to the NVRA Does Not Allow States to Target Non-Voters for Purging Absent Reliable Evidence They Have Changed Residence.

Defendant argues that Congress authorized a purge triggered by nonvoting when it amended Section 8(b)(2) of the NVRA as part of HAVA's enactment in 2002.  *See* Br. in Supp. of D's Mot. to Dismiss at 4-6; Reply Br. in Supp. of D's Mot. to Dismiss at 3-5.  He is incorrect.  HAVA's amendment has no effect on the NVRA's prohibition against targeting non-voters for purging.

The language on which Defendant relies, added by Section 903 of HAVA, is neither a substantive expansion nor restriction of the pre-existing procedures. Rather, by its own terms, it is merely a rule of construction: "except that nothing in this paragraph [prohibiting purging for failure to vote] *may be construed* to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters . . . ."  52 U.S.C. § 20507(b)(2) (emphasis added).

The best reading of this provision is as a clarification of the NVRA's pre-existing requirements.  The principle in Section 8(b)(2) that registrants may not be

-18-

purged based on a failure to vote might possibly have been seen as in tension with the procedures of Section 8(d) during the waiting period after the notice. After all, Section 8(d) states that registrants for whom there exists reliable evidence of change of residence and who do not respond to a notice of potential ineligibility *may be purged if they do not vote for two election cycles*. So the HAVA proviso clarified that there is no conflict: *after* states have identified voters who may have moved based on reliable, objective, independent evidence, and sent the Section 8(d) notice of their potential ineligibility, states are free to purge if the voter does not appear to vote for two election cycles. That language does not address the core issue here: whether a state may use non-voting to *trigger* the Section 8(d) notice and cancellation process specifically referenced by the 2002 HAVA amendments.

Defendant correctly notes that the amendment clarifies "that states could and should remove voters from their registration lists, pursuant to a list maintenance program, where a voter both failed to return a postage prepaid forwardable notice and then also failed to vote for two additional federal election cycles." Br. in Supp. of D's Mot. to Dismiss at 5-6; Reply Br. in Supp. of D's Mot. to Dismiss at 3. We agree with this description of the process to the extent it describes the Section 8(d) notice and cancellation process. But the question here is whether Georgia may use non-voting as evidence of ineligibility, i.e., as the *trigger* for

beginning the Section 8(d) notice and cancellation process.  The answer was "no"

in 1993.  It remains "no" after the 2002 HAVA amendment.

As originally enacted, the NVRA forbids purging registrants based on non-

voting.  Pub. L. 103-31, 107 Stat. 77, § 8(b)(2).  HAVA did not change that.  In

fact, it reiterated that "no registrant may be removed solely by reason of a failure to

vote."  52 U.S.C. § 21083(a)(4)(A).

But even if the amended language of Section 8(b)(2) were unclear, Section

906 of HAVA rules out Defendant's interpretation.  It specifies that, other than

Section 303(b)'s changes to registration requirements for first-time voters

registering by mail, nothing in HAVA may be read to authorize conduct otherwise

forbidden by the NVRA.[9]  52 U.S.C. § 21145.  And the legislative history of

Section 903 of HAVA (the NVRA amendment), makes clear that Congress

intended to keep the NVRA's protections against improper purging in place:

---

[9] Section 906 of HAVA provides: "Except as specifically provided in section
21083(b) [amending Section 6 of the NVRA's requirements for registrants by
mail] …, nothing in this chapter may be construed to authorize or require conduct
prohibited under any of the following laws, or to supersede, restrict, or limit the
application of such laws:

    …
        (4) The National Voter Registration Act of 1993…"

52 U.S.C. § 21145(a).

The minimum standard requires that removal of those deemed ineligible must be done in a manner consistent with the National Voter Registration Act (NVRA). The procedures established by NVRA that guard against removal of eligible registrants remain in effect under this Act. Accordingly, H.R. 3295 leaves NVRA intact, and does not undermine it in any way.

H.R. Conf. Rep. No. 107-730, pt. 1, at 81 (2002). Congress's intent that the 2002 amendment not weaken any NVRA protection—including the bar against using non-voting to trigger confirmation and removal procedures—is plain.

Defendant's cites to large swaths of HAVA's legislative history are unavailing. They merely restate that the NVRA permits purging some voters who, per objective and reliable evidence, may be ineligible, after the requisite notice and waiting period. In fact, that legislative history reiterates the fundamental, and for Defendant, fatal point that nothing in HAVA was intended to lessen the NVRA's protections. *See Statement of Sen. Dodd*, cited in Br. in Supp. of D's Mot. to Dismiss at 13. Thus, if a state's use of non-voting to *trigger* the Section 8(d) notice and cancellation process is not "consistent with the NVRA," *see id.*, it is perforce inconsistent with HAVA.

## C. HAVA Does Not Require States to Target Non-Voters for Purging Absent Reliable Evidence They Have Changed Residence.

Defendant also appears to suggest that HAVA *requires* procedures that purge nonvoters after a two-cycle waiting period. *See* Br. in Supp. of D's Mot. to

Dismiss at 3-8.  There is no such requirement.  Just as Section 903 of HAVA merely clarifies and approves what the NVRA previously allowed, Section 303 of HAVA's statewide database list maintenance provisions only permits action that is consistent with the NVRA.  *See* 52 U.S.C. § 21083(a)(2),(4).

Yet, Defendant seems to argue that HAVA and the NVRA compel its purge procedures because states must "both register all eligible applicants *and* [] remove *all* ineligible registered voters from the registration lists."  Br. in Supp. of D's Mot. to Dismiss at 5 (second emphasis added).  This misreads the law.  But more to the point, procedures for determining "ineligibility" based on a change in residence are fatally flawed if the basis for establishing ineligibility is a failure to vote.  The NVRA simply does not permit *ad hoc* guesswork about a voter's residence to presume that voter's ineligibility to vote.  To the contrary, objective and reliable evidence (such as that derived from the NCOA database or an analogous source) is required.  Thus, while a state may seek to purge all ineligible voters from its voter registration list, it may do so only after making reliable voter eligibility determinations that comply with the NVRA.  Neither the NVRA nor HAVA permit a state to assume a voter has moved away from the jurisdiction (and thus become ineligible) merely because that voter declined to vote.  52 U.S.C. §§ 20507(b)(2), 21083(a)(4)(A).

-22-

**D. The Attorney General's Preclearance of Georgia's 1997 Purging Procedures Indicates Nothing About Their Validity Under the NVRA.**

Defendant argues that the Department of Justice's preclearance under Section 5 of the Voting Rights Act of Georgia's purging procedures in 1997 after objecting to a similar submission in 1994 signifies that those procedures were legally compliant in all respects. Defendant is incorrect about the legal effect of Section 5 preclearance.

That the Attorney General precleared the 1997 law, but not its 1994 predecessor, merely reflects intervening Supreme Court authority clarifying that objections to voting changes under Section 5 of the Voting Rights Act cannot be based on substantive violations of other laws. *See Bossier*, 520 U.S. at 471. The 1997 preclearance thus signified nothing more than that the 1997 Georgia statute complied with Section 5: under the available evidence, the state had met its burden under Section 5 of showing that the statute had neither a discriminatory purpose nor a retrogressive effect based on race or language minority status. Indeed, the Attorney General's Section 5 procedures specifically note that "preclearance by the Attorney General of a voting change does not constitute the certification that the voting change satisfies any other requirement of the law beyond that of section 5…" 28 C.F.R. § 51.49. Likewise, the Attorney General's Section 5 preclearance

-23-

letters, such as the 1997 preclearance letter to Georgia, explain that Section 5 itself provides that preclearance does not preclude a subsequent challenge to the change (including a challenge by the Department or private parties under the NVRA).[10] *See* Ex. 1 to Br. in Supp. of D's Mot. to Dismiss. Hence, Defendant's argument that the Department's preclearance under Section 5 of Georgia's 1997 state purging law reflects a determination that the law complied with the NVRA is simply incorrect.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully submits that Defendant's interpretation of the NVRA and HAVA is incorrect and that this Court should deny Defendant's motion to dismiss.

---

[10] Section 5 of the Voting Rights Act provides "Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure." 52 U.S.C. § 10304(a).

Date: May 4, 2016

Respectfully submitted,

JOHN A. HORN
United States Attorney
Northern District of Georgia

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Gabriel A. Mendel*
GABRIEL A. MENDEL
Ga. Bar No. 169098
Assistant United States Attorney
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
(404) 581-6000

*/s/ Samuel G. Oliker-Friedland*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
SAMUEL G. OLIKER-FRIEDLAND
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7238 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 353-6196

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief is submitted in 14 point Times New Roman font, as required by the U.S. District Court for the Northern District of Georgia in Local Rule 5.1(C).

Date:  May 4, 2016

*/s/ Gabriel A. Mendel*
GABRIEL A. MENDEL
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been served this day on all counsel of

record through the ECF Filing System.

Date:   May 4, 2016

*/s/ Gabriel A. Mendel*
GABRIEL A. MENDEL
Assistant United States Attorney

# EXHIBIT 1

FILED

Nov 2 10 56 AM '95

RICHARD
U.S. DISTRICT COURT
NO. DIST. OF CA, S.J.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETE WILSON, Governor of the State of California; STATE OF CALIFORNIA, ) ) ) | Case No. C 95-20042 JW Case No. C 94-20860 JW (Related Action) |
| Plaintiffs, ) ) | ORDER GRANTING |
| vs. ) ) | IN PART AND DENYING IN PART PLAINTIFFS |
| UNITED STATES OF AMERICA; JANET RENO, Attorney General; TREVOR POTTER, Chairman, Federal Elections Commission; FEDERAL ELECTIONS COMMISSION, ) ) ) ) ) ) | VOTING RIGHTS COALITION AND UNITED STATES' MOTION FOR FURTHER RELIEF |
| Defendants. ) ) ) | |

## I. INTRODUCTION

Plaintiffs Voting Rights Coalition, et al. and the United States of America's (collectively, "Plaintiffs") motion for further relief was heard by the Court on Friday, October 20, 1995. Robert Rubin appeared on behalf of the Coalition and Holly Wiseman appeared on behalf of the United States Department of Justice. Cyrus Rickards appeared on behalf of Governor Pete Wilson and the named state agencies. In addition, Ms. Darlene Marquez, Co-Chairperson of the Voting

1   Rights Coalition, appeared and testified on behalf of Plaintiffs and Mr. John

2   Mott-Smith, Chief of the Elections Division of the Office of the Secretary of State

3   of the State of California testified on behalf of the Governor and state agencies.

4       Based upon all pleadings filed to date, the testimony of the witnesses

5   presented at the hearing and upon the oral argument of counsel, the Court

6   GRANTS in part and DENIES in part Plaintiffs' motion, as discussed below.

7   II. BACKGROUND

8       On March 2, 1995, the Court granted Plaintiffs' motion for entry of a

9   permanent injunction, finding that the National Voter Registration Act

10  ("NVRA"), 42 U.S.C. § 1973gg is constitutional. This finding was affirmed by

11  the Ninth Circuit Court of Appeals on July 24, 1995. <u>Voting Rights Coalition, et</u>

12  <u>al. v. Pete Wilson, et al.</u>, No. 95-15449 (9th Cir. July 24, 1995). The Court

13  bifurcated the issue of implementation of the NVRA and ordered the State of

14  California and Governor Wilson to submit an implementation plan to the Court

15  for review.

16      On March 17, 1995, Defendants submitted a plan for implementation of the

17  NVRA. On May 4, 1995, the Court ordered the State to implement the plan

18  within forty-five (45) days and prohibited the removal of names from the voter

19  rolls "in a manner inconsistent with the NVRA." The parties then met and

20  conferred and attempted to resolve as many of the implementation issues as

21  possible without the intervention of the Court. The parties were able to resolve

22  all of their differences, with the exception of the issues now presented to the

23  Court through Plaintiffs' motion for further relief.

24      Plaintiffs contend that the issues remaining for resolution are mandated by

25  the NVRA and must be implemented by Defendants. The Governor and the

26  named state agencies contend that they are properly implementing the

27

2

1    requirements which are set forth in the NVRA. Defendants contend that the
2    issues set forth in Plaintiffs' motion are simply not requirements which are
3    mandated by the NVRA nor are such issues necessary to carry out the intent of
4    Congress. These disputed issues are set forth and discussed separately below.

### III. LEGAL STANDARDS

6    The "starting point for interpreting a statute is the language of the statute
7    itself. Absent a clearly expressed legislative intention to the contrary, that
8    language must ordinarily be regarded as conclusive." Consumer Product Safety
9    Com'n v. GTE Sylvania, Inc., 100 S.Ct. 2051, 2056 (1980). In order to determine
10   whether such a "clearly expressed legislative intention" exists, the Court looks to
11   the legislative history of the statute. I.N.S. v. Cardoza Fonseca, 107 S.Ct. 1207,
12   1213, n. 12 (1987). "If a court, employing traditional tools of statutory
13   construction, ascertains that Congress had an intention on the precise question at
14   issue, that intention is the law and must be given effect." Id at 1221, quoting
15   U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, n. 9
16   (1984). Applying these standards, the Court finds as follows.

### IV. DISCUSSION

#### A. DMV Voter Registration

19   Pursuant to the NVRA, "[A]ny change of address form submitted in
20   accordance with State law for purposes of a State motor vehicle driver's license
21   shall serve as notification of change of address for voter registration with respect
22   to elections for Federal office for the registrant involved unless the registrant
23   states on the form that the change of address is not for voter registration
24   purposes." 42 U.S.C. § 1973gg-3(d). According to this section, a registrant's
25   change of address is presumed to be for the purposes of both the DMV and voter
26   registration, unless indicated otherwise by the applicant.

27

3

By this motion, Plaintiffs contend that the change of address form currently used by the State of California reverses the presumption established by the NVRA, so that an applicant's change of address is not presumed to be for both purposes of DMV and voter registration, unless the applicant indicates otherwise. The forms currently utilized by the California DMV facilities contains the following options:

___ I have moved to a new county and wish to update my voter record....

___ I have moved within the same county and wish to update my voter record....

As indicated by the Defendants in their implementation plan, if neither box is checked, DMV will assume that the applicant does not wish to update his or her voter record. Plaintiffs contend that such an assumption violates the purpose and intent of the NVRA. Defendants argue that it "is the informed judgment of the Secretary of State that the potential for error and harm is greater through a system of automatic updating of registration records than with the present system." (Declaration of John Mott-Smith, p. 2). However, Defendants also state that the new DMV forms, which will be available within six (6) months, will include a separate box which indicates that the applicant does not want his or her voter record updated. In the interim 6 month period, Defendants request that they be permitted to use the present forms and apply the presumption that if neither box is checked, the applicant does not want his or her address updated for voting purposes.

Based upon the clear statutory language as contained in the NVRA, the Court finds that the NVRA mandates that any change of address for DMV purposes also be presumed to be for voter registration purposes, unless the applicant "states on the form that the change of address is not for voter

4

1   registration purposes." Therefore, if the State of California chooses to utilize
2   forms which do not provide a space within which an applicant may indicate that
3   he or she does not wish an address change to apply for purposes of voter
4   registration, then the State must apply the presumption that all changes of
5   addresses apply for both DMV and voter registration purposes. Accordingly, the
6   Court will permit the DMV to use the present forms only during the interim
7   period between now and the time that the new forms are ready for use. If no box
8   is checked, the State must assume that the applicant wishes to update his or her
9   voter record.

10                          B. Annual Residency Confirmation

11          The NVRA prohibits the removal of the name of any person from the list of
12   official voters for failure to vote. 42 U.S.C. § 1973gg-6(b)(2). Through its
13   "Annual Residency Confirmation and Outreach Procedure"("ARCOP"), the State
14   of California sends a postcard to voters inquiring whether such voter still lives at
15   the present address. If the card is returned as undeliverable AND the voter does
16   not vote in two (2) subsequent federal elections, then the voter's name is purged
17   from the list. Plaintiffs contend that this procedure violates the NVRA because it
18   impermissibly drops registrants from the list for failure to vote. Defendants
19   contend that the method is permissible because the voter is not dropped simply
20   due to a failure to vote, but also because there is not a current address for such
21   voter.

22          The Court disagrees with Plaintiffs that the State's procedure, although not
23   directly based on a voter's failure to vote, results in a voter being dropped from
24   the list for his or her failure to vote. Since the State receives a card which states
25   that the card is undeliverable and then the addressee fails to vote in subsequent
26   elections, the Court finds that the State's current "Residency Confirmation and

27

                                          5

1   Outreach Program" does not violate the NVRA.  Accordingly, the Court DENIES

2   Plaintiffs' motion to discontinue such program.

3             C. California Elections Code Sections Preempted by the NVRA

4             Plaintiffs contend that 16 sections of the California Election Code are

5   preempted by the NVRA and should be enjoined by the Court.  The State does not

6   argue that such sections are preempted, but requests that the Court refrain from

7   enjoining specific statutes until all implementation issues are resolved since the

8   State is operating under this Court's Order to comply with the NVRA and is not,

9   therefore, implementing any state election codes which conflict with the NVRA.

10             The Court considers, however, that all implementation issues are now

11   resolved as a result of this hearing.  However, the Court is concerned that the

12   statutes which Plaintiffs contend are preempted by the NVRA may contain

13   subsections or subparts that are not preempted.  Therefore, the Court orders that

14   the parties review all Elections Code Sections and submit a list to the Court

15   within twenty (20) days of the date of this Order indicating which specific

16   Sections, including subsections and/or subparts, are preempted by the NVRA.

17   Until further order of the Court, all California Elections Code Sections which are

18   preempted by the NVRA may not be enforced by the State of California.

19                       D.  Compliance Reports

20             Plaintiffs finally request that the Court establish a reasonable reporting

21   mechanism whereby it may monitor the State's compliance with the NVRA.

22   Plaintiffs suggest that the Court require the State to submit a 30-day status report

23   to be followed by quarterly reports as to its compliance with the implementation

24   issues.  Defendants argue that such a requirement is burdensome, expensive and

25   unnecessary in light of the requirements of the NVRA.

26             At the hearing, the parties agreed to meet and confer and that the

27

Department of Justice would submit a list to the Court indicating exactly what type(s) of report it would like from the State to ensure compliance with the NVRA. The State then agreed to respond to the Department's list and the matter would be deemed submitted to the Court upon the State's response. The Court therefore DEFERS Plaintiffs' request for compliance reports by the State until the receipt of the State's brief. The Department of Justice shall submit a report within twenty (20) days of the date of this Order. The State shall submit a response to such report within five (5) days of the submission of the Department's report. The matter will then be deemed submitted on the papers. In the interim, the Court retains jurisdiction over any and all implementation issues in this action. If Plaintiffs discover that Defendants are not complying with the provisions of the NVRA, or of this Order, they may request emergency relief by filing an ex parte application with the Court requesting appropriate relief. Therefore, the Court DEFERS Plaintiffs' request that the State submit compliance reports on a quarterly basis.

## E. Equitable Relief

Finally, Plaintiffs request that the Court enter an Order which provides equitable remedial relief on behalf of those persons who entered social service agencies between January 1, 1995 until the effective date of the Court's Order of Implementation filed on May 4, 1995 and were deprived of the right to register to vote at the agency due to the Governor's failure to timely implement the NVRA. Plaintiffs' request does not include any Department of Motor Vehicles ("DMV") since the parties entered a separate agreement regarding a remedial remedy for such agency. Plaintiffs contend that the Court should order that the Defendants send each and every person who contacted a social service agency during the relevant time period a voter registration application.

7

1        The Defendants argue that such a request is extremely costly and
2  unwarranted given the fact that many of the people who contacted a social service
3  agency during the relevant time period are people who continue to have contact
4  with the agency and have since been afforded an opportunity to register to vote at
5  the agency. Therefore, Defendants assert that they should be required only to
6  contact those people who did not and will not return to the agency and inform
7  such people that they may call and request that a voter registration application be
8  sent to them.

9        Based upon all pleadings filed to date, as well as on the oral argument of
10  counsel, the Court orders that the Defendants send each and every person who
11  visited a social service agency between January 1, 1995 through June 10, 1995
12  AND who will not return to a social service agency again within the next six (6)
13  months a voter registration application. Such application must be sent within
14  sixty (60) days of the date of this Order. Defendants shall also file with the Court
15  and serve upon Plaintiffs a copy of the list of applicants to whom a voter
16  registration application is being sent as soon as such list is available to
17  Defendants but no later than forty-five (45) days from the date of this Order.

## V. CONCLUSION

19        Based upon the foregoing, the Court GRANTS Plaintiffs' motion for
20  further relief as to the DMV Voter Registration change of address forms, the
21  California Elections Code Sections and remedial equitable relief as set forth
22  herein and DENIES and/or DEFERS Plaintiffs' motion for further relief as to all
23  other issues discussed herein.

95102501.civ

IT IS SO ORDERED.

8

DATED: October 30, 1995

_James W Ware_

JAMES WARE
United States District Judge

9

1    This is to certify that copies of this order have been mailed to:

2    Robert Rubin
3    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
        OF WITH THE SAN FRANCISCO BAY AREA
4    301 Mission Street, Suite 400
     San Francisco, CA 94105
5
6    Mark D. Rosenbaum
     ACLU FOUNDATION OF SOUTHERN
7       CALIFORNIA
     1616 Beverly Drive
8    Los Angeles, CA 90026
9
     Alan L. Schlosser
10   ACLU FOUNDATION OF NORTHERN
        CALIFORNIA
11   1663 Mission Street, Suite 460
     San Francisco, CA 94103
12
13   Kathryn K. Imahara
     ASIAN PACIFIC AMERICAN LEGAL
14      CENTER OF SOUTHERN CALIFORNIA
     1010 South Flower Street, Suite 302
15   Los Angeles, CA 90015
16
17   William R. Tamayo
     ASIAN LAW CAUCUS, INC.
18   468 Bush Street, Third Floor
     San Francisco, CA 94108
19
20   Joaquin G. Avila
     Voting Rights Attorney
21   Parktown Office Building
     1774 Clear Lake Avenue
22   Milpitas, CA 95035
23
     Harry Bremond
24   WILSON, SONSINI, GOODRICH & ROSATI
     650 Page Mill Road
25   Palo Alto, CA 94304-1050
26
27

David H. Raizman
WESTERN LAW CENTER FOR
 DISABILITY RIGHTS
1441 W. Olympic Blvd.
Los Angeles, CA 90015

Elaine B. Feingold
DISABILITY RIGHTS AND EDUCATION
 DEFENSE FUND, INC.
2212 Sixth Street
Berkeley, CA 94710

Cyrus J. Rickards
OFFICE OF WITH THE ATTORNEY GENERAL
1515 K Street
P.O. Box 944255
Sacramento, CA 94244-2550

Pete Wilson
GOVERNOR OF WITH THE STATE OF CALIFORNIA
1st Floor, State Capitol
Sacramento, CA 95814

Bill Jones
SECRETARY OF STATE
1230 J Street, Suite 209
Sacramento, CA 95814

Brenda Premo
DEPARTMENT OF REHABILITATION
830 K Street, Room 307
Sacramento, CA 94244

Frank Zolin
DEPARTMENT OF MOTOR VEHICLES
2415 1st Avenue
Sacramento, CA 95818

Eloise Anderson
DEPARTMENT OF SOCIAL SERVICES
744 P Street
Sacramento, CA 95814

1    Holly Lee Wiseman
     U.S. DEPARTMENT OF JUSTICE
2    Civil Rights Division, Voting Section
     P.O. Box 66128
3    Washington, D.C. 20035-6128

4
     Lawrence E. Noble
5    FEDERAL ELECTIONS COMMISSION
     999 E Street, N.W.
6    Washington, D.C. 20463

7
     Michael J. Yamaguchi
8    UNITED STATES ATTORNEY
     450 Golden Gate Avenue
9    San Francisco, CA 94102

10

11   DATED:  10/2/95              CLERK OF COURT

12

13                               By:

14                                   Ronald L. Davis
                                     Deputy Clerk
15

16

17

18

19

20

21

22

23

24

25

26

27

```
 1   JANET RENO, Attorney General            Local counsel:
     for the United States                  MICHAEL J. YAMAGUCHI
 2   DEVAL L. PATRICK, Asst. Atty General    United States Attorney
     ELISABETH JOHNSON                       No. Dist. of California
 3   BARRY H. WEINBERG                       MARY BETH UITTI
     HOLLY LEE WISEMAN                       Chief of Civil Division
 4   Attorneys, Voting Section              WILLIAM MURPHY
     Civil Rights Division                   South First Street
 5   United States Department of Justice     Suite 371
     P.O. Box 66128                          San Jose, CA 95113
 6   Washington, DC 20035-6128               (408) 291-6000
     Telephone: (202) 514-5686
 7                                                        ORIGINAL
     Attorneys for UNITED STATES                           FILED
 8   OF AMERICA and JANET RENO
                                                        NOV 13 1995
 9              UNITED STATES DISTRICT COURT      RICHARD W. WIEKING
           FOR THE NORTHERN DISTRICT OF CALIFORNIA  CLERK, U.S. DISTRICT COURT
10                    SAN JOSE DIVISION          NORTHERN DISTRICT OF CALIFORNIA
                                                          SAN JOSE
11   PETE WILSON, et al.,            )    CASE NO. C95-20042 JW
                                     )    CASE NO. C94-20860 JW
12        Plaintiffs,                )    (Consolidated)
                                     )
13        v.                         )    JOINT STIPULATION
                                     )
14   UNITED STATES OF AMERICA,       )
     et al.,                         )
15                                   )
          Defendants,                )
16                                   )
     _____/
17
18          JOINT STIPULATION TO SUBSTITUTE LANGUAGE
19        Come now all parties to the above-styled causes, by and
20   through their attorneys, and stipulate as follows:
21        That the following language shall be substituted for
22   paragraph 2 on page 5 of this Court's Order filed November 2,
23   1995 (which paragraph begins: "The NVRA prohibits the removal of
24   the name of any person from the list of official voters for
25   failure to vote."):
26          The NVRA prohibits the removal of the name of any
27        person from the list of official voters for failure to
28   Joint Stipulation
```

vote. 42 U.S.C. Sec. 1973gg-6(b)(2).  The United States
and Voting Rights Coalition contend that the state's
proposed list cleaning procedure ("RCOP," for Residency
Confirmation Outreach Procedure) violates this section
of the Act because the process begins by sending postal
inquiries to non-voters.

As outlined in the state's implementation plan
(Chapter 5, pp. 5-12), RCOP would function as follows:
Approximately 6 months prior to the primary election in
even-numbered years and approximately six months after
the general election in odd-numbered years, county
registrars would send out a nonforwardable residency
confirmation postcard to those voters who had not voted
within the past six months (in the case of pre-primary
RCOP) or in the last general election (in the case of
post general election RCOP).

If the postcard were returned as undeliverable
without forwarding address information, a forwardable
confirmation notice would be sent out pursuant to 42
U.S.C. 1973gg-6(d)(2) of the NVRA.  If this notice were
not returned and the voter did not vote in the next two
federal elections, the voter would be removed from the
registration list.

Respectfully submitted,

Dated: November 9, 1995

DANIEL E. LUNGREN
Attorney General

CYRUS J. RICKARDS
Deputy Attorney General
Attorneys for Governor
     Pete Wilson, et al

ROBERT RUBIN
NANCY STUART
Lawyers' Committee for
    Civil Rights of the
    San Francisco Bay Area
Attorneys for Voting Rights
    Coalition

DEVAL L. PATRICK
Assistant Attorney General
ELISABETH JOHNSON
BARRY WEINBERG
HOLLY LEE WISEMAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Attorneys for United States
    and Janet Reno

Joint Stipulation          3

# EXHIBIT 2

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

February 11, 1997

VIA TELEFACSIMILE & FEDERAL EXPRESS

The Honorable Mark Barnett
Attorney General
State of South Dakota
500 East Capitol Avenue
Pierre, South Dakota  57501-5070

Dear Mr. Attorney General:

  This is to notify you that I have authorized the filing of a lawsuit against the State of South Dakota, the South Dakota State Board of Elections, and the South Dakota Secretary of State to compel compliance with the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg to 1973gg-10.

  As you are aware, the NVRA, which took effect January 1, 1995, requires that states follow specific procedures and protections set forth in the Act in purging registrants from the registration list for elections for federal office. In particular, the NVRA provides that a voter may not be removed from the registration list for federal elections by reason of the voter's failure to vote. 42 U.S.C. § 1973gg-6(b)(2). The Act also provides that voter removal programs for federal elections must be conducted in a manner which is uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965. 42 U.S.C. § 1973gg-6(b)(1).

  Under South Dakota's voter removal procedures, which were adopted to conform state law to the requirements of the NVRA, registered voters who fail to vote within a four year period are specifically targeted for inclusion in the state's voter removal program. These procedures can have the end result of a voter being purged from the voter registration list for federal elections simply for having failed to vote. As we have made clear in correspondence

to the Secretary of State on June 19, 1995, December 7, 1995, and November 5, 1996, these procedures violate the NVRA.

Our concern is that no registered voter in the State of South Dakota be purged from the registration list for federal elections because of his or her failure to vote. Thus, we intend to move forward on this matter expeditiously. However, we are willing to delay filing the complaint for a short period of time if the State is willing to resolve this matter voluntarily and negotiate a consent decree that would be filed with the complaint.

Under these circumstances, we request that you apprise us within ten days whether the State wishes to discuss settlement of this matter. Patricia O'Beirne, an attorney in the Voting Section, will be in contact with your office. In the meantime, Ms. O'Beirne can be reached at 202-307-6264.

Sincerely,


Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

EXHIBIT

3

U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

February 11, 1997

VIA TELEFACSIMILE & FEDERAL EXPRESS

The Honorable Bruce M. Botelho
Attorney General
State of Alaska
450 Diamond Courthouse
P.O. Box 110300
Juneau, Alaska 99811-0300

Dear Mr. Attorney General:

This is to notify you that I have authorized the filing of a lawsuit against the State of Alaska, the Alaska Lieutenant Governor, and the Alaska Director of Elections to compel compliance with the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg to 1973gg-10.

As you are aware, the NVRA, which took effect January 1, 1995, requires that states follow specific procedures and protections set forth in the Act in purging registrants from the registration list for elections for federal office. In particular, the NVRA provides that a voter may not be removed from the registration list for federal elections by reason of the voter's failure to vote. 42 U.S.C. § 1973gg-6(b)(2).

Under Alaska's voter removal procedures, which were adopted for the stated purpose of conforming state law to the requirements of the NVRA, registered voters who fail to vote within a four-year period are specifically targeted for inclusion in the state's voter removal program. These procedures can have the end result of a voter being purged from the voter registration list for federal elections simply for having failed to vote. As we discussed in our December 10, 1996 letter to Assistant Attorney General Kathleen Strasbaugh, these procedures violate the NVRA.

Our concern is that no registered voter in the State of Alaska be purged from the registration list for federal elections because of his or her failure to vote. Thus, we intend to move forward on this matter expeditiously. However, we are willing to delay filing the complaint for a short period of time if the State is willing to resolve this matter voluntarily and negotiate a consent decree that would be filed with the complaint.

Under these circumstances, we request that you apprise us within ten days whether the State wishes to discuss settlement of this matter. Patricia O'Beirne, an attorney in the Voting Section, will be in contact with your office. In the meantime, Ms. O'Beirne can be reached at 202-307-6264.

Sincerely,


Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

# Attachment 2



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

October 24, 1994

Dennis R. Dunn, Esq.
Senior Assistant Attorney General
40 Capital Square, S.W.
Room 132
Atlanta, Georgia 30334-7298

Dear Mr. Dunn:

This refers to the submission to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c, of Act No. 1207 (1994) of the State of
Georgia, which adopts changes (listed in Attachment A) to voter
registration and related procedures to, inter alia, implement the
National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C.
1973gg et seq.  We received your responses to our request for
additional information on August 24 and October 18, 1994; other
supplemental information was received on October 20, 1994.

We have given careful consideration to the information you
have provided, as well as to information from other interested
persons.  Except as set forth below, the Attorney General does
not interpose any objection to the specified changes.  However,
we note that Section 5 expressly provides that the failure of the
Attorney General to object does not bar subsequent litigation to
enjoin the enforcement of the changes.  See the Procedures for
the Administration of Section 5 (28 C.F.R. 51.41).  In this
regard, the granting of Section 5 preclearance does not preclude
the Attorney General or private individuals from filing a civil
action pursuant to Section 11 of the NVRA, 42 U.S.C. 1973gg-9.

We cannot reach the same conclusion with respect to the
procedures for removing registered voters from the registration
list, insofar as the procedures provide for sending a
registration confirmation notice to persons who have not voted or
otherwise had "contact" during a three-year period.  In this
regard, we note that the NVRA specifically provides with respect
to such voter removal procedures that the procedures "shall not
result in the removal of the name of any person from the official
list of voters registered to vote in an election for Federal
office by reason of the person's failure to vote."  Section
8(b)(2), 42 U.S.C. 1973gg-6(b)(2).

Under the proposed procedures, registered voters in Georgia who fail to vote (or otherwise have "contact" with the election administration system) during a three-year period would be specifically targeted to be included in the state's purge procedures. This result is directly contrary to the language and purpose of the NVRA, and is likely to have a disproportionate adverse effect on minority voters in the state. The proposed procedures thus appear to eliminate certain of the gains to minority voters mandated by Congress in enacting the NVRA and, accordingly, "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Beer v. United States, 425 U.S. 130, 141 (1976).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained with regard to the specified voter removal procedures. Therefore, on behalf of the Attorney General, I must object to the voter removal procedures proposed by Act No. 1207 insofar as they provide a "no contact" rule for triggering the mailing of a registration confirmation notice.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to change continues to be legally unenforceable. See Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

In addition, there are two other NVRA compliance issues raised by Act No. 1207. First, Act No. 1207 may be read as requiring that a registrant placed on the inactive registration list will be purged unless the person votes within the prescribed period, although the NVRA specifies that appearing to vote (without voting) will terminate the purge process for that voter. Section 8(d)(1), 42 U.S.C. 1973gg-6(d)(1). However, in your letters of October 18 and 20, 1994, you clarified that appearing to vote or otherwise having "contact" during the prescribed period is sufficient to avoid being purged. Second, the NVRA requires that agencies designated for voter registration include "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." Section 7(a)(2)(B), 42 U.S.C. 1973gg-5(a)(2)(B).

- 3 -

Act No. 1207 designates only offices that provide such programs to persons with physical disabilities, a limitation not provided in the NVRA.  We understand that the state is reviewing this matter and is considering whether the secretary of state should exercise the discretionary authority granted by Act No. 1207 to designate as voter registration sites those agencies that provide programs to persons with nonphysical disabilities.

Finally, we note that the preclearance of those provisions of Act No. 1207 that enable or permit the state or its political subdivisions to adopt future voting changes does not constitute preclearance of those future changes and, accordingly, Section 5 review will separately be required when those changes are adopted or finalized.  See 28 C.F.R. 51.15.  The matters for which Section 5 review will be required include (but are not limited to): the designation of additional locations where registration may occur or changes in existing locations; the statewide voter registration application and any other forms developed to implement the NVRA; the procedures to be used to integrate voter registration into the driver's license application, renewal, and updating process; and the cost or charge prescribed for a copy of the voter registration list.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Georgia plans to take concerning this matter.  If you have any questions, you should call Special Section 5 Counsel Mark A. Posner, at (202) 307-1388.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

## Attachment A -- Changes Enacted by Act No. 1205 (1994)

1.   Assignment of responsibility to the Georgia Secretary of State to coordinate implementation of the NVRA, and to establish and maintain the lists of active and inactive registered voters.

2.   Adoption of the registration form prescribed by the Federal Election Commission and promulgation of a uniform statewide voter registration application by the Georgia Secretary of State.

3.   Voter registration by the state Department of Public Safety (including the adoption of procedures and a voter registration application).

4.   Voter registration at "voter registration agencies," including every office that provides public assistance, every office that provides state funded programs primarily engaged in providing services to persons with physical disabilities, every armed forces recruitment office, and other offices to be designated by the Georgia Secretary of State (including promulgation of a voter registration inquiry/declination form by the Georgia Secretary of State).

5.   Voter registration by mail (including the promulgation of a mail registration application by the Georgia Secretary of State).

6.   An amendment to the list of permissible satellite registration locations.

7.   Procedures when insufficient or false information is provided on a voter registration application.

8.   Standards governing voter registration deadlines and the acceptance of voter registration applications, and the preparation of registration lists.

9.   The requirement that voter registration applicants be notified of the disposition of their applications.

10.   Amended procedures concerning registrants who move or whose registration record reflects that they have moved.

11.   An amended registration card.

12.   Procedures for voter registration list maintenance, including the placement of registrants on and the use of an inactive registration list, and the removal of names from the list of eligible registered voters.

13.   Amended procedures governing challenges to the eligibility of persons to register and vote.

- 2 -

14.   The provision that the appointment of deputy registrars is discretionary rather than mandatory.

15.   Amended qualifications for registrars and deputy registrars.

16.   A definition of which voter registration information is public (including authorizing the Georgia Secretary of State to establish by rule or regulation the cost to be charged for a copy of a registration list).

17.   Procedures for use of county registration lists in municipal elections, and the discontinuation of existing municipal separate registration systems.

18.   Penalties for unlawful voter registration conduct.

19.   Provisions regarding registration using the post card application provided by the Overseas Citizens Absentee Voting Act and related matters.

# Attachment 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 95-CV-382 |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA, et al., | ) | (JUDGE BUCKWALTER) |
| | ) | |
| Defendants. | ) | |
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 94-CV-7671 |
| | ) | |
| THOMAS J. RIDGE, et al., | ) | (JUDGE BUCKWALTER) |
| | ) | |
| Defendants. | ) | |

<u>UNITED STATES' MOTION FOR SUMMARY JUDGMENT</u>

On March 30, 1995, this Court declared that the Commonwealth of Pennsylvania was not in compliance with the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg to 1973gg-10 ("NVRA"), a constitutional act of Congress. As detailed in the attached memorandum, while voter registration has begun successfully at many sites in Pennsylvania, Pennsylvania remains out of compliance with the NVRA in several important respects even some sixteen months after this Court's order.

There are no genuine issues of material fact which would prevent the remaining issues from being determined at this time. The press of the upcoming elections and deadline for voter registration makes it imperative that the defendants be ordered to swiftly come into compliance with the NVRA and extend to its citizens, particularly those who are disabled, the easy opportunities for voter registration mandated by Congress.

Respectfully submitted,

MICHAEL R. STILES                    DEVAL L. PATRICK
United States Attorney               Assistant Attorney General
                                     Civil Rights Division


                                     ELIZABETH JOHNSON
                                     BARRY H. WEINBERG
                                     JUDYBETH GREENE
                                     Attorneys, Voting Section
                                     Civil Rights Division
                                     Department of Justice
                                     P.O. Box 66128
                                     Washington, D.C. 20035-6128
                                     (202) 616-2350

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 95-CV-382 |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA, | ) | (JUDGE BUCKWALTER) |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ASSOCIATION OF COMMUNITY | ) | |
| ORGANIZATIONS FOR REFORM NOW | ) | |
| (ACORN), et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 94-CV-7671 |
| | ) | |
| THOMAS J. RIDGE, et al., | ) | (JUDGE BUCKWALTER) |
| | ) | |
| Defendants. | ) | |

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I.    SUMMARY

On March 30, 1995, this Court declared that the Commonwealth of Pennsylvania was not in compliance with the National Voter Registration Act of 1993, 42 U.S.C. 1973gg ("NVRA"), a constitutional act of Congress.  While voter registration has begun at many sites and has been successful where properly implemented, Pennsylvania remains out of compliance with the NVRA in several important respects some sixteen months after this Court's order.

More than 100,000 persons with disabilities served at state funded programs have been denied the voter registration opportunities mandated by the NVRA due to the state's refusal to designate such offices as NVRA sites.  Additionally, state

legislation passed in late June 1995 affects the cancellation of
voter registration contrary to the NVRA and this Court's orders
of March 30, April 24 and May 4, 1995.  Finally, the state
refuses to provide relief to those not given the voter
registration opportunities mandated by Congress during the
state's five months of total noncompliance.

The state was simply wrong when it told the Court[1] that the
United States, by raising issues relative to the state's
violation of the NVRA, is seeking to micromanage the state
agencies and programs that fall within the scope of the NVRA.

In fact, our position is just the opposite: it is the
responsibility of the state to manage state agencies and programs
to assure that its agencies comply with the NVRA, but the state
has not done so here.  Had the state assumed its
responsibilities, there would be no need for the present action.

The fact that the state has abrogated its responsibilities
to fully enforce the NVRA and to take the steps necessary to
monitor its compliance has forced us to address these matters to
the Court.  We urge the Court to enter summary judgment against
the defendants on these issues[2] and order declaratory and

---

[1]    See Defendant's Response to United States' Response to
Court's Order to Show Cause at 4.

[2]    Defendants' response to the United States' Second Set
of Interrogatories had not been received by the United States
until the late afternoon of August 6, 1996.  We are in the
process of reviewing those responses and should they demonstrate
that other issues are amenable to summary judgment, we will file
supplemental papers as soon as possible.

2

injunctive relief requiring the state to take the steps it should have taken on its own to rectify this continued noncompliance.

II.   PROCEDURAL HISTORY

The National Voter Registration Act of 1993 went into effect on January 1, 1995. As the Commonwealth of Pennsylvania had not taken action to provide its citizens with the Act's voter registration opportunities and protections by that date, the United States filed the instant action on January 23, 1995.

On March 30, 1995, this Court ruled that the NVRA was a constitutional act of Congress and set a status conference to discuss any necessary or proper relief.[3] After additional status conferences and negotiations between the parties, a stipulated order requiring defendants to comply with the mandated provisions of the NVRA was entered on April 24, 1996, and an agreed implementation plan (Defendants' Second Amended Implementation Plan) was ordered into effect on May 4, 1996. On May 4, 1996, an order also was entered pre-empting specific Pennsylvania statutes which conflicted with the NVRA.

---

[3]    Subsequent to this Court's order upholding the constitutionality of the NVRA, other courts reached the same conclusion and the Supreme Court denied certiorari on the State of California's appeal of the Ninth Circuit's holding that the NVRA is constitutional. See, Assoc. of Community Organizations for Reform Now v. Edgar, 800 F.Supp. 1215 (N.D. Ill.), aff'd, 56 F.3d 791 (7th Cir. 1995); Wilson v. United States, 878 F.Supp. 1324 (N.D. Cal.), aff'd, Voting Rights Coalition v. Wilson, 60 F.3d 1411 (9th Cir. 1995), cert. denied, 116 S.Ct. 815 (1996); Virginia v. United States, Case Nos. 3:95-CV-357, 3:95-CV-531, 3:95-CV-532 (E.D. Va. October 3, 1995) (unpublished ruling and consent order); Condon v. Reno, 913 F.Supp. 946 (D.S.C. 1995); Associations of Community Organizations for Reform Now v. Miller, 912 F.Supp. 976 (W.D. Mich. 1996.

The plan included two tiers of implementation dates (some in June 1995 and others in July 1995) in order to allow the Pennsylvania legislature an opportunity to pass legislation which would comport with the NVRA and thereby avoid a dual registration system.  On June 30, 1995, Governor Ridge signed Act No. 1995-25 entitled the "Pennsylvania Voter Registration Act."[4]

On January 3, 1996, this Court issued an order to show cause by June 30, 1996, why the instant action should not be dismissed. After receiving submissions by the parties and discussing the posture of the case, the Court ruled on July 22, 1996, that it would retain jurisdiction to resolve the remaining issues in the case and entered an order setting a schedule for motions for summary and/or partial summary judgment.  As we demonstrate below, the issues presented are eminently appropriate for summary judgment given the lack of material factual disputes.  <u>See generally</u>, Rule 56(b), Fed. R. Civ. P.; <u>Ransburg Electro-Coating Corp.</u> v. <u>Landsale Finishers, Inc.</u>, 484 F. 2d 1037, 1039 (3rd Cir. 1973)(summary judgment appropriate where there is no genuine issue of material fact remaining after examination of pleadings, depositions, answers to interrogatories, and admissions on file,

---

[4]    The legislation provides for agency-based and motor vehicle-based voter registration, and NVRA-complying voter registration forms.  It also provides for the reinstatement of all registrants who had been purged from the state voter registration rolls under procedures violative of the NVRA for purposes of federal election.  Section 525 of the new law names the clerk of Orphans Courts and marriage license bureaus as additional voter registration agencies.  25 P.S. § 961.525.

together with affidavits).  Moreover, we are entitled to summary judgment on the issues presented as a matter of law.

III. <u>PENNSYLVANIA HAS FAILED TO DESIGNATE AS VOTER REGISTRATION AGENCIES OFFICES WHICH SERVE PERSONS WITH DISABILITIES</u>

Section 7(a)(2)(B) of the NVRA, 42 U.S.C. 1973gg-5(a)(2)(B), provides that "[e]ach State shall designate agencies as voter registration agencies all offices in the State that provide state-funded programs primarily engaged in providing services to persons with disabilities."  The state has designated a few offices which serve some Pennsylvanians with disabilities, yet the overwhelming majority of the persons with disabilities who receive services at state-funded programs in Pennsylvania are not provided with the voter registration opportunities mandated by Congress.

For example, the state properly designated as voter registration sites the state-operated in-patient psychiatric facilities run by the Office of Mental Health which served 8,027 people in fiscal year 1994/1995.[5]  Yet the 147,000 individuals over age 18 who received out-patient services, in-patient services and other mental health related services at programs funded by the Office of Mental Health during the same fiscal year were not provided the NVRA-mandated voter registration opportunities.  Deposition of Robert Wild, Director of the Bureau of Management, of the Office of Mental Health in the Department

---

[5]     See Exhibit 1.

of Public Welfare, ("Wild Depo.") (Exhibit 2) at 15-16; see also
Exhibit 3 (number of clients served in each category of service).

There is no question that these programs are "state-funded."
These programs in fact are funded almost totally by the state.
As explained by Robert Wild, most of the programs are funded 90-
100% by the state unless medicaid covers it; if there is medicaid
coverage the state provides 47% and the federal government
provides 53% of the funding. Wild Depo. at 10-12, 14, 18, 23,
25, 27-28. In either instance, the programs are state-funded.[6]

Similarly, for the Office of Mental Retardation state-
operated residential facilities that served 3,307[7] adults in
fiscal year 1994/95 were designated as voter registration
agencies, whereas the programs funded through Office of Mental
Retardation which served 52,574[8] adults in the same time period
were not designated. These programs also are funded 90% to 100%
by the state unless there is medicaid coverage, in which case the

---

[6]     These sites can incorporate voter registration services
into the main points of entry into the system. Thus, while there
are hundreds of such programs, the point of entry is through one
of 91 base service units operated by counties through their
offices of Mental Health and Mental Retardation; these offices
are 90% state-funded. Wild Depo. at 6, 9-10.

[7]     See Exhibit 4.

[8]     See Exhibit 4. In order to reach this figure we
subtracted the early intervention total (included 0-3 year olds)
from total caseload served in FY 1994/95.

state provides 47% and the federal government provides 53% of the funding.[9]   In either instance, the programs are state-funded.

The Office of Aging funds managed care services which serve approximately 74,845 people per year[10] through home delivered meals, counseling, personal care, home health, daily services, placement services, attendant care,[11] medical equipment, care management II, and some home support.   Deposition of John J. Detman, Division Chief, Division of Community Services, Department of Aging, at 17-19, 44 ("Detman Depo.") (Exhibit 5). As all of the people in these programs have some degree of disability, Detman Depo. at 17-18, they are precisely the population which Congress intended to reach.[12]

---

[9]    Deposition of Edward Manning, Regional Program Manager for the Central Region Office of Mental Retardation, Department of Public Welfare, ("Manning Depo.") (Exhibit 43) at 15-17.

[10]    As John Detman, Division Chief, Division of Community Services in the Department of Aging, noted in his deposition, this number may include some duplication, i.e., people who receive more than one type of service may be counted twice. Detman Depo. at 45-47.   However, the Department of Aging serves disabled persons in other programs as well, and this number would not necessarily include all of these individuals.   Detman Depo. at 46-47.

[11]    The Department of Public Welfare also has an attendant care program which serves approximately 2,000 persons per year using federal and state funds.   This program also is not designated for voter registration.   Letter of July 15, 1996; from Calvin Koons to Judybeth Greene; Exhibit 6.

[12]    All of these individuals apply for services through an "OAF" form which they fill out with assistance from a program provider, often in their own home.   Detman Depo. at 18-19.   The voter registration mandated by the NVRA easily could be integrated into these one-on-one transactions.

Other state-funded programs which serve disabled persons but are excluded from the state's voter registration program include:

- The Department of Education's Adult Basic Literary Program which serves 60,000 adults per year, many of whom are disabled. Deposition of Donald E. Lunday, Chief of the Regional Programs Division, Bureau of Adult Basic and Literacy Education, Pennsylvania Department of Education ("Lunday Depo.")(Exhibit 7) at 4-5. Indeed some of these programs are specifically geared for disabled persons such as the Scranton School for the Deaf, the Western Pennsylvania School for the Deaf, Goodwill Industries of Pittsburgh, Harim Andrews Center, and Threshold Rehabilitation. Lunday Depo. at 5-7, 16-18.

- The Special Education Programs which serve over 10,000 adult students (i.e., 18-21 year olds) who have disabilities. Deposition of Samuel Bashore, Special Education Advisor, Bureau of Special Education, Pennsylvania Department of Education ("Bashore Depo.") (Exhibit 8) at 5, 18.

- The eight independent living centers funded by the state,[13] which provide services to persons with disabilities. Deposition of Raymond Walker, Supervisor, Facilities and Grants Management Section, Pennsylvania Office of Vocational Rehabilitation ("Walker Depo.) (Exhibit 9) at 4-5.

- The Association for the Blind which has many programs serving visually handicapped persons which are funded by state block grant funds. Deposition of Eugene Barton, Director of Field Operations, Bureau of Blindness and Visual Services, Office of Social Programs, Pennsylvania Department of Welfare ("E. Barton Depo.")(Exhibit 10) at 17-19, 27, 31.[14]

---

[13]    There are an additional six independent living centers funded by the federal government. Walker Depo. at 6.

[14]    The state represented that it would provide figures on the number of persons served in these programs, E. Barton Depo. at 31-32, but to date, has not done so.

8

- The paratransit services provided through the Department of Public Welfare and through the Pennsylvania Department of Transportation.[15]

Pennsylvania's failure to provide voter registration at these programs thwarts the NVRA's goal of increasing voter registration opportunities for persons with disabilities. Many of the programs discussed above, such as independent living centers, paratransit and education programs, were specifically mentioned in the legislative history as programs which must provide voter registration. The Senate Report explains that the final NVRA legislation was expanded to,

> include[] a definition that is intended to have more extensive outreach to persons with disabilities. While it would include vocational rehabilitation offices, it would also extend to many other agencies that have more contact on a regular basis with persons with disabilities such as, but not limited to, those agencies which provide transportation, job training, education counseling, rehabilitation or independent living services.

S. Rep. No. 103-6, 103rd Cong., 1st Sess. (1993) ("Senate Report") at 29. Indeed the legislative history of the NVRA strongly evidences an intent that the obligation in Section 7(a)(2) be read broadly:

> The bill has a broad scope with regard to agency-based registration for persons with disabilities. As noted by a number of organizations representing the disabled community, particularly Disabled AND Able to Vote, there is no one agency which provides services to all, or even part of the disabled population. Vocational rehabilitation services, for example, reach no more

---

[15]    Although the state has not been able to provide information regarding the number of people served through this program, we understand that there are thousands of individuals served through such programs.

9

than one disabled person out of 15 at any one time
during their entire life.  Independent living centers
are overwhelmingly located in large cities and do not
serve those persons with disabilities who live in
suburbs, small towns, or rural areas.  Thirty-seven
percent of all persons with disabilities acquire the
disability after the age of 55.  As a result,
employment education and training programs rarely
provide services to these individuals.  In order to
access this isolated population, it is essential that
as many locations as possible which provide services to
disabled Americans offer voter registration services.

Senate Report at 16.

In short, there is no question but that the Commonwealth of

Pennsylvania is in violation of the NVRA in its failure to

provide voter registration at state-funded programs serving

persons with disabilities.  To secure the benefits mandated by

Congress for this underserved population,[16] the United States

requests this Court to enter an order directing the state to

designate these NVRA-mandated offices for voter registration and

to take responsibility for assuring that those agencies perform

their functions appropriately: to develop and conduct training

_____

[16]   We sought to obtain information from the state under
Rule 30(b)(6), Fed. R. Civ. P. about the scope of state-funded
programs which serve persons with disabilities.  See United
States Notice of Deposition dated June 27, 1996, Exhibit 11.
But the state did not provide a list of such programs and did not
produce a witness to provide an overview of such programs.  In
fact, during one deposition counsel for the state instructed a
state official not to answer a question about whether he knew of
other state-funded programs which served persons with
disabilities.  R. Barton Depo. at 24-25, Exhibit 12.

    Given the decentralized nature of many of the programs
serving persons with disabilities, there are likely to be state-
funded programs which serve persons with disabilities in addition
to those we have described above.  It is the state which is
charged under the NVRA to designate the appropriate agencies and
programs which serve persons with disabilities; Pennsylvania has
not done so.

programs for achieving compliance in these offices, to develop a
reporting system which will include these sites and to designate
an individual responsible for coordinating compliance in these
sites.[17]

IV. <u>PENNSYLVANIA LAW IS IN CONFLICT WITH THE NVRA</u>

This Court held in its order dated March 30, 1996, that the
NVRA pre-empts contrary state law and found that several aspects
of then-current Pennsylvania law were pre-empted by the NVRA.   In
a subsequent order dated May 4, 1995, the Court specified
particular provisions of then-current Pennsylvania law which were
pre-empted by the NVRA including its canvass provisions and non-
voting purge provisions.

The Pennsylvania Voting Rights Act ("PVRA"), passed after
those orders, retains several features of the pre-empted laws.
Under one section of the PVRA individuals who have not voted in
five years are removed from the registration rolls if they do not
vote by the second general federal election after the date of a
mailing.   25 P.S. § 961.1901(b)(3).   Another section allows the
use of a canvass to purge from the registration rolls voters who
may have moved.   25 P.S. § 961.1901(b)(2).   A third section of
the new Pennsylvania law, not specifically addressed by the
earlier orders of the Court, now prevents the registration of
applicants if their voter identification card is returned by the

---

[17]   We address the question of recapturing lost voter
registration opportunities for persons with disabilities who have
applied and recertified for these programs since January 1, 1995,
in section VI, <u>infra</u>.

Post Office as undeliverable, 25 P.S. § 961.528(b)(2); this
provision also results in the removal of persons from the
registration rolls in a manner contrary to the NVRA.

The state has urged that these claims should not be
considered as they were not enacted at the time this lawsuit was
filed and do not conflict facially with the NVRA.  See,
Defendant's Response to Plaintiffs' Answer to Rule to Show Cause
at 6-7.  As explained below, these laws are in direct conflict
with the NVRA and these matters are ripe for review.  Moreover,
no amended pleadings or supplemental pleadings are necessary in a
situation such as the one at bar.  This matter was filed to bring
the state into compliance with the NVRA.  The Court specifically
ruled that "the Pennsylvania law requiring voters to be purged
for failure to vote in two years.... [and] the Pennsylvania law
permitting removal of names from voter registration up to fifteen
days before a primary or general election ... [are] contrary to
the [NVRA]," Order, March 30, 1995, and later declared a number
of state statutes to be pre-empted to the extent they conflicted
with the NVRA.  Order, May 4, 1995.  Moreover, in its May 4, 1995
order, the Court also declared "any other provision of
Pennsylvania law which conflicts with the NVRA" are "pre-empted
to the extent that they conflict with the NVRA."  Order, May 4,
¶ 1(j) at 4.  These orders cannot be read to be as limited as the
state would like -- these orders were not a license for the state
to enact additional laws in conflict with the NVRA.

12

The jurisdiction of the Court is not so limited as the state argues.  See Hutto v. Finney 437 U.S. 678, 678 (1978) (holding that after the State's progress toward compliance proved unsatisfactory, the District Court's equitable jurisdiction provided ample authority to fashion a remedy which went beyond its earlier orders).  This Court has continuing jurisdiction to modify its decrees as equity may require, John Simmons Company v. Grier Brother Company, 258 U.S. 82, 88-89 (1921), United States v. United Shoe Machinery Corp., 391 U.S. 244 (1968), and has broad discretion to fashion its remedy to include justice. Louisiana v. United States, 380 U.S. 145 (1965).

Further, given the purpose and function of pleadings,[18] no supplemental pleadings are necessary.  See, e.g., Frazier v. Southeastern Pennsylvania Tranp. Auth., 785 F.2d 65, 67-68 (3rd Cir. 1986) (a complaint is sufficiently specific if "sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer."); Ash v. Wallenmeyer, 879 F.2d 272 (7th Cir. 1989)(stating that the federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process); and Erff v. Markhon Industries, 781 F.2d 613, 617 ("pre-trial order[s] [are] treated

---

[18]    As Wright and Miller explain, "Historically, pleadings have served four major functions: (1) giving notice to the nature of a claim or defense; (2) stating the facts each party believes to exist; (3) narrowing the issues that must be litigated; and (4) providing a means for speedy disposition of sham claims and insubstantial defenses."  5 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 1202 at 68 (1990).

13

as superseding the pleadings and establish[ing] the issues to be considered at trial.")[19]  The state clearly has had notice since the original pleading, and throughout this litigation, that we challenge those state statutes which conflict with the NVRA, and this Court's orders have provided further notice that such conflicts must be resolved against the state.  Accordingly, this Court should declare that these provisions are pre-empted to the extent that they violate the NVRA.

A.   Pennsylvania's Purge for Non-Voting is in Violation of the NVRA

Section 8(b)(2) of the NVRA sets forth a straightforward prohibition on purging registrants for failure to vote:

> (b)  Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office –
>
>    . . . .
>
>    (2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.

42 U.S.C. 1973gg-6(b)(2).

After this Court declared Pennsylvania's earlier non-voting purge to be contrary to the NVRA, Order March 30, 1995, ¶ 3,  the state enacted a new law using failure to vote in five years as a

---

[19]    While we maintain that there is no need for amending or supplementing the complaint, if the court determines that such amendment is appropriate we would ask that the pleadings be deemed "amended" pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, in order to bring the pleadings into conformance with the evidence.

14

trigger for a list maintenance process which, itself, then uses non-voting as the basis for purging the individual from the registration rolls. Section 1901(B)(3) of the PVRA requires that

> the Commission shall send a notice pursuant to Subsection (D) to any elector who has not voted nor appeared to vote during the period beginning five years before the date of the notice and ending on the date of the notice and for whom the Board of Elections did not during that period in any other way receive any information that the voter still resides in the registered election district.

25 P.S. § 961.1901(b)(3). The notice triggered by these five years of non-voting is a postage prepaid and preaddressed return card, sent by forwardable mail on which the elector may state his or her current address. If the registrant does not return the notice confirming his or her address or appear to vote during the period beginning on the date of the notice and ending on the day after the second general election which occurs after the notice, his or her registration will be cancelled. [20]  Section

---

[20]    The notice is the same as the Section 8(d)(2) notice prescribed by the NVRA for removal of persons for whom evidence shows that they may have changed addresses. The Pennsylvania notice states:

> if the elector did not change residence or changed residence but still resides in the county, the elector must return the card not later than 30 days prior to the next election. If the card is not returned, affirmation or confirmation of the elector's address may be required before the elector is permitted to vote in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for federal office that occurs after the date of the notice. If the elector does not vote in an election during that period, the elector's registration shall be cancelled.

Section 1901(B)(2)(I)(A) of the PVRA.

1901(B)(2)(I)(A) of the PVRA; 25 P.S. § 961.1901(b)(2)(I)(A).
Thus, a voter gets a notice for failing to vote, and it is for
failing to vote in the ensuing period after the notice is sent,
that a registrant is then stricken from the rolls, even if the
voter remains in all ways eligible to vote.[21]

In prohibiting removal for non-voting, Congress rejected
arguments that such a procedure is necessary for fraud prevention
and list maintenance.  The Senate acknowledged that "most States
use the procedure of removal or non-voting merely as an
inexpensive method for eliminating persons believed to have moved
or died." Senate Report at 17.  However, Congress also recognized
that because of such procedures, "many persons may be removed
from the election rolls merely for exercising their right not to
vote, a practice which some believe tends to disproportionately
affect persons of low incomes, and black and other minorities."
Id. at 18.  Indeed, Pennsylvania's previous two year non-voting
purge was proven to have a disparate impact on minorities.  Ortiz
v. City of Philadelphia, 824 F. Supp. 514, 526-31, 539 (E.D. Pa.
1993).

Congress was well aware of the need for states to maintain
accurate voting rolls, but found that "purging for non-voting
tends to be highly inefficient and costly."  Senate Report at 18.

---

[21] Although an element of Pennsylvania's non-voting purge
arguably is an individual's failure to respond to this notice (as
opposed to the notice being returned as undeliverable).  Congress
was very clear that an individual's registration should not be
cancelled solely for failure to respond to a mailing.  Senate
Report at 32.  Moreover, it is the act of non-voting that causes
the voter to be purged.

The NVRA was designed to render superfluous the need for large scale purges and list cleaning systems such as Pennsylvania's purge for non-voting by providing an ongoing flow of address corrections from the newly designated voter registration agencies and through the U.S. Postal Service's National Change of Address system.  Id.

While one court has found that non-voting could, consistent with the NVRA, be used as a trigger for a voter removal program, Voting Rights Coalition v. Wilson, Case Nos. C-94-20860 JW and 95-20042 JW, unpublished order, at 4-5 (N.D. Cal. Nov. 2, 1995),[22] that program is distinguishable from Pennsylvania's new law in a critical way: it used failure to vote only as a trigger for a non-forwardable address confirmation card.  Only in those instances where address confirmation cards were returned as undeliverable that Section 8(d)(2) notices were sent to the registrants.  Registrants were not purged for failure to vote. Unlike the California program, it is the act of not voting -- not voting in five years and then not voting in two general election cycles after receipt of the notice --  that alone results in a person being stricken from the rolls in Pennsylvania. Accordingly, the Pennsylvania law runs afoul of Section 8(b)(2)'s prohibition on purges for non-voting and is thus pre-empted.

---

[22]    A copy of this unpublished order is attached as Exhibit 13.  Also attached in this exhibit, is a subsequent joint stipulation as to language in the court's order, which was drafted to clarify the specific parameters of California cancellation procedures.

The Pennsylvania legislature also included an alternative clause which converts the five-year non-voting trigger to a ten-year and then a twenty-year non-voting trigger. This section, entitled "Applicability", specifies that:

> In the event that the five-year period for notice to electors provided for under Section 1901(B)(3) has been declared invalid or rejected by a court of competent jurisdiction or by the United States Department of Justice, after all appeals have been exhausted and upon certification to the Secretary of the Commonwealth and publication in the Pennsylvania Bulletin, notice shall be given in accordance with Section 1901(B)(3) after a period of ten years. In the event that a ten-year period has been certified to the Secretary of the Commonwealth as invalid and upon publication in the Pennsylvania Bulletin, notice shall be given in accordance with Section 1901(B)(3) after a period of 20 years.

Section 5107(b) of the PVRA, 25 P.S. § 961.5107(b). These non-voting triggers violate the NVRA in the same manner as does the five-year non-voting purge and are similarly pre-empted.[23]

---

[23] It may be, as an empirical matter, that after some period of time, the failure to vote is not an unreliable indicator of a change in address or death (although Pennsylvania has provided no evidence to that effect). However, Congress prohibited any state activity which "results" in the removal of registrants on account of failure to vote, and expressly rejected attempts to place a time limit on this prohibition. See H. Rep. at 36 (rejecting amendment to permit removal after 100 years of non-voting). Thus Congress determined that even when the relationship between non-voting and ineligibility was a virtual certainty (i.e. every registered person not voting for 100 years will be dead), non-voting can not be used as a proxy for ineligibility.

Instead, Congress determined that the permitted list maintenance devices authorized by the NVRA, such as the NCOA procedures and the agency-based change of address information, would be more than adequate to support the states' interest in maintaining accurate rolls. Moreover, counties are free to investigate whether persons remain eligible to vote and to proceed on the basis of the information obtianed to remove individuals who have died or moved, using the appropriate

(continued...)

B.    Pennsylvania's Canvass Provision Will Purge Voters in
      Violation of the NVRA

On May 4, 1995, this Court declared that the state's then-
existing canvass laws were preempted

> to the extent that they conflict with the provisions of
> the NVRA which require that any list maintenance
> procedures be part of a uniform and nondiscriminatory
> state program and which require that particular
> procedures be followed prior to the removal of a
> registrant on the ground that the registrant has
> changed address, Section 8(b)(1) and 8(d) of the NVRA,
> 42 U.S.C. 1973gg-6(b)(1) and 1973gg-6(d), and to the
> extent that they permit removal of names 15 days before
> a primary or general election in contravention of
> Section 8(c)(2)(A), 42 U.S.C. 1973gg-6(c)(2)(A).

Order, May 4, 1995, at 4.

Yet at the end of June 1995, the Pennsylvania legislature

passed a new canvass law which is virtually identical to the

statute which this Court declared pre-empted on May 4, 1995, with

the exception that the earlier statute allowed a hearing to be

set within four days, instead of seven days, from the date of the

notice.[24]  Cf. Exhibit 14 (containing text of former 25 P.S.

---

[23](...continued)
mechanisms for such cancellation, including Section 8(d)(2) of
the NVRA where there are indications that the individual may have
moved. Thus, Congress embodied in the statute its determination
that any marginal benefit which might result from permitting the
use of non-voting was outweighed by the burden on individuals'
rights not to vote and the disparate systemic impact such a rule
tends to have on minorities and the poor.

[24]    Section 1901(B)(2) of the PVRA provides for a canvass
which leads to the cancellation of registration if an individual
does not respond in a certain time period:

     (I) The registration commission may, by
commissioners or by inspectors of registration, verify
the registration in an election district by visiting
the building from which an elector is registered and
                                        (continued...)

19

623-33 and 951-31). Thus, this new canvass provision is legally indistinguishable from the provision which this Court declared to be pre-empted and, if used by a county, could result in cancellation of voter registration contrary to the NVRA. A canvass procedure could co-exist with the NVRA if it were uniform and nondiscriminatory, it did not rely on lists created in a discriminatory fashion[25] and if the cancellation

---

[24](...continued)
other buildings as the commission deems necessary.

(II) The commission shall make a record of the name and address of each registered elector who is found not to reside at the registered address or who, for any other reason, appears not to be qualified to vote in the registered election district.

(III) The commission shall leave at the address of each person referred to in subparagraph (II) a notice requiring him to communicate with the commission on or before a date which the commission shall designate, and which shall not be less than seven days and not more than 15 days from the date of the notice and in any case not later than the 15th day preceding the election next ensuing, and satisfy the commission of his qualifications as an elector. The commission shall cause a confirmation of each such notice to be sent by mail promptly to such person at the address from which he is registered. The envelope containing such information is to be plainly marked that it is not to be forwarded. At the expiration of the time specified in the notice, the commission shall cancel the registration of such person who has not communicated with the commission and proved his qualification as an elector....

25 P.S. § 961.1901(b)(2).

[25]    Congress foreclosed allowing a registrar to rely, without evaluation, on lists compiled by non-neutral groups for purging their registration rolls. Both the House of Representatives and the Senate noted in their reports that, "The purpose of [the uniform and nondiscriminatory] requirement is to prohibit selective or discriminatory purge programs. This
(continued...)

20

procedures were completed ninety days before a federal election. 42 U.S.C. 1973gg-6(b)(1) and (d) and 1973gg-6(c)(2)(A). However, there are no assurances that the statute will be employed solely in this manner.

The state has, as a stopgap measure, instructed counties not to take action under the canvass until further order of this Court. Exhibit 15. Accordingly, this Court should enter an order declaring that these new canvass provisions violate the NVRA and declaring that Section 1901(B)(2) of the PVRA is pre-empted to the same extent as set forth in its previous orders.

C.    Pennsylvania's Procedures When a Voter Identification Card is Undeliverable Violate the NVRA

The NVRA sets forth the conditions under which the registration of an individual who submits a voter registration by mail can be cancelled if the notice of disposition of their application is returned as undeliverable. Section 6(d) specifically provides that, "[i]f a notice of the disposition of a mail voter registration application under section 8(a)(2) is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 8(d)." 42

---

[25](...continued)
requirement may not be avoided by a registrar conducting a purge program or activity based on lists provided by other parties where such lists were compiled as the result of a selective, non-uniform, or discriminatory program or activity." House and Senate Reports at 15 and 31, respectively. Accordingly, in order for a registrar to use lists or election mailings compiled by elected officials, candidates, political party committees, or elected party representatives, the registrar would first have to ascertain sufficient facts to establish that these lists were not compiled as the result of a selective, non-uniform, or discriminatory program or activity.

U.S.C. 1973gg-4(d). The Section 8(d) process referenced by this section involves an address confirmation process, which requires sending the voter a specific notice by forwardable mail and waiting for two federal general elections to pass before purging the voter if no response is received and the individual does not appear to vote. 42 U.S.C. § 1973gg-6(d).

Pennsylvania law does not distinguish between mail-in registration and other sources of voter registration; it allows registrars to refuse to register all applicants whose voter identification cards (i.e., disposition notices) are returned as undeliverable. Sections 528(b)(2) and (d)(1) of the PVRA provide that after an elector has completed a voter registration application, the county election commission mails a voter identification card to the applicant, by nonforwardable mail, which serves as notice of disposition of his or her application. 25 P.S. §§ 961.528(b)(2), (d)(1) (1995). Section 528(d)(3) of the PVRA further provides:

> No registration application shall be deemed to be accepted until ten days after the voter's identification card has been mailed. Upon return by the post office of an identification card ... which the post office is unable to deliver at the given address, the commission shall investigate. If the commission finds that the applicant is not qualified to register from such address, the commission shall reject the application of the applicant and shall notify the applicant by first class forwardable mail of this action.

25 P.S. § 961.529.

This law clearly contravenes Sections 6(d) of the NVRA because it forecloses voter registration to mail-in voter

22

applicants solely due to a failure of the postal service to be able to deliver an individual piece of mail.  Thus, persons who registered by mail and did not receive the voter identification card due to a postal or administrative error may be deprived of their voter registration by operation of this statute.

At present, Pennsylvania counties are following a crazy quilt of varying approaches to registrants whose voter identification cards are returned as undeliverable.  See, e.g. Affidavits of county election officials from Berks, York, Lancaster, Lehigh, Fayette, Clearfield and Allegheny Counties, Exhibits 16-22.  As state officials appear to be unaware of the counties actions in this regard, we spoke with the registrars of these counties about the procedures they follow when voter identification cards are returned to them by the Post Office as undeliverable.  While all of the registrars are working hard to comply with the law as they understand it, some counties have rejected voter registration applicants in contravention of the NVRA, and some appear to apply standards other than Pennsylvania law.

Based on these interviews, as set out in Exhibits 16 through 22, it appears that most of the counties first investigate these returned cards by a variety of means (i.e., making phone calls, on-site investigations, contacting the post office, and/or checking the original voter registration forms) and then either correct the registration records, reject the applications, or put

23

the persons on an inactive list and allow them to vote by
affirmation at the polls.  Still others are simply holding on to
all these returned cards and awaiting further instruction from
this Court.[26]

Virtually none of the counties have separated the returned
voter identification cards which originated as mail-in voter
registrations from returned voter identification cards from other
sources, which in total number in the thousands.  All of the
counties, however, state that the voter identification cards
which have been returned to them include cards which originated
as mail-in applications.  Exhibits 16-22.

Congress had a clear and convincing basis for this NVRA
requirement.  The legislative history of the NVRA indicates a
skepticism about the use of the mail to detect fraud and a
concern that cancelling the registration of a person whose notice
of disposition was returned as undeliverable would unfairly
deprive some eligible individuals of their right to vote solely
to a problem in mail delivery.  Indeed, much of the testimony
before Congress indicated that a significant percentage of the
persons whose notifications were returned as undeliverable were,
in fact, in all ways eligible to vote.[27]  Testimony further

---

[26]   Clearfield County has been able to determine the correct
addresses of the registrants for almost all the cards which are
returned, after their investigation.  Exhibit 22.

[27]   See Voter Registration:  Hearing Before the Subcomm. on
Elections of the Comm. on House Administration, 101st Cong., 1st
Sess. 233-234 (Mar. 21, 1989) (Voter Registration) (affidavit of
Emmett Fremaux, Jr., Exec. Dir. of the District of Columbia Board
(continued...)

indicated that the root cause of undeliverable notifications was error on the part of the election officials, not fraud on the part of the applicant.[28] In addition, Congress was warned that postal service errors were responsible for some of the undeliverable mail, especially in poorer neighborhoods.[29]

------

[27](...continued) of Elections and Ethics) (20 percent of persons whose initial notices were returned as undeliverable were reached by subsequent mailings); Universal Voter Registration Act of 1977: Hearings Before the Comm. on House Administration, 95th Cong., 1st Sess. 203 (39 out of 40 persons whose notices returned as undeliverable were reached by subsequent mailings); see also Legislation to Facilitate Exercising the Right to Vote: Hearings Before the Subcomm. on Postal Operations and Services of the House Comm. on Post Office and Civil Service, 99th Cong., 1st Sess. 33 (July 30, 1985) (testimony of Susan Farmer, Secretary of State of Rhode Island) (2 percent of registrants purged because of undeliverable mail appeared at polls and were determined to be eligible to vote).

[28]   See, e.g., Universal Voter Registration Act of 1977, supra, at 203 (testimony of Hon. William Bablitch, Senate Majority Leader of Wisconsin) ("the District Attorney of one of our largest counties found that * * * he got about a hundred [postcards] back out of ten thousand sent out or something, almost all of them were due to clerical errors. Instead of 543 Johnson Street, it was 534 Johnson Street or something like that."); id. at 393 (testimony of Ruth Clusen, President, League of Women Voters) ("in most cases where the card was returned [to the registrar as undeliverable], it was mistakes on the part of election officials, not those who tried to vote").

[29]   See, e.g., Voter Registration, supra, at 311 (testimony of Frank Parker) ("I have seen figures of as high as 5 percent of misdelivered mail. I live here in the District, and just about every day I get a letter that doesn't belong to me, including letters that have somebody else's address on them. So I think if that is true then, you run the risk of purging 5 percent of the electorate erroneously."); Voting Rights Act: Runoff Primaries and Registration Barriers: Oversight Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 98th Cong., 2d Sess 258 (June 28, 1984) (testimony of Sanford Newman, Exec. Dir. of Project VOTE!) ("Indeed, the principal concern about mail verification should be that problems with mail delivery, especially in many low-income neighborhoods (continued...)

Thus, the Senate Report indicates Congress' intent to protect those individuals who registered by mail and whose notices of disposition were returned as undeliverable from being purged from the voter registration rolls without the purge protections of the Act.[30]  Senate Report at 30-32.

Instead of permitting states to use an undeliverable notice of disposition as grounds for the summary denial of a mail registration application, the failure of the notice of disposition to be delivered permits the registrar to initiate Section 8(d) procedures.  The Act thus permits states to use this unsuccessful mailing as a trigger to the Section 8(d) removal procedures, but makes the state wait and see if the person appears to vote, at which point error can be corrected, before

---

[29](...continued)
and housing projects, result in the rejection of applications from people who really do live at the address shown on the application.").  See also Arthur F. Greenbaum, The Postman Never Rings Twice, 33 Am. Univ. L. Rev. 601, 625 (1984) ("[J]ust as service by posting is subject to more interference in public housing projects than in other locations, so too is mail service. This led one prominent commentator to describe mail service in ghetto areas as 'singularly unreliable.'" (footnotes omitted)).

[30]     Moreover, Congress specifically rejected an earlier version of Section 6(d) that would have provided that "if a notice of acceptance of an application is returned undelivered, the State election official shall reject the application."  138 Cong. Rec. S6874, S6878 (May 19, 1992) (emphasis added).  Senator Ford, the floor manager for the NVRA, opposed the amendment, arguing that it "conditions acceptance of a registration application on the Postal Service rather than the applicant meeting the State requirements" and that although he did "not have anything against the U.S. Postal Service or those employees who work so hard to see that our mail gets through, * * * none of us are perfect."  Id. at S6875.  The rejection of this amendment indicates that Congress was skeptical of using mail delivery as a condition of registration.

they are taken off the list. Moreover, the mailing of the
Section 8(d)(2) notice after the first notice is returned
provides a second opportunity for the mail to be properly
delivered.

As Section 528(b)(2) of the PVRA directly conflicts with
Section 6(b) of the NVRA, this Court should declare Section
528(b)(2) of the PVRA to be pre-empted with respect to mail-in
applications for registration in federal elections.[31]

V.   PENNSYLVANIA HAS FAILED TO REMEDY ITS FAILURE TO PROVIDE
     VOTER REGISTRATION AT NVRA-MANDATED PROGRAMS BETWEEN
     JANUARY 1 AND JUNE 1, 1995

There have been 925,408 people who received their driver's
licenses or identity cards, renewed such documents or changed
their address for them between January 1 and June 1, 1995, and
who have not returned to the Pennsylvania Department of
Transportation offices for services after June 1, 1995.  See
Defendant's Answers to United States First Set of
Interrogatories, Nos. 4, 5 and 6.  Exhibit 23.  Thus, these
individuals have all been denied the voter registration
opportunities mandated by Congress.  Moreover, it is probable
that a substantial portion of these individuals would have
registered at the Pennsylvania Department of Transportation had

---

[31]   In ACORN v. Miller, 912 F.Supp. 976, 986 (W.D. Mich.
1995), the district court held that a Michigan statute which
rejects, without further action, a voter registration application
for which the voter identification card was returned by the Post
Office, was not inconsistent with the NVRA. The legislative
history of the NVRA does not support and is contrary to the
interpretation given to this statute by the Michigan court.  See,
e.g., H. Conf. Rep. 66, 103d Cong. 18 (1993); 139 Cong. Rec.
S5643, S5672, S5740 (May 6, 1993).

such opportunities been offered because 238,561 people registered at these sites between June 30 and December 31, 1995. Exhibit 24.

Similarly, there have been hundreds of thousands of people who filed applications, recertifications or changes of address at public assistance and WIC offices between January 1 and June 1, 1995.[32] Additionally, there are 9,054 individuals who applied for vocational rehabilitation services in Pennsylvania during this period. Exhibit 28. These individuals have also been denied the voter registration opportunities mandated by Congress.

Moreover, given that the Orphan's Court was not even named as a discretionary agency for voter registration until the end of June 1995, it appears that over 38,000 couples were not provided the requisite NVRA opportunity for voter registration in 1995.[33] Finally, there are large numbers of people served by

---

[32] We know, from the May 1996 Office of Income Maintenance Report, more than 124,000 people applied for benefits, sought recertification or filed changes of address at its offices in that month alone. Exhibit 44. In response to our interrogatories seeking the number of people who applied for or sought to recertify for public benefits (WIC, AFDC, medicaid an foodstamps) between January 1 and June 1, 1995, and seeking information as to how many of these individuals returned to the agency after June 1, 1995, the state represented that it had created a software program to retrieve the information. Defendants' Answers to United States First Set of Interrogatories, No. 14. Exhibit 23. We have not yet received this information.

[33] According to the Pennsylvania Department of Health, Division of Health Statistics, there were 75,703 marriage licenses provided by Orphan's Courts in 1994. (Exhibit 29). Assuming that roughly the same number of marriage licenses were provided in Pennsylvania in 1995, it would appear that at least 38,000 couples were not provided NVRA voter registration opportunities during 1995. This would be in addition to those
(continued...)

the still undesignated programs serving persons with disabilities in Pennsylvania who have not been reached by the NVRA-mandated opportunities.

In short, Pennsylvania's delay in implementing the NVRA has deprived hundreds of thousands of Pennsylvanians of the easy opportunities for voter registration mandated by the NVRA. The state has an obligation to recapture these lost opportunities.

Illinois, like Pennsylvania, did not provide for NVRA mandated voter registration opportunities as of the January 1, 1995, effective date of the Act. And Illinois, like Pennsylvania, was compelled into compliance through private and federally initiated lawsuits. On May 24, 1996, the district court in Illinois identified the need for the state to recapture the voter registration opportunities lost to its citizens, stating:

> Because Illinois voluntarily selected a route [to challenge the Act's constitutionality] that necessarily created delays in compliance, very large numbers of prospective registrants (those who would have been afforded the opportunity to register at various enumerated Illinois offices between January 1, 1995 and the considerably later dates when such opportunities were first made available) have been deprived of their right to register expressly conferred by the Act.

ACORN v. Edgar, No. 95 C174, unpub. ord. at 2 (N.D. Ill. May 24, 1996) (emphasis in original).[34]  See Exhibit 30.  Hence, on

---

[33] (...continued)
offices which started somewhat later in providing these opportunities.

[34]    Cases brought under other remedial and civil rights statutes support the proposition that the intended beneficiaries
(continued...)

29

July 16, 1996, the court ordered Illinois to offer mail-in voter
registration forms until the cutoff date for the November 1996
general election to each individual who enters an Act-mandated
facility for any reason, and to all individuals who apply for or
renew motor vehicles license plates or motor vehicle registration
stickers. ACORN v. Edgar, No. 95 C174, unpub. ord. at 4-5 (N.D.
Ill. July 16, 1996); See Exhibit 31. Additionally, the court
ordered Illinois to provide a TTY/TDD toll-free number through
which English-speaking or Spanish-speaking persons could register
to vote under the Act, by obtaining a postage pre-paid mail-in
registration form, and further ordered three weeks of media spots
and newspaper advertisement regarding the toll-free number and

---

[34](...continued)
of a constitutional federal statute must have their benefits
retroactively restored to the effective date of the statute.  One
example comes from Section 5 of the Voting Rights Act, wherein
certain jurisdictions must receive federal preclearance of voting
changes prior to their implementation.  Various lawsuits were
brought in the 1980's against states which had completely failed
to preclear changes in their judicial election systems since the
November 1, 1964, effective date of Section 5.  These states
contended that such changes were not covered by the Act.
Nonetheless, when they lost such contentions, courts required
these states to seek preclearance for these changes all the way
back to the 1964 effective date of the Act.  See, e.g., Brooks v.
Board of Elections, 775 F.Supp. 1470 (S.D. Ga. 1989) (three-judge
court), aff'd, 498 U.S. 916 (1990); Haith v. Martin, 618 F.Supp.
410 (E.D.N.C. 1985) (three-judge court), aff'd, 477 U.S. 901
(1986).

   Similarly, when defendants are sued for employment
discrimination under Title VII of the Civil Rights Act and a
violation is proven, courts often award back-pay and other
benefits originating from the date on which the violation began
in order to place the plaintiff in as near as practicable in the
position he or she would have in but for the violation. See,
e.g., Williams v. City of Montgomery, 550 F.Supp. 662 (M.D. Ala.
1982), aff'd, 742 F.2d 586 (11th Cir. 1984), cert. denied, 470
U.S. 1053 (1985).

the deadlines for voter registration, and the distribution of public service announcements publicizing this information. Id. at 4-5. Informational inserts regarding these voter registration opportunities were also directed to be placed in license tag renewal notices and public assistance check envelopes through September 30, 1996. The court also ordered that such advertisements be placed on approximately 3,500 Chicago Transit Authority buses, trains and PACE buses. Id. at 6-7.[35]

Other examples of such relief that courts have endorsed in settlement of NVRA cases include:

- Mailings of voter registration forms to public assistance clients who were not provided NVRA voter registration opportunities and are not currently receiving public assistance benefits and are not registered to vote, Condon v. Reno, No. 3:95-192-0/54, unpub. ord. at 1-2 (D.S.C. Apr. 2 1996);[36] ACORN v. Miller, No. 4:95-CV-45, unpub. ord. at 2-3 (W.D. Mich. March 5, 1996).

- Messages with all unemployment checks issued during a particular week, indicating that any individual who wishes to receive a voter registration form may call and request one from the unemployment or job service

---

[35]    Subsequently, the parties in Illinois agreed to an amended order which, inter alia, kept the aforementioned provisions but only required the toll-free number to be provided until September 30, 1996. ACORN v. Edgar, No. 95 C174, unpub. ord. at 2-3 (N.D. Ill. Aug. 1, 1996). Exhibit 32.

Another aspect of these orders was to include a savings provision which allows election authorities to correct erroneous mail-in registration that are timely filed, even though such corrections are made within thirty days of the election. July 16, 1996 Ord. at 7; Aug. 1, 1996 Ord. at 5.

[36]    The decisions referenced here were attached to the United States' Response to the Court's order to show cause, with the exception of the National Congress of Puerto Rican Rights, et al. v. Sweeney, et al., No. 95 Civ. 8642, consent order (S.D.N.Y Jan. 24, 1996) decision, which is attached as Exhibit 33.

office (which were designated by New York as
discretionary voter registration agencies) and that
assistance in completing the form will be provided at
their offices. <u>National Congress of Puerto Rican
Rights</u> v. <u>Sweeney</u>, No. 95 Civ. 8642, consent order at 5
(S.D.N.Y. Jan. 24, 1996).

• Provision of voter registration opportunities to all
persons who visit welfare offices for any purpose for a
six month period of time and mailing to every person on
the state central welfare database a notice advising
them of a toll-free number by which they may request
voter registration forms or pick up such forms in
person, and likewise sending such notices to all
persons who were denied medicaid, AFDC or foodstamp
benefits during the state's five and a half months of
noncompliance. <u>Voting Rights Coalition v. Wilson</u>, No.
C-94-20860 JW, No. C-95-20042 JW at 1-2, unpub. ord. at
2 (N.D.Cal. Feb. 12, 1996); see also <u>ACORN</u> v. <u>Miller</u>,
No. 4:95-CV-45, unpub. ord. at 2-3 (W.D. Mich. March 5,
1996)(requiring oral offer of voter registration to
each person visiting Department of Social Services for
seven months).[37]

• Provision of voter registration opportunities to all
persons who visit Department of Motor Vehicle offices
for purposes of renewing a motor vehicle registration
for a nine month period and inclusion of a notice in
every motor vehicle renewal registration billing
apprising vehicle owners that they may phone a toll-
free number to obtain a voter registration form and
identifying sites where such forms may be obtained in
person. <u>Voting Rights Coalition</u> v. <u>Wilson</u>, No. C-94-
20860 JW, No. C-95-20042 JW, unpub.ord. at 1-2 (Feb.
12, 1996 N.D. Cal.).

In the instant matter, the state has been unwilling to

outline procedures which it believes will achieve such a remedy

in a manner most suited to its operations.[38]  As other NVRA

---

[37]    Additionally, the Department of State committed to
producing radio public service announcements in English and
Spanish concerning where and how to register to vote at public
assistance and disability offices in Michigan.  <u>Id</u>. at 4.

[38] We note, however, that Robert DeSousa, Chief Counsel for
the Secretary of the Commonwealth, stated during an in-chambers
discussion in April 1995, that the state was considering
(continued...)

32

cases have shown, relief would be effective if the state were to send voter registration mail applications to all of those individuals who filed applications, reapplications and changes of address at Section 7 agencies and Pennsylvania Department of Motor Vehicles, who did not return since June 1995 and who are not registered to vote.[39]

As an alternative to specific mailings of voter registration forms, remediation may also be achieved through a uniform offer of voter registration to all persons who visit any Section 7 and driver's licensing and motor vehicle licensing site for a six month period beginning immediately, and through a state-wide public information campaign apprising the public of these new voter registration possibilities and of the cutoff dates for voter registration in the upcoming elections through the media and through notices with public assistance checks and motor vehicle registration renewals.

Indeed, the idea of offering voter registration to all individuals approaching the receptionist desk at public

---

[38] (...continued)
producing public service advisories and adding mailers about voter registration opportunities to tax notices or other mailings from the state.

[39]    In Michigan, of the 1,009,438 applications mailed to applicants at Section 7 agencies as part of the state's remedial program on May 20-28, 1996, 83,875 resulted in completed applications as of June 30, 1996.  Michigan NVRA Compliance Report, July 31, 1996, at 1; Michigan NVRA Compliance Report, May 31, 1996 at 1, in Exhibit 34.  As Michigan had been providing driver's license-based voter registration since 1975, there were no remedial issues with regard to the state's driver's license applicants.

33

assistance offices does not appear new to Pennsylvania. We note that in Philadelphia, as of May 16, 1996, Deputy Executive Director William Stroup mandated a "Voter Registration Receptionist Initiative" at Philadelphia Offices of Income Maintenance. Under this initiative, the receptionist offers voter registration to all clients who visit the office; this is in addition to the offer of voter registration offered during the intake interview. See Exhibit 35.

Congress contemplated that there would be 20 months of voter registration under the NVRA from January 1, 1995 until the close of registration for next federal general election in November 1996. Pennsylvania, by its total noncompliance with the Act for at least 5 months, reduced this registration period by 25%. That the state took steps toward compliance with the Act in June 1995, does not make up for the fact that it completely failed for at least 5 months to affirmatively offer voter registration opportunities to over one million persons who may well not visit a government agency designated under the NVRA before the close of registration for the federal election in November 1996. These persons must be made whole by being offered the opportunity to register under the NVRA. The state should not be able to rely now on its deliberate delay to argue against placing its citizens in the position that they would have been in absent its violation.

Congress enacted Section 11 of the Act, which authorizes suits such as the instant action, with the intent that injunctive

34

relief would serve "as corrective actions in order to carry out the enforcement of the NVRA." Senate Report at 2. The relief we have requested--to direct the state to provide easy voter registration procedures to those to whom it denied such procedures for most of 1995--falls precisely within the ambit of Congress' intent. Moreover, such relief is well within the authority of this Court to grant, for as the Supreme Court has noted, "the essence of equity jurisdiction has been the power [of the court] to do equity and to mold each decree to the necessities of a particular case." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982), quoting, Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944). Thus, Pennsylvania should attempt to reach those persons who were denied the easy opportunity to register to vote at NVRA mandated agencies since January 1,1995, and to offer them that opportunity prior to this year's federal general election.

VI. PENNSYLVANIA HAS NOT TAKEN THE ACTION NECESSARY TO ENSURE COMPLIANCE AT THE AGENCIES IT HAS DESIGNATED FOR VOTER REGISTRATION

The Pennsylvania Department of Transportation ("PennDOT") has proven to be quite effective in expanding voter registration opportunities for Pennsylvania's citizens and adding people to the voter registration rolls. Yet Pennsylvania's agency-based voter registration programs have shown dismal results.

On average, 80% to 90% of all WIC applicants in Pennsylvania who indicated an interest in applying to register to vote between February and May 1996 took the forms home; as a result although

35

6% to 7% indicated an interest in registering to vote, less than 1% (0.6% to 0.8%) of the individuals filing applications, recertifications or changes of address at WIC offices registered to vote.[40]   Similar rates were reported at the Department of Public Welfare's Office of Income Maintenance.   For example, in the month of May, only 4,074 out of 124,226 (3.3%) of the individuals filing applications or recertification for public assistance or changing their address, completed voter registration forms for transmittal at the public assistance office.   An additional 17,037 people (80% of those indicating an interest in registering to vote) took the forms home.   Exhibit 44.

By way of contrast, in Michigan, a state which began agency-based registration only as a result of a court order, 17% to 24% of those individuals filing applications, recertifications or changes of address related to benefits at public assistance agencies filled out voter registration forms at these sites between February and June 1996.   An additional 3.7% to 6.2% of

_____

[40]    The above figures are based on raw data from the Pennsylvania Department of Health.   See Exhibit 27.   Figures contained in a cumulative report from the Department of Health regarding the WIC program dated May 31, 1996, indicate that only 3,700 of 310,648 (1.2%) completed applications at WIC offices for transmittal to county election officials.   Exhibit 46.   Another 22,827 (or 86% of those indicating a desire to register to vote) took the forms home.   Id.

the individuals visiting these offices took home voter
registration forms.[41]

The depositions of agency personnel paint a picture of
agency components told to conduct voter registration, with no one
responsible for monitoring the results.   According the William
Boehm, Pennsylvania's Director of Voter Registration, neither he
nor any one else in the Secretary of State's office monitors the
voter registration activities of the state agencies.   Deposition
of William Boehm, Director of Voter Registration, Bureau of
Commissions, Elections and Legislation, Pennsylvania Department
of State ("Boehm Depo.") (Exhibit 36) at 55-56.   While he
explains that responsibility lies with the agencies, neither he
nor any one else in the Secretary of State's office has directed
the agencies to conduct any analysis of their voter registration
activities.   Boehm Depo. at 23-25, 33, 70, 88.   He asserts that
the Secretary of State's office is merely obligated to collect
data to supply to the Federal Election Commission in 1997
pursuant to Section 9 of the NVRA 42 U.S.C. 1973gg-7(a).   Boehm
Depo. at 16.

Yet the agencies, with one exception, do not perform this
monitoring function.[42]   Representatives from the Offices of

---

[41]    These figures are based on the raw data in the Monthly
NVRA Compliance Reports submitted to us by the State of Michigan.
Exhibit 34.

[42]    Christine Bowser from the Office of Income Maintenance
("OIM"), testified during her deposition that since information
regarding voter registration activities had become available on a
county by county level at OIM offices, she has been reviewing the
(continued...)

Mental Health, Mental Retardation, and Vocational Rehabilitation
report that they do no monitoring of their voter registration
activities. Wild Depo. at 32-39; Bruaw Depo at 14-16; R. Barton
Depo at 33-34. The NVRA coordinator for the Department of
Health's WIC program stated that she reviews reports showing the
number of declinations, as well as the number of voter
registration forms taken home and the number of voter
registration forms transmitted by each local agency each month.
Deposition of Jeannette Fossi, Supervisor, Program Planning and
Monitoring Unit, Women, Infants and Children Program, Department
of Health ("Fossi Depo.") (Exhibit 39) at 19. But she has taken
no action on the rather alarming data, and she testified that
registration rates of 0.01% or 9 out of 9,323, do not raise any
particular concerns for her, nor does the fact that over 90% of
those indicating an interest in voter registration take the forms

---

[42](...continued)
data. Bowser stated that the high number of people taking home
the voter registration forms (80-90%), concerned her and led to
her June 17, 1996, directive directing OIM caseworkers to
encourage people to fill out their forms in the office.
Deposition of Christine Bowser, Operations Director, Office of
Income Maintenance, Pennsylvania Department of Public Works
("Bowser Depo.") (Exhibit 37) at 161-164, 171; Exhibit 42. Again
this is quite a recent development. Moreover, it does not ensure
that people are actually being asked about voter registration
during their interview. The data base is created by the intake
worker who must fill in an element on the computer screen at each
intake interview. That input choices for that screen consist
only of statements that essentially mean "Yes, I offered the
client voter registration..." There is no input choice for "No,
I did not offer voter registration." See Exhibit 38, which
details the available responses to computer prompt.

home rather than taking the easier course of completing the forms
then and there.  Fossi Depo. at 20, 57.

With respect to the Orphan's Court, it is clear from the
testimony of William Boehm, Boehm Depo. at 38, and the Affidavit
of Martin Madigan, Acting Registrar of Wills for Allegheny
County, Exhibit 40, that there is no central person coordinating
or monitoring compliance at the Orphan's Courts.  The Secretary
of State's records, for example reflect that only one person out
of several thousand marriage license applicants registered to
vote through the Orphan's Court in Philadelphia in 1995, and two
people applied to register to vote through this site between
January and April, 1996.  Boehm Depo. at 36-38.  However, after
we called the Philadelphia Orphan's Court office to determine the
reason for the low number of registration applications, the
number of reported applications rose to 27 in two months.
Exhibit 47.

In sum, Pennsylvania has not assumed its responsibility "to
implement [the NVRA] in a manner that enhances the participation
of eligible citizens as voters in elections for federal office."
42 U.S.C. 1973gg(b)(2).  Given the state's continued resistance
to using readily available data, data which in may cases is in
the possession of state officials, the NVRA's procedures will not
by applied at designated Section 7 agencies unless the Court
requires the state to assume its responsibilities.  As the
details of the administration of this program should be left to
the state an order should be entered requiring that the state

shoulder reporting and monitoring responsibilities to ensure that the state is in a position to run its own program and to certify its compliance, rather than rely on the federal government and private plaintiffs to do so.

Accordingly, we urge the Court to order defendants to provide monthly reports to plaintiffs stating the NVRA activity at each site at each agency until March 1997, with this information broken down by number of people filing applications, recertifications and changes of address as well as the number of people specifically declining to register, the number of blank declination forms, the number of people taking registration forms home and the number of people filling out voter registration forms which were transmitted by each office to the appropriate election officials.  In addition, the Court should direct the coordinator designated by each agency to investigate each site where the take-home rate is 85% or above to determine whether that result is the true choice of the applicant or whether the intake staff is encouraging the applicant to take the form home rather than filling it out then and there.  If this investigation shows that it is the latter case, the coordinator should take corrective steps.

VII. <u>CONCLUSION</u>

As set forth in detail above, the statutory conflicts between the NVRA and PVRA are clear and ripe for decision by way of summary judgment.  Similarly, there are no genuine issues of material fact as to the other issues raised by this motion. Accordingly, we urge that the Court grant this motion for summary judgment.

40

Respectfully submitted,

MICHAEL R. STILES
United States Attorney

DEVAL L. PATRICK
Assistant Attorney General
Civil Rights Division

ELIZABETH JOHNSON
BARRY H. WEINBERG
JUDYBETH GREENE
Attorneys, Voting Section
Civil Rights Division
Department of Justice
P.O. Box 66128
Washington, D.C. 20035-6128
(202) 616-2350

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of August 1996, I caused a copy of the foregoing Motion for Summary Judgment to be served upon the defendants, amicus participants, and ACORN plaintiffs by first class mail and telefacsimile addressed as follows:

Calvin Koons, Esq.
Senior Deputy Attorney General
Office of Attorney General of the
    Commonwealth of Pennsylvania
15th Floor, Strawberry Square
Litigation Section
Harrisburg, PA  17120

Thomas A. Allen, Esq.
One Liberty Place, Suite 1800
1650 Market Street
Philadelphia, PA  19103

David Rudovsky
Kairys, Rudovsky, Kalman & Epstein
924 Cherry Street, Suite 500
Philadelphia, PA  19107

Elliot Mincberg
Lawrence Ottinger
People for the American Way
2000 M Street, N.W., Suite 400
Washington, D.C.  20036

Steve Bachmann
ACORN
P.O. Drawer 310
2657 Lakeshore
Edwardsburg, MI  49112-0310

JUDYBETH GREENE
Trial Attorney

## EXHIBIT LIST ACORN v. RIDGE

1. January - June 1995 Admissions, and Total Population Served in FY 94/95 at Pennsylvania-operated in-patient psychiatric facilities, as provided by the Pennsylvania Office of Mental Health, Department of Public Welfare.

2. Deposition of Robert Wild, Director of the Bureau of Management, of the Office of Mental Health in the Department of Public Welfare.

3. Charts Reflecting Unduplicated Client Count of Patients Served by Various Types of Mental Health Programs Funded by Pennsylvania.

4. Chart Reflecting Number of Persons Served in Various State-Funded Programs Serving Individuals with Mental Retardation in Pennsylvania in FY 1994/95.

5. Deposition of John J. Detman, Division Chief, Division of Community Services, Department of Aging.

6. Letter of July 15, 1996 from Calvin Koons, Esq. to Judybeth Greene, Esq.

7. Deposition of Donald E. Lunday, Chief of the Regional Programs Division Bureau of Adult Basic and Literacy Education, Pennsylvania Department of Education.

8. Deposition of Samuel Bashore, Special Education Advisor, Bureau of Special Education, Pennsylvania Department of Education.

9. Deposition of Raymond Walker, Supervisor, Facilities and Grants Management Section, Pennsylvania Office of Vocational Rehabilitation.

10. Deposition of Eugene Barton, Director of Field Operations, Bureau of Blindness and Visual Services, Office of Social Programs, Department of Public Welfare.

11. United States' Notice of Deposition, dated June 27, 1996.

12. Deposition of Roger Barton, Assistant Director, Bureau of Program Operations, Office of Vocational Rehabilitation, Pennsylvania Department of Labor.

13. Voting Rights Coalition v. Wilson, Case Nos. C-94-20860 JW and 95-20042 JW, unpublished order (N.D. Cal. Nov. 2, 1995) and Voting Rights Coalition v. Wilson, Jt. Stipulation to Substitute Language (N.D. Cal., filed Nov. 9, 1995).

14. Text of 25 P.S. § 625-33 and 951-31 (repealed June 30, 1995).

15.   Advisory dated August 31, 1994, from William Boehm, Commissioner, Bureau of Commissions, Elections and Legislation to County Registration Commissions recommending that they do not take action pursuant to purge and canvass provisions of Pennsylvania Voter Registration Act until a conclusion is reached on the Department of Justice's challenge to those provisions.

16.   Affidavit of Sandra Ruppert, Chief Registrar, Berks County, Pennsylvania.

17.   Affidavit of Karen Hoyt-Stewart, Director of Elections and Voter Registration, York County, Pennsylvania.

18.   Affidavit of Karen Axe, Chief Clerk of the Election Board, Lancaster County, Pennsylvania.

19.   Affidavit of Fay Ginther, Chief Clerk to the Election Board and Registration Commission, Lehigh County, Pennsylvania.

20.   Affidavit of Barbara A. DeCarlo, Director, Bureau of Elections, Fayette County, Pennsylvania.

21.   Affidavit of Mark Wolosik, Director Election Bureau, Allegheny County, Pennsylvania.

22.   Affidavit of Donna Brumbarger, Office Manager of the Election/Voter Registration Office for Clearfield County, Pennsylvania.

23.   Defendant's Answers to United States' First Set of Interrogatories.

24.   Chart Containing Number of Persons Registering to Vote in Pennsylvania between June 30 and December 31, 1995 through PVRA and Other Sources; Chart Provided by Pennsylvania Department of State, Bureau of Commissions, Elections and Legislation.

25.   No Document.

26.   Deposition of William Bruaw, Mental Retardation Program Specialist, Bureau of Direct Program Operations, Office of Mental Retardation, Pennsylvania Department of Public Welfare.

27.   Voter Registration Reports, February - May, 1996, Pennsylvania Department of Health Division of Special Foods Programs - WIC.

28.   Letter of July 16, 1996 from Calvin Koons, Esq. to Judybeth Greene, Esq.

29.   Chart Showing the Number of Marriages in Each County in Pennsylvania in 1994 and Cumulative Total.  Pennsylvania Department of Health.  (Note: Counties are designated by number

codes; a chart correlating the number codes to counties is also attached.)

30. ACORN v. Edgar, No. 95 C174, Unpub. Ord. (N.D. Ill. May 24, 1996).

31. ACORN v. Edgar, No. 95 C174, Unpub. Ord. (N.D. Ill. July 16, 1996).

32. ACORN v. Edgar, No. 95 C174, Unpub. Ord. (N.D. Ill. Aug. 1, 1996).

33. National Congress of Puerto Rican Rights, et al. v. Sweeney, et al., No. 95 Civ. 8642, consent order (S.D.N.Y Jan. 24, 1996).

34. NVRA Status Reports, State of Michigan (March-July 1996); ACORN v. Miller, 912 F.Supp. 976 (W.D. Mich. 1995).

35. Memorandum of William Stroup, Deputy Executive Director, Office of Income Maintenance, to Philadelphia Office of Income Maintenance Centers, July 16, 1996.

36. Deposition of William Boehm, Director of Voter Registration, Bureau of Commissions, Elections and Legislation, Pennsylvania Department of State.

37. Deposition of Christine Bowser, Operations Director, Office of Income Maintenance, Pennsylvania Department of Public Works.

38. Department of Public Welfare Computer Prompt Information re: Voter Registration Codes, February 12, 1996.

39. Deposition of Jeannette J. Fossi, Supervisor, Program Planning and Monitoring Unit, Women, Infants and Children Program, Pennsylvania Department of Health.

40. Affidavit of Martin Madigan, Acting Registrar of Wills, Allegheny County, Pennsylvania.

41. No Document.

42. Operations Memorandum #96-6-4, From Christine Bowser, Director Bureau of Operations to Executive Directors in the Office of Income Maintenance, Pennsylvania Department of Public Works, June 17, 1996.

43. Deposition of Edward Manning, Regional Program Manager for the Central Region Office of Mental Retardation, Department of Public Welfare.

44. Computer Summary of Voter Registration Activity at Pennsylvania Offices of Income Maintenance April 23 - May 23, 1996.

45.   Voter Registration Report reflecting cumulative state information as of May 31, 1996 regarding voter registration activities at Pennsylvania Department of Health WIC offices.

46.   Cumulative State Totals for Voter Registration Activities by Local Office by Month at WIC offices, produced by Department of Health.

47.   Voter Registration Statistics for May 1, 1996 through June 30, 1996, County of Philadelphia, PA.

# Attachment 4

```
 1   JANET RENO, Attorney General           Local counsel:
     for the United States                 MICHAEL J. YAMAGUCHI
 2   ISABELLE KATZ PINZLER                  United States Attorney
     Asst. Atty General                    No. Dist. of California
 3   ELIZABETH JOHNSON                      MARY BETH UITTI
     BARRY H. WEINBERG                      Chief of Civil Division
 4   MICHELE E. GILMAN                      YONKEL GOLDSTEIN
     Attorneys, Voting Section             Bar No. 136169
 5   Civil Rights Division                 280 South First Street
 6   United States Department of Justice   Suite 371
     P.O. Box 66128                        San Jose, CA 95113
 7   Washington, DC 20035-6128             (408) 535-5056
     Telephone: (202) 307-3266
 8
     Attorneys for Defendants,
 9   Counter-claimants and
     Third-party Plaintiffs
10   UNITED STATES OF AMERICA
     and JANET RENO,
11   The Attorney General
12
13                 UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                      SAN JOSE DIVISION
15   PETE WILSON, et al.,         )   Case No. C 95-20042-JW
                                  )   Case No. C 94-20860-JW
16        Plaintiffs,             )   (Consolidated)
                                  )
17                                )
                                  )
18        v.                      )   UNITED STATES' NOTICE OF
                                  )   MOTION AND MOTION
19   UNITED STATES OF AMERICA,    )   FOR FURTHER RELIEF
     et al.,                      )
20                                )   DATE: December 8, 1997
                                  )   TIME: 9:00 a.m.
21        Defendants,             )
     _____/
22
23         UNITED STATES' MOTION FOR FURTHER RELIEF
24      TO DEFENDANTS AND THEIR ATTORNEYS:
25      PLEASE TAKE NOTICE THAT plaintiff United States hereby
26   moves for further relief against defendants, their agents,
27
     U.S. Motion for Further Relief
```

servants, employees, and representatives.  The United States
respectfully requests that this Court grant the following
relief with regard to California's purge and fail-safe voting
procedures for elections of federal officials:

1.    Declare that California's Alternative Residency
Confirmation Procedure (ARCP), Cal. Elec. Code § 2444,
violates the National Voter Registration Act (NVRA), 42 U.S.C.
§ 1973gg-6(b)(2), because it constitutes a purge for
nonvoting, and order the defendants not to employ ARCP as a
direct or indirect means for removing a voter from the list of
eligible voters;

2.    Declare that California's fail-safe voting procedures
for registrants who have moved within the same registrar's
jurisdiction and the same congressional district without re-
registering to vote violates the NVRA, 42 U.S.C. § 1973gg-
6(e)(2), insofar as the state does not permit fail-safe voters
who move prior to twenty-eight days before a federal election
to vote by affirmation at any location;

3.    Order defendants to inform this Court within two
weeks of this Court's order which of the alternatives provided
by the NVRA the state will use to comply with the fail-safe
voter provisions of the NVRA: (a) permitting fail-safe voters
to vote at their old location (upon oral or written
affirmation), central location (upon written affirmation), or

new location (upon such confirmation as required by state law); or (b) permitting all fail-safe voters to vote at their old polling location upon oral or written affirmation; or (c) permitting all fail-safe voters to vote at their new polling location upon oral or written affirmation;

4.   Order defendants immediately to advise all affected officers and agencies of this Court's Order; and

5.   Grant such other and further relief as may be just and proper.

Dated: October 22, 1997

Respectfully submitted,

MICHAEL J. YAMAGUCHI
United States Attorney

ISABELLE KATZ PINZLER
Acting Assistant Attorney
General

*Michele E. Gilman*

ELIZABETH JOHNSON
BARRY H. WEINBERG
MICHELE E. GILMAN
Attorneys, Voting Section
Civil Rights Division
United States
Department of Justice
P.O. Box 66128
Washington, DC 20035-6128
(202) 307-3266
FAX:   (202) 307-3961

## CERTIFICATE OF SERVICE

Case name:   <u>Pete Wilson</u> v. <u>United States</u>, No. C95-20042-JW,
             and <u>Voting Rights Coalition</u> v. <u>Pete Wilson</u>, No.
             C94-20860-JW (Consolidated) in the United States
             District Court for the Northern District of
             California

I, Michele E. Gilman, am employed in the District of
Columbia.  I am 18 years of age or older and not a party to the
within entitled cause.  My business address is Department of
Justice, Civil Rights Division, Voting Section, 320 1st Street,
Washington, D.C. 20534.

I hereby certify that on October 22, 1997, I have caused to
be served the attached

NOTICE OF MOTION AND MOTION FOR FURTHER RELIEF

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR FURTHER RELIEF

PROPOSED ORDER

NOTICE OF SUBSTITUTION OF COUNSEL

by mailing via Federal Express a true copy thereof enclosed in a
sealed envelope with postage prepaid as follows:

Daniel E. Lungren                Robert Rubin
Attorney General of the          Nancy Stuart
 State of California             Lawyer's Committee for Civil
Cyrus J. Rickards                  Rights of the San Francisco
Deputy Attorney General            Bay Area
1300 I Steet                     301 Mission Street, Suite 400
Sacramento, CA 94244-2550        San Francisco, CA 94105


Michele E. Gilman

JANET RENO, Attorney General
for the United States
ISABELLE KATZ PINZLER
Asst. Atty General
ELIZABETH JOHNSON
BARRY H. WEINBERG
MICHELE E. GILMAN
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
P.O. Box 66128
Washington, DC 20035-6128
Telephone: (202) 307-3266

Local counsel:
MICHAEL J. YAMAGUCHI
United States Attorney
No. Dist. of California
MARY BETH UITTI
Chief of Civil Division
YONKEL GOLDSTEIN
Bar No. 136169
280 South First Street
Suite 371
San Jose, CA 95113
(408) 535-5056

Attorneys for Defendants,
Counter-claimants and
Third-party Plaintiffs
UNITED STATES OF AMERICA
and JANET RENO,
The Attorney General

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | | |
|---|---|---|
| PETE WILSON, et al., | ) | Case No. C 95-20042-JW |
| | ) | Case No. C 94-20860 JW |
| Plaintiffs, | ) | (Consolidated) |
| | ) | |
| | ) | |
| v. | ) | **UNITED STATES' MEMORANDUM** |
| UNITED STATES OF AMERICA, | ) | **IN SUPPORT OF MOTION FOR** |
| et al., | ) | **FURTHER RELIEF** |
| | ) | |
| | ) | Date: December 8, 1997 |
| Defendants, | ) | Time: 9:00 a.m. |
| _____ | / | |

U.S. Memorandum of Law

1

## TABLE OF CONTENTS

2

I.    THE ALTERNATIVE RESIDENCY PROCEDURE IS A NON-VOTING
3        PURGE IN VIOLATION OF THE NVRA . . . . . . . . . . . .    2

4        A.    THE RESIDENCY CONFIRMATION OUTREACH PROCEDURE . .    2

5        B.    THE ALTERNATIVE RESIDENCY CONFIRMATION PROCEDURE    5

6
II.   CALIFORNIA'S FAIL-SAFE PROVISIONS VIOLATE THE NVRA AND
7        MAY HAVE AN ADVERSE IMPACT ON MINORITY VOTERS  . . . .    9

8
III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .    15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# TABLE OF AUTHORITIES

**FEDERAL STATUTES**

National Voter Registration Act of 1993, 42 U.S.C.
§§ 1973gg to 1973gg-10   . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1973gg-6(d)(2)   . . . . . . . . . . . . . . . 3

42 U.S.C. § 1973gg-6(b)(2)   . . . . . . . . . . . . . . . 2

42 U.S.C. § 1973gg-6(c)   . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1973gg-6(e)(2)   . . . . . . . . . . . 9, 10, 11

**LEGISLATIVE MATERIALS**

S. Rep. 103-6 (1993)   . . . . . . . . . . . . . . 2, 8, 10

H. Rep. 103-9 (1993)   . . . . . . . . . . . . . . . 7, 10

**STATE STATUTES**

Cal. Elec. Code § 2224 (ARCP)   . . . . . . . . . 1, 2, 5, 9

Cal. Elec. Code §14311 (fail-safe)   . . . . . . . 1, 11, 12

Cal. Elec. Code § 2035 (fail-safe)   . . . . . . . . . . 10

**MISCELLANEOUS**

Joint Stipulation (Nov. 13, 1995)   . . . . . . . . . . . 3

Memorandum of Points and Authorities in Support of
Defendants' Opposition to Plaintiffs' Motion for Further
Relief, at 8 (Aug. 25, 1995)   . . . . . . . . . . . . . . 4

Order Granting In Part and Denying In Part Plaintiffs Voting
Rights Coalition and United States' Motion for Further
Relief, at 5-6 (Nov. 2, 1995) . . . . . . . . . . . . . . 4

Transcript of Proceedings before the Hon. James Ware, at
67-68, 69 (Oct. 20, 1995) . . . . . . . . . . . . . . . . 5

**UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FURTHER RELIEF**

On May 4, 1995, this Court gave the State of California forty-five days to comply with the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg to 1973gg-10. Despite this Court's Order, California subsequently enacted two additions to its election code which conflict with the NVRA. On January 31, 1996, California enacted the Alternative Residency Confirmation Procedure ("ARCP"), Cal. Elec. Code § 2224, which permits counties to purge registered voters for non-voting in contravention of the NVRA. On October 16, 1995, California enacted Cal. Elec. Code § 14311, which requires persons who have moved within a county prior to twenty-eight days before an election without re-registering to vote to show identification before being permitted to vote. This requirement defies the NVRA's mandate that for federal elections states provide at least one location at which such "fail-safe" voters, who are already registered voters, can vote by affirmation, without identification. Accordingly, the United States respectfully requests that this Court declare California Election Code Sections 2224 and 14311 to be in violation of, and preempted by, the NVRA.

II.   **THE ALTERNATIVE RESIDENCY PROCEDURE IS A NON-VOTING PURGE IN VIOLATION OF THE NVRA**

The NVRA prohibits non-voting purges, i.e., procedures which lead to the removal of an otherwise qualified voter from the voting rolls for failure to vote.  42 U.S.C. § 1973gg-6(b)(2).  The legislative history of the NVRA makes it clear that Congress considered the prohibition on purging for non-voting an essential element of the Act:

> One of the purposes of this bill is to ensure that once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction. The [Senate] Committee recognizes that while voting is a right, people have an equal right not to vote, for whatever reason.  However, many States continue to penalize such non-voters by removing their names from the voter registrations rolls merely because they have failed to cast a ballot in a recent election...

S. Rep. 103-6, at 17-18 (1993)(emphasis added).

Despite this language and despite the express prohibition in the Act of non-voting purges, in January of 1996, the State of California enacted the ARCP.  Cal. Elec. Code § 2224.  This procedure is exactly the type of purge the NVRA prohibits.

A.   **THE RESIDENCY CONFIRMATION OUTREACH PROCEDURE ("RCOP")**

This Court previously considered the issue of non-voting purges in this case when the United States and private plaintiffs challenged a list maintenance mechanism proposed by the state in its first NVRA Implementation Manual, which

U.S. Memorandum of Law                    -2-

was submitted to this Court on March 17, 1995.  That procedure, referred to as the Residency Outreach Confirmation Procedure ("RCOP") permitted county registrars to send nonforwardable "residency confirmation postcards" to voters who had not voted within six months prior to a primary election in even-numbered years or a general election in odd-numbered years.

If the postcard was returned as undeliverable without forwarding address information, a forwardable confirmation notice would be sent out pursuant to Section 8(d)(2) of the NVRA, 42 U.S.C. § 1973gg-6(d)(2).  If this notice was not returned and the voter did not vote in the next two federal elections, the voter would be removed from the registration list.  Joint Stipulation (Nov. 13, 1995).

The United States and private plaintiffs contended that this procedure constituted a non-voting purge in violation of the NVRA because non-voting was used as the trigger which eventually could result in a voter's removal from the rolls.

The state contended that using non-voting to trigger the NVRA's Section 8(d)(2) notice and removal procedure did not violate the NVRA because it was not non-voting per se which caused the voter to be purged, but rather, information received in response to the residency confirmation postcards that the voter was no longer at the address on record.  In its brief in support of this argument, the state specifically

U.S. Memorandum of Law                    -3-

pointed out that if the voter did not return the residency

confirmation postcard, the voter remained on the rolls:

> [I]f through mistake or a deep-seated
> disgust with government forms or because
> you had a bad day at the office or for
> any reason at all, <u>you simply throw the
> card away, nothing happens</u>.  You are not
> removed from the voting rolls.  It is
> only if the registrar receives
> information from a new resident or the
> post office indicating that you have
> moved that the RCOP purge procedures are
> triggered.

<u>Memorandum of Points and Authorities in Support of</u>

<u>Defendants' Opposition to Plaintiffs' Motion for Further</u>

<u>Relief</u>, at 8 (Aug. 25, 1995) (emphasis added).

Agreeing with this rationale, this Court held that RCOP

was not a non-voting purge:  "Since the State receives a card

which states that the <u>card is undeliverable</u> and then the

addressee fails to vote in subsequent elections, the Court

finds that the State's current `Residency Confirmation and

Outreach Program' does not violate the NVRA."  <u>Order Granting</u>

<u>In Part and Denying In Part Plaintiffs Voting Rights</u>

<u>Coalition and United States' Motion for Further Relief</u>, at 5-

6 (Nov. 2, 1995) (emphasis added).

At oral argument on the Motion for Further Relief, this

Court emphasized the crucial distinction between (i)

triggering the Section 8(d)(2) process because a residency

confirmation postcard is returned as undeliverable and (ii)

triggering the purge process simply because the voter chose

not to respond:

> Here's what I would like to have you
> address and which I understand is the
> concern: in an effort to zealously police
> the voting roles the state could use the
> fact that a person doesn't vote to send
> out lots of these cards, this results in
> an obligation, creating obligation by
> voters to respond in some way or to
> scrutinize about their eligibility to
> vote when the NVRA has said that
> nonvoting is okay, you can live in this
> country until you're ninety years old and
> vote for the first time.  And that the
> concern is that by using nonvoting as a
> triggering event, that places a burden on
> the voters which the NVRA has explicitly
> said cannot be there.

Transcript, at 67-68.

Counsel for the state answered as follows:

> My response to the court is that [the]
> California system is not that.  It is not
> remotely that, and that nobody is removed
> from the voter roll for failure to vote,
> and I think what really goes to show that
> is the fact that <u>if this card goes out,</u>
> <u>as we pointed out in the brief, and it</u>
> <u>gets thrown away for any reason, nothing</u>
> <u>happens</u>.

Transcript, at 69 (emphasis added).

## B.   THE ALTERNATIVE RESIDENCY CONFIRMATION PROCEDURE ("ARCP")

Shortly after this Court's ruling, in January 1996, the
state enacted an additional list maintenance procedure, now
codified as Cal. Elec. Code § 2224, which contains the very

evil RCOP avoided.[1]  Under this Alternative Residency

Confirmation Procedure ("ARCP"), people registered to vote in

elections for federal office, who have not voted in four

years, are sent a forwardable residency confirmation postcard

with a postage paid and pre-addressed return portion on which

the voter can verify or correct the address information.

Voters who do not respond to the postcard -- in the

state's terms, those who throw the card away -- are placed on

the inactive voters list and sent a notice informing them

that they must vote within two general federal elections or

be removed from the list of voters, <u>even if the state</u>

<u>receives no information that they have moved</u>.  In other

words, if the voter still lives at the same address, but

chooses to ignore the confirmation postcard, whether

"...through mistake or a deep-seated disgust with government

forms or because you had a bad day at the office," he or she

will now be removed from the list of voters.  Thus, ARCP

---

[1] The bill which enacted the procedure, S.B. 1313, was
submitted to the Department of Justice for review under
Section 5 of the Voting Rights Act on December 23, 1996.
Although the statute was passed in January of 1996, it did not
go into effect until January of 1997.  On June 23, 1997, the
United States precleared S.B. 1313 as enabling legislation.
The ARCP procedure was added to the revised NVRA
Implementation Manual and submitted to the United States on
January 14, 1997.  The United States precleared the manual as
enabling on August 18, 1997.  The four counties in California
which are covered under Section 5 of the Voting Rights Act
(Yuba, Monterey, Kings and Merced) must individually submit
their procedures under ARCP for approval under Section 5.

U.S. Memorandum of Law              -6-

accomplishes what RCOP did not. Under the new law, enacted after this Court's previous order on non-voting, a voter can be removed from the list of eligible voters for failure to vote despite the NVRA's express prohibition against non-voting purges, and despite the legislative history and this Court's statements which make it clear that registered voters have a right not to vote, just as they have a right to vote.

The NVRA is explicit regarding the reasons for which a voter may be purged from the lists. Sections 8(a)(3) and (4) of the NVRA provide that the name of a registrant may not be removed from the official list of eligible voters except: (1) at the request of the registrant; (2) as provided by state law, by reason of criminal conviction or mental incapacity; or (3) pursuant to a general program to remove voters who have become ineligible by reason of death or a change in residence.

This list does not include a failure to respond to notices from local registrars. Indeed, the legislative history of the Act, as discussed earlier, shows that Congress did not want such a failure to result in elimination from voting rolls. Moreover, the House Committee Report, while noting the importance of keeping accurate and current voter rolls, states that "[t]he Committee is concerned that [any activity that is used to start, or has the effect of starting, a purge of the voter rolls] can be abused and may

1  result in the elimination of names of voters from the rolls

2  solely due to their failure to respond to a mailing."   H.

3  Rep. 103-9, at 15 (1993) (emphasis added).

4      Congress recognized that prior to the NVRA most states

5  used non-voting as an indicator that a person had moved.

6  However, Congress was concerned about the discriminatory

7  effects of these laws, and sought to eliminate the

8  presumption that non-voting means a voter has moved.

9
             While most States use the procedure of
10           removal for non-voting merely as an
             inexpensive method for eliminating
11           persons believed to have moved or died,
             many persons may be removed from the
12           elections rolls merely for exercising
             their right not to vote, a practice which
13           some believe tends to disproportionately
             affect persons of low incomes, and blacks
14           and other minorities.

15  S. Rep. 103-6, at 17-18 (1993).

16
17      The state does not need to use non-voting to keep its

18  voter registration lists clean.  Section 8(c) of the NVRA

19  sets forth one way to comply with the NVRA's requirement that

20  each state establish a general program to remove voters who

21  have become ineligible by reason of change of address;

22  namely, using the National Change of Address information

23  supplied by the Postal Service.  42 U.S.C. § 1973gg-6(c).

24  But NCOA is not the exclusive way to track voters who have

25  moved.  There are many, many other ways in which counties

26  can, and do, identify voters who have become ineligible to

27

vote because they have moved.  For instance, California

counties rely on returned sample ballots sent out prior to

each election, change of address information from the

Department of Motor Vehicles and public assistance agencies,

address correction information from the Postal Service, and

returned voter notification cards, just to name a few.  All

of these provide the state with actual, reliable information

that the voter has become ineligible by reason of change of

address <u>before</u> the purge process is triggered.  Moreover,

many of these mailings go to all registered voters, including

those who do not vote and are thereby targeted by the state's

new ARCP non-voting purge procedures.

The function of ARCP is as a purge for nonvoting.

Accordingly, the United States respectfully requests that

this Court declare the ARCP to be a non-voting purge in

violation of the NVRA and enjoin the state from its further

implementation.

## II.   CALIFORNIA'S FAIL-SAFE PROVISIONS VIOLATE THE NVRA AND MAY HAVE AN ADVERSE IMPACT ON MINORITY VOTERS

The NVRA specifies the locations at which voters who

have moved within their registrar's jurisdiction and the same

congressional district without re-registering to vote may

cast their ballots in elections for federal office.  42

U.S.C. § 1973gg-6(e)(2)(A).  Congress went to the trouble of

specifying the permissible polling places for this narrow

class of voters in order "to incorporate an underlying purpose
of the Act; that once registered, a voter . . . remain on the
list of voters so long as the individual remains eligible to
vote in that jurisdiction." H. Rep. 103-9, at 18 (1993); S.
Rep. 103-6, at 34 (1993).

Pursuant to the NVRA, voters who have moved within their
registrar's jurisdiction and the same congressional district
without re-registering must be allowed to vote in elections
for federal office "at the option of the registrant" (i) upon
oral or written affirmation of their new address at their <u>old</u>
polling place; (ii) upon written affirmation of their new
address at a <u>central</u> location designated by the registrar; or
(iii) upon "confirmation" of their new address "by such means
as are required by law" at their <u>new</u> polling place.[2]  42
U.S.C. § 1973gg-6(e)(2)(A).  However, if the state permits
these voters to vote upon oral or written affirmation at
either their old or new polling place, no other voting
locations need be provided for these voters.  42 U.S.C. §
1973gg-6(e)(2)(B).  This option reflects Congress' desire to
ensure that there is at least one location at which a fail-
safe voter can vote solely upon affirmation in elections for

---

[2]  The distinction between "affirmation" and "confirmation"
hinges on whether a voter may simply assert -- under oath or not,
as the state may desire -- their current address (affirmation), or
whether the state can require some form of independent verification
of their address (confirmation).

U.S. Memorandum of Law          - 10 -

1    federal office.

2       California law conflicts with this scheme.  Prior to the

3    NVRA, California law provided that voters who moved anywhere

4    in the state within twenty-eight days prior to an election

5    could vote at their old polling place without affirmation or

6    identification.  Cal. Elec. Code § 2035.  However, voters who

7    moved before the twenty-eight day registration deadline

8    without re-registering to vote could not vote in the

9    election.  Following this Court's May 1995 Order requiring

10   the state to comply with the NVRA, California enacted Cal.

11   Elec. Code § 14311, which provides that voters who have moved

12   within a county and who have not re-registered at their new

13   address may vote either at the central location or at their

14   new polling place.  At either location, such voters must show

15   "proof of current residence."  Persons who move within twenty-

16   eight days of an election continue to be allowed to vote at

17   their old polling place; no showing of identification is

18   required of these voters.[3]

19

20      California's lack of compliance with the NVRA is clear,

21   as is the procedure the state can adopt to cure it.  Under

22   the NVRA, 42 U.S.C. § 1973gg-6(e)(2), in federal elections

23   identification can only be required at the new polling place

24

25      [3]  The bill which contains § 14311 was submitted to the
26   Department of Justice for review under Section 5 of the Voting
     Rights Act on December 7, 1995.  The United States precleared it on
27   February 5, 1996.

U.S. Memorandum of Law              - 11 -

1  -- not at the central or old polling places.  By contrast,

2  California requires identification at <u>both</u> the central and

3  new locations and provides for voting at the old location

4  only for voters who have moved within twenty-eight days prior

5  to the election.  Moreover, the NVRA provides that if the

6  state permits fail-safe voters to vote upon affirmation at

7  either the old or the new polling place, no other locations

8  need be provided.  As noted earlier, this ensures that there

9  exists at least one location at which a fail-safe voter can

10  vote in federal elections without identification.  However,

11  under California law, only voters who have moved within

12  twenty-eight days of an election have this option.

13

14      The state's clear violation of the NVRA is particularly

15  troubling because the state appears to have the most

16  stringent fail-safe voter identification requirements in the

17  country.[4]  Pursuant to Cal. Elec. Code § 14311, the Secretary

18  of State promulgated a regulation setting forth the

19

_____

20      [4]  This conclusion is based on the results of surveys which the
21  Federal Election Commission asked the states to complete as part of
    the FEC's report to Congress on the impact of the NVRA on the
22  administration of elections for federal office during the preceding
    two-year period, 1995 through 1996.  Forty-three states and the
23  District of Columbia responded to the survey (six states are exempt
    from the Act and Vermont had not yet implemented the Act).
24  California refused to report on any of the issues surveyed other
    than registration statistics.  The surveys revealed that only five
25  other states are requiring a form of identification from fail-safe
    voters, and that none of those states are requiring more than one
26  form of identification from any fail-safe voter.  (<u>See</u> Attachment
    A <u>Declaration of Penelope Bonsall in Support of United States'</u>
27  <u>Motion for Further Relief.</u>)

acceptable forms of identification to prove residency.  (See Attachment B.)  This regulation provides that persons without driver's licenses or California identification cards must show two forms of identification to demonstrate their residency.  These forms of identification include lease agreements, mortgage statements, property tax statements, income tax returns, utility bills, credit card statements, and the like, as well as a sworn statement from another voter in the precinct stating that he or she can identify the person attempting to vote and attesting to their address. Poor persons are less likely to possess driver's licenses[5] and even less likely to possess two of the alternative forms of identification, since most are linked to property ownership or financial stability.  And in California, poor persons are disproportionately members of racial and language groups who

---

[5] The 1990 U.S. Department of Transportation Drivers License Statistics show as follows:

| Income | With Licenses | Without Licenses |
|---|---|---|
| <$10,000 | 73.4% | 26.6% |
| $10,000-$19,999 | 84.7% | 15.3% |
| $20,000-$34,999 | 92.2% | 7.8% |
| $35,000-$49,999 | 95.1% | 4.9% |
| >$50,000 | 97.3% | 2.7% |

are protected under the Voting Rights Act.[6]

The NVRA expressly mandates that any list maintenance program be "nondiscriminatory, and in compliance with the Voting Rights Act of 1965." Section 14311, in addition to facially violating the NVRA, raises the potential for discrimination, however unintentional, against minorities. Accordingly, the United States respectfully requests that this Court declare Section 14311 a violation of the NVRA and order the state to bring its fail-safe voter provisions into compliance with the NVRA insofar as the state does not permit fail-safe voters who move prior to twenty-eight days before an election to vote in federal elections by affirmation at any location.

In order to bring its fail-safe voter provisions into compliance with the NVRA for federal elections, the state has three alternatives: (1) permit fail-safe voters to vote at their old location (upon oral or written affirmation), central location (upon written affirmation), or new location (upon such confirmation as required by state law); or (b) permit all fail-safe voters to vote at their old polling

---

[6] According to 1990 Census data, while Hispanics constitute only 22.5% of the voting age population in California, they constitute 39.3% of voting age persons living in poverty. Likewise, blacks constitute 6.7% of the voting age population, but 10.7% of voting age persons living in poverty. See also 42 U.S.C. §§ 1973 and 1973aa-1a (provisions of the Voting Rights Act protecting language minorities).

location upon oral or written affirmation;[7] or (c) permit all fail-safe voters to vote at their new polling location upon oral or written affirmation.  Only by selecting one of these alternatives can the state remedy its current violation of the NVRA.  Of course, the NVRA applies only to elections for federal office.  Accordingly, the State may provide fail-safe voters with a ballot containing only federal contests.

## III.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court declare Sections 2224 and 14311 of the California Election Code in violation of and preempted by the NVRA, and order the state to adopt fail-safe procedures that comply with the NVRA and to seek review for these new procedures under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

---

[7]   We note that this option permits the state to use its present procedure for voters who move within twenty-eight days of an election (or an affirmation procedure) for all voters who move before an election without updating their voter registration records.

1

2   MICHAEL J. YAMAGUCHI
  United States Attorney

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Respectfully submitted,

ISABELLE KATZ PINZLER
Acting Assistant Attorney
General

*Michele E Gilman*

ELIZABETH JOHNSON
BARRY H. WEINBERG
MICHELE E. GILMAN
Attorneys, Voting Section
Civil Rights Division
United States
Department of Justice
P.O. Box 66128
Washington, DC 20035-6128
(202) 307-3266
FAX:  (202) 307-3961

U.S. Memorandum of Law      -  16  -

# Attachment 5



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

February 11, 1997

DLP:EJ:BHW:TCH:POB
DJ 166-6-5

VIA TELEFACSIMILE & FEDERAL EXPRESS

The Honorable Bruce M. Botelho
Attorney General
State of Alaska
450 Diamond Courthouse
P.O. Box 110300
Juneau, Alaska  99811-0300

Dear Mr. Attorney General:

This is to notify you that I have authorized the filing of a lawsuit against the State of Alaska, the Alaska Lieutenant Governor, and the Alaska Director of Elections to compel compliance with the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg to 1973gg-10.

As you are aware, the NVRA, which took effect January 1, 1995, requires that states follow specific procedures and protections set forth in the Act in purging registrants from the registration list for elections for federal office. In particular, the NVRA provides that a voter may not be removed from the registration list for federal elections by reason of the voter's failure to vote. 42 U.S.C. § 1973gg-6(b)(2).

Under Alaska's voter removal procedures, which were adopted for the stated purpose of conforming state law to the requirements of the NVRA, registered voters who fail to vote within a four-year period are specifically targeted for inclusion in the state's voter removal program. These procedures can have the end result of a voter being purged from the voter registration list for federal elections simply for having failed to vote. As we discussed in our December 10, 1996 letter to Assistant Attorney General Kathleen Strasbaugh, these procedures violate the NVRA.

cc:  Records  Chrono  Herren  O'Beirne  Inv. File
     Johnson/Weinberg/Wertz/Murphy/Johnson-Betts

Our concern is that no registered voter in the State of Alaska be purged from the registration list for federal elections because of his or her failure to vote. Thus, we intend to move forward on this matter expeditiously. However, we are willing to delay filing the complaint for a short period of time if the State is willing to resolve this matter voluntarily and negotiate a consent decree that would be filed with the complaint.

Under these circumstances, we request that you apprise us within ten days whether the State wishes to discuss settlement of this matter. Patricia O'Beirne, an attorney in the Voting Section, will be in contact with your office. In the meantime, Ms. O'Beirne can be reached at 202-307-6264.

Sincerely,

Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

# Attachment 6



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

February 11, 1997

DLP:EJ:BHW:TCH:POB
DJ 166-69-11

VIA TELEFACSIMILE & FEDERAL EXPRESS

The Honorable Mark Barnett
Attorney General
State of South Dakota
500 East Capitol Avenue
Pierre, South Dakota  57501-5070

Dear Mr. Attorney General:

This is to notify you that I have authorized the filing of a lawsuit against the State of South Dakota, the South Dakota State Board of Elections, and the South Dakota Secretary of State to compel compliance with the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg to 1973gg-10.

As you are aware, the NVRA, which took effect January 1, 1995, requires that states follow specific procedures and protections set forth in the Act in purging registrants from the registration list for elections for federal office. In particular, the NVRA provides that a voter may not be removed from the registration list for federal elections by reason of the voter's failure to vote. 42 U.S.C. § 1973gg-6(b)(2). The Act also provides that voter removal programs for federal elections must be conducted in a manner which is uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965. 42 U.S.C. § 1973gg-6(b)(1).

Under South Dakota's voter removal procedures, which were adopted to conform state law to the requirements of the NVRA, registered voters who fail to vote within a four year period are specifically targeted for inclusion in the state's voter removal program. These procedures can have the end result of a voter being purged from the voter registration list for federal elections simply for having failed to vote. As we have made clear in correspondence

cc:  Records  Chrono  Herren  O'Beirne  Inv. File
     Johnson/Weinberg/Wertz/Murphy/Johnson-Betts

to the Secretary of State on June 19, 1995, December 7, 1995, and November 5, 1996, these procedures violate the NVRA.

Our concern is that no registered voter in the State of South Dakota be purged from the registration list for federal elections because of his or her failure to vote. Thus, we intend to move forward on this matter expeditiously. However, we are willing to delay filing the complaint for a short period of time if the State is willing to resolve this matter voluntarily and negotiate a consent decree that would be filed with the complaint.

Under these circumstances, we request that you apprise us within ten days whether the State wishes to discuss settlement of this matter. Patricia O'Beirne, an attorney in the Voting Section, will be in contact with your office. In the meantime, Ms. O'Beirne can be reached at 202-307-6264.

Sincerely,


Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

# Attachment 7

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CIBOLA COUNTY, NEW MEXICO;
CIBOLA COUNTY BOARD OF
COMMISSIONERS; ELMER CHAVEZ,
BENNIE COHOE, FRANK EMERSON,
ANTONIO GALLEGOS, EDWARD
MICHAEL, and JANE PITTS, Members
of the Cibola County Board of
Commissioners; and EILEEN M.
MARTINEZ, Cibola County Clerk.

     Defendants.

No.  CIV-93-1134-LH/LFG

## SECOND ORDER
### EXTENDING AND MODIFYING STIPULATION AND ORDER
### ORIGINALLY ENTERED APRIL 21, 1994

Before BALDOCK, Circuit Judge, and CONWAY and HANSEN, Senior District Judges.[*]

PER CURIAM.

---

[*] This three judge panel is convened in accordance with 28 U.S.C. § 2284 and 42 U.S.C. § 1973aa-2.

1

Plaintiff United States initiated this action in September 1993 alleging violations of the Voting Rights Act of 1965 (VRA) against Defendants Cibola County, New Mexico, and its duly elected officials. According to the complaint, VRA violations arose from election practices and procedures adversely affecting Native Americans residing in Cibola County. Pursuant to a court-approved "Stipulation and Order" (decree), the United States has kept careful watch over Cibola County's electoral process for the past thirteen years. The Court entered the original decree in this case directing Defendants' compliance with the VRA on April 21, 1994. Upon the decree's expiration ten years hence, the Court on May 3, 2004, modified and extended the decree at the parties' behest. The first order modified and extended the original decree through December 31, 2006. Now before the Court is the parties' joint motion for a second order modifying and extending the decree through January 15, 2009. Cibola County and its duly elected officials concede that, although "some progress" has been made, they remain in violation of the VRA and the Court's decree. Pursuant to an amended complaint filed January 31, 2007, the county and it officials further concede their voting practices and procedures violate the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA).[1]

The Court grants the parties' joint motion (doc. # 88), and incorporates into this order their Amended Joint Stipulation and Native American Election Information Program (doc. # 89). The decree originally entered on April 21, 1994, and first modified on May 3, 2004,

---

[1] Defendants stipulated to the filing of the amended complaint. <u>See</u> Fed. R. Civ. P. 15(a).

is hereby modified and extended a second time. The Court shall retain jurisdiction over the second modified and extended decree through January 15, 2009, after which date the parties should be prepared for the entry of final judgment herein. Cibola County and its duly elected officials are hereby directed to come into complete compliance with the VRA, NVRA and HAVA by that date. The parties are forewarned that, after thirteen years, the time for Defendants to fully comply with federal law is now. If Defendants are not in complete compliance with the VRA, NVRA and HAVA on January 15, 2009, the Court shall direct Defendants to show cause whey they should not be held in contempt of this Court's decree. See United States v. McKinley County, 941 F. Supp. 1062, 1065 (D.N.M. 1996) ("Entry of a consent decree is a discretionary exercise of judicial power enforceable by contempt.").

       SO ORDERED.

                                   Entered for the Court
                                   this 19th day of March, 2007

                                   _____
                                   Bobby R. Baldock
                                   United States Circuit Judge

                                   _____
                                   John E. Conway
                                   Senior United States District Judge

                                   _____
                                   C. LeRoy Hansen
                                   Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 93-1134-LH/LFG |
| | ) | |
| CIBOLA COUNTY, NEW MEXICO; | ) | |
| CIBOLA COUNTY BOARD OF | ) | |
| COMMISSIONERS; ELMER CHAVEZ, | ) | |
| BENNIE COHOE, FRANK EMERSON, | ) | |
| ANTONIO GALLEGOS, EDWARD | ) | |
| MICHAEL, and JANE PITTS, Members | ) | |
| of the Cibola County Board of | ) | |
| Commissioners; and EILEEN M. | ) | |
| MARTINEZ, Cibola County Clerk, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**AMENDED JOINT STIPULATION**

The United States and Defendants ("Cibola County" or "the County"), agree through their undersigned counsel to the following Amended Joint Stipulation.

Cibola County has been subject to Section 203 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973aa-1a, ("Section 203") since 1984 for American Indians who speak the Keresan language. In 1992, the County's coverage under Section 203 was extended to American Indians who speak the Navajo language. In 2002, the Director of the Bureau of the Census determined that coverage under Section 203 should be continued for both language groups. This coverage was triggered by three American Indian reservations located in whole or in part in the County – the Acoma Pueblo ("Acoma"), the Laguna Pueblo ("Laguna"), and the Ramah Chapter of the Navajo Nation ("Ramah").

Section 203 requires that all information that is provided by Cibola County in English about voter "registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots," must be provided in the Keresan and Navajo languages to the extent that they are needed to allow language minority group members to be informed of and participate effectively in the electoral process and all voting-related activities. 42 U.S.C. § 1973aa-1a(c). The provisions of Section 203 apply to all stages of the electoral process, "including, for example the issuance, at any time during the year, of notifications, announcements, or other informational materials concerning the opportunity to register, the deadline for voter registration, the time, places and subject matters of elections, and the absentee voting process." *Attorney General's Procedures for the Implementation of the Provisions of the Voting Rights Act Regarding Language Minority Groups*, 28 C.F.R. § 55.15. Because the Keresan and Navajo languages are historically unwritten, defendants are required to furnish oral instructions, assistance and other information relating to registration and voting in the Keresan and Navajo languages. 42 U.S.C. § 1973aa-1a(c); see also 28 C.F.R. § 55.12(c).

The United States filed this action against Cibola County, New Mexico, the Cibola County Board of Commissioners, the individual members of the Cibola County Board of Commissioners, and the Cibola County Clerk (collectively, "County") on September 27, 1993, alleging violations of Sections 2 and 203 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973 and 1973aa-1a, arising from Cibola County's election practices and procedures as they affected Native American citizens of the County, including those Native American citizens who rely in whole or in part on the Keresan or Navajo language.

The County did not contest that, prior to 1994, it failed to make the election process in Cibola County equally available to Native American and non-Native American citizens as

2

required by Section 2 and the Fourteenth and Fifteenth Amendments, nor did the County contest that in past elections it had failed to comply fully with the minority language requirements of Section 203. On April 21, 1994, this Court entered a Stipulation and Order ("Stipulation") between the parties instituting the Native American Election Information Program ("NAEIP") in Cibola County to remedy past non-compliance with the above-mentioned provisions of federal law. The Order, by its terms, was scheduled to expire on March 15, 2004.

From 1994 through 2003, the County made some progress under the Stipulation, but the County had failed to comply fully with its requirements. The County conceded that its failure to provide all instructions, assistance and other voting related information orally in Navajo and Keresan constituted good cause to extend the Stipulation through December 31, 2006, and the United States agreed to renegotiate its provisions. On March 15, 2004, the parties moved this Court for an Order extending and modifying the Court's April 21, 1994 Order, as set forth in an accompanying Joint Stipulation. Although the Joint Stipulation streamlined the County's obligations, it retained the core requirements of the NAEIP. The Court approved the Joint Stipulation as an Order on April 22, 2004.

The County has not met these streamlined requirements. In particular, the County failed to provide the Voting Rights Coordinators ("Coordinators") with required training regarding their obligations and responsibilities under the Joint Stipulation and NAEIP before the November 2004 and June 2006 elections. As a consequence, the County did not perform tasks agreed to and ordered in the Joint Stipulation. For example, the County did not ensure that the requisite radio announcements in the relevant American Indian languages were made during the sixty-day period before the 2004 and 2006 elections. Nor did it ensure that the Coordinators conducted translation training for bilingual poll workers for those elections. At least one Coordinator did

not attend tribal meetings to provide election and registration information to community members, as required by the Joint Stipulation. In 2005, the County decided not to employ Coordinators, even though each of the individuals who had served most recently as a Coordinator was required to attend State and County election training in accordance with the NAEIP. Although the Coordinators objected to such treatment, the County rejected their request to be paid for their services in 2005.

The County also failed to process many valid, timely voter registration applications for the November 2004 election in violation of Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-6. In fact, the County failed to process as many as a hundred voter registration applications before early voting began for the November 2004 election. This failure, in turn, prevented several would-be voters from participating in early voting, and forced many more to cast provisional ballots on election day. Moreover, at least 16 of the provisional ballots which were rejected and not counted for the November 2004 election were cast by voters who had on file with the County valid, timely voter registration applications. These 16 voters, all of whom cast ballots at precincts located on American Indian reservations in the County, were disenfranchised by the County's errors. Cibola County continued to have numerous registration list errors for the June 6, 2006 federal primary election due, in part, to the County's practice of having voters' names removed from the registration list or placed on the inactive list solely on the basis that the voter had not voted in any election for two federal election cycles (or four years).

In addition, the County disenfranchised many other voters by failing to ensure that provisional ballots were available in all polling places by the time the polls were scheduled to open on November 2, 2004 and/or failed to provide some provisional voters with the voter

identification/affirmation envelope. These failures violate Section 302 of the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15482. Many polling places in Cibola County did not receive provisional ballots until more than two hours after the polls opened. As a result, several prospective voters were turned away without being offered a provisional ballot. Moreover, the County did not provide at least two polling places with voter identification/affirmation envelopes, by which voters affirm their eligibility to vote, as required by Section 302 of HAVA, 42 U.S.C. § 15482(a)(2). At least 36 provisional ballots from the November 2004 election, most of which were cast at polling places on the Laguna Pueblo reservation, were rejected because the County failed to provide the envelope used for the required affirmation. Cibola County did not properly train election officials prior to the June 6, 2006 federal primary election to ensure that voters, who were otherwise qualified to receive a provisional ballot, would receive a provisional ballot for that election.

Pursuant to Section 303(b) of HAVA, 42 U.S.C. § 15483(b), for elections for federal office held in 2004 and after, election officials are required to obtain appropriate identification information from voters who registered to vote by mail on or after January 1, 2003 and who had not previously voted in an election for federal office. The County failed to ensure that such voters provided appropriate identifying information prior to casting ballots in the November 2, 2004 federal election. For the June 6, 2006 federal primary election, Cibola County did not train poll workers regarding the identification requirements for such voters or the forms of identification sufficient to meet these requirements.

With the written consent of the County, on January 31, 2007, the United States filed an amended complaint against the County to enforce the provisions of the NVRA and HAVA discussed above.

The County concedes that it has failed to comply substantially with the Joint Stipulation in this case, and that its voter registration practices before and after the November 2004 general election violate Section 8 of the NVRA. The County further admits that, for federal elections in 2004 and 2006, it failed to comply substantially with the provisional ballot requirements of Section 302 of HAVA and failed to obtain the appropriate identification information from first-time voters in the jurisdiction who registered by mail, as required by Section 303 of HAVA.

Based on these violations, the parties agree that there is good cause to extend the provisions of the Joint Stipulation, as amended herein. The parties agree that these amendments and the additional relief set forth below are necessary to ensure future compliance with this Amended Joint Stipulation, Sections 2 and 203 of the Voting Rights Act, Section 8 of the NVRA, and Sections 302 and 303 of HAVA.

Accordingly, the parties stipulate to the following:

1.      The County Commission shall at all times provide adequate funding to ensure that the County's duties and obligations under this Amended Joint Stipulation are carried out to the greatest possible extent.

2.      The County Defendants agree to carry out their responsibilities under this Amended Joint Stipulation in accordance with appropriate state and federal laws.

3.      The County shall make all phases of the election process as accessible to the Native American populations at the Acoma, Laguna and Ramah reservations within Cibola County as they are to the remainder of the County's population. Accordingly, the County shall provide information, publicity, and assistance in the Keresan and Navajo languages regarding all aspects of the electoral process, including but not limited to voter registration, voter registration cancellation, absentee voting, early voting, provisional voting, procedures at the polls including

6

translation of the ballot, and training of polling officials and translators as outlined in the NAEIP, as amended and attached to this Amended Joint Stipulation. The revised NAEIP shall supersede any and all previous NAEIPs for the County.

4.      To assist in the effectiveness of this Amended Joint Stipulation and to ensure the continued enforcement of the voting guarantees of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution, Cibola County should remain designated for federal observers pursuant to Section 3(a) of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973a(a). The County recognizes the authority of federal observers to observe all aspects of the voting process conducted in the polls on election day, including assistance to voters in the voting booth provided that the voter does not object to being observed.

5.      The County recognizes and agrees that greater supervision of the NAEIP is necessary to ensure compliance with this Amended Joint Stipulation and, as set forth herein, shall provide greater supervision and more frequent reports regarding the County's compliance with this Amended Joint Stipulation and the NAEIP.

6.      The County shall ensure that the Coordinators are fairly compensated for the time they expend fulfilling their responsibilities under the NAEIP. Work performed by the Coordinators outside of the contract period will be compensated on a per diem and pro rata basis.

7.      The County shall immediately notify counsel for the United States in the event a vacancy should occur in a Coordinator position.

8.      For each month of his or her contract, each Coordinator shall complete the Monthly Coordinator Report, which is attached to this Amended Joint Stipulation, detailing his or her activities under the NAEIP and provide a copy to the County Clerk not later than the end of the first week following such month. The County shall submit a copy of the completed

7

Monthly Coordinator Reports to the State Director of Elections and counsel for the United States by the end of the second week following such month.

9.      After each election, the County shall prepare a report detailing, by paragraph, the specific efforts made by the County to comply with each provision of the NAEIP.  The County may incorporate by reference any information already supplied in the Monthly Coordinator Reports.  If an appropriate provision is not specifically mentioned in the report and the County fails to provide details within 30 days of written notice of such omission by the United States, noncompliance with that provision shall be presumed.  The County shall submit the report to the State Director of Elections and counsel for the United States not later than 30 days after the election.

10.      The County shall ensure that all timely, valid voter registration applications are processed and entered into the computerized statewide voter registration list not later than five business days after their receipt by the County, unless registration is closed pursuant to N.M.S.A. § 1-4-8(A).  Notwithstanding this requirement, the County shall ensure that all valid voter registration applications are processed and entered into the computerized statewide voter registration list no later than 20 days before any federal election.  At least 15 days before any such election, the County shall certify in writing that it has processed all valid voter registration applications and that the names of such voters appear in the computerized statewide voter registration list.  The County shall file this certification with this Court with service copies to counsel for the United States.

11.      The County shall ensure that the County's official voter registration lists to be used for early voting and those to be used in the polls on election day are prepared at a time and

in a manner calculated to reflect all voters who have submitted timely, valid voter registration applications.

12.     The County shall restore to the official voter registration list the name of any voter whose name was placed on the inactive list or otherwise removed from the official voter registration list in a manner inconsistent with the procedures set forth in Section 8 of the NVRA during the preceding two years.  The County shall complete this requirement no later than sixty days from the date of this filing.  The County shall provide to counsel for the United States a list of the names of all voters whose names were restored to the official voter registration list pursuant to this paragraph.

13.     The County shall not place the name of any voter on the inactive list or otherwise remove the voter's name from the official voter registration list solely by reason of the person's failure to vote.   The County shall only place the name of any voter on an inactive list based on objective information indicating that the voter has become ineligible to vote due to having moved, such as returned mail with no forwarding address or National Change of Address program data showing a move outside the County.  This shall not preclude the County from immediate removals from the voter registration list, in accordance with state law, of the name of any voter who is confirmed to have become ineligible to vote due to death or disqualifying felony, or who confirms in writing a move outside the County.

14.     For all Cibola County voters who registered to vote on or after January 1, 2003, and prior to October 6, 2004, the County shall identify all such individuals who registered to vote by mail and have not provided identification pursuant to Section 303(b) of HAVA, 42 U.S.C. § 15483(b)(2)(A).  For all such voters, the County shall ensure that the voter complies with the

9

HAVA identification requirements in the next federal election in which the voter attempts to vote, unless:

    (a)    The voter voted in any Federal election in New Mexico prior to filing the registration application, as set forth in Section 303(b)(1)(B); or

    (b)    The voter provided a copy of a valid photo identification or another form of acceptable identification with his or her voter registration application, as set forth in Section 303(b)(3)(A) of HAVA and N.M.S.A. § 1-4-5.1(I)(4)(a); or

    (c)    The voter provided at least the last 4 digits of his or her social security number with his or her voter registration application and the County or State election official can match the information submitted with an existing State identification record bearing the same number, name and date of birth as provided in the individual's voter registration, as set forth in Section 303(b)(3)(B) of HAVA; or

    (d)    The voter is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff-1, et seq., or is entitled to vote otherwise than in person under any other federal law, as set forth in Section 303(b)(3)(C) of HAVA.

The County shall complete the requirements of this paragraph no later than 60 days from the date of this filing. For all mail-in registrations received by the County on or after the date of this Amended Joint Stipulation, the County shall ensure that voters requiring identifying information under HAVA are so identified at the time their voter registration information is entered in the computerized statewide voter registration list and that such list reflects such identification. The County shall provide to counsel for the United States a list of the names of all voters who were identified under this paragraph.

10

15.     The County shall ensure that all poll workers are trained prior to any election for federal office regarding the designation on the registration lists of voters who are required to produce identification in order to cast a ballot, the need to request identification from such voters, and the forms of identification that may be accepted for this purpose.

16.     The County shall ensure that sufficient numbers of provisional ballots are provided not later than 6:00 a.m. on election day to all polling places to be used for any federal election.  The County also shall ensure that sufficient numbers of provisional ballots are available at any location to be used for early voting in any federal election at least one hour before early voting is scheduled to begin.  In addition, the County shall ensure that each provisional ballot includes the necessary voter identification/affirmation envelope.

17.     The County shall ensure that all poll workers for federal elections are trained regarding the need to contact the County Clerk's office to verify the registration status of any individual who seeks to vote, but whose name is not on the voter registration list; the circumstances under which a voter is to be offered a provisional ballot; and the requirement that a provisional voter complete fully the identification/affirmation envelope for such a ballot.

18.     The Parties agree that, in the event of substantial non-compliance with this Amended Joint Stipulation, the parties shall confer for the purpose of seeking the appointment of a third party to oversee the NAEIP and to ensure the County's compliance with federal voting laws.

19.     This Amended Joint Stipulation shall remain in effect through January 15, 2009.

20.     The Court shall retain jurisdiction to enter further relief or such other orders as may be necessary for the effectuation of the terms of this Amended Joint Stipulation and to

ensure compliance with Sections 2 and 203 of the Voting Rights Act, the NRVA, HAVA, and

the Fourteenth and Fifteenth Amendments to the Constitution.

Agreed and stipulated to on this 31st day of January, 2007.

For Plaintiff:                                    For Defendants:

UNITED STATES OF AMERICA          CIBOLA COUNTY, NEW MEXICO, *et al.*

ALBERTO R. GONZALES                  /s/
Attorney General                              _____
                                                     JOE C. DIAZ
                                                     JOAN D. MARSAN
                                                     Modrall, Sperling, Roehl,
WAN J. KIM                                    Harris & Sisk, P.A.
Assistant Attorney General               500 Fourth Street, N.W.
Civil Rights Division                       Bank of America Centre, Suite 1000
                                                     P.O. Box 2168
DAVID C. IGLESIAS                        Albuquerque, New Mexico  87103-2168
United States Attorney


/s/
_____
JOHN K. TANNER
GAYE L. TENOSO
RICHARD A. DELLHEIM
M. ERIC EVERSOLE
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1734 (telephone)
(202) 307-3961
richard.dellheim@usdoj.gov

I hereby certify that on January 31, 2007,
I filed the foregoing pleading electronically
through the CM/ECF System, which caused
the following parties of counsel to be served
by electronic means, as more fully reflected on
the Notice of Electronic Filing.

**Elizabeth L. German**
beth@brownandgerman.com

**Raymond Hamilton**
raymond.hamilton@usdoj.gov

**Anna E Tuttle**
aet@modrall.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case
who therefore require manual noticing).

**John K. Tanner**
**Gaye L. Tenoso**
**Richard Dellheim**
**M. Eric Eversole**
**Sada Manickam**
US Department of Justice
Civil Rights Div - Voting Section
950 Pennsylvania Ave
Rm 7254-NWB
Washington, DC 20530


MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.


By:/s/_____
    Joe C. Diaz
    Joan D. Marsan
    Attorneys for Cibola County

THE NATIVE AMERICAN ELECTION INFORMATION PROGRAM

I.    Native American Voting Rights Coordinators

A.    Cibola County shall continue to employ three Native American Voting Rights Coordinators ("Coordinator(s)") to coordinate the Native American Election Information Program ("NAEIP") in the County. One of the Coordinators shall be bilingual in Navajo and English, and shall serve primarily the area of the Ramah Chapter of the Navajo Nation. Two of the Coordinators shall be bilingual in Keresan and English, and one shall serve primarily the area of the Acoma Pueblo, while the other shall serve primarily the area of the Laguna Pueblo.

B.    Cibola County shall ensure that each Coordinator is paid a salary commensurate with his or her services rendered under this NAEIP and shall provide compensation to cover all reasonable travel, lodging and food expenses incurred for his or her attendance at State, local or other election training or other events permitted or required by this NAEIP.

C.    In the event of a vacancy in the Coordinator position, the County Clerk shall immediately notify the United States and tribal officials from the appropriate Pueblo or Chapter. Although the County is free to solicit applicants through its normal job selection process, it must seek recommendations on four qualified applicants from the appropriate tribal leaders. The County shall select the most qualified candidate, who otherwise satisfies any County employment requirements, from all available applicants. The County must complete this process within 90 days of the vacancy. A vacancy does not relieve the County of its obligations under the NAEIP.

D.    The Coordinators shall be trained by the State and County in all aspects of the election process, and shall attend all election seminars by the Secretary of State and/or the Cibola County clerk. In addition, at least 90 days before any federal primary or general election,

14

the County Clerk shall fully brief the coordinators regarding their duties under the NAEIP and Section 203 of the Voting Rights Act. The County Clerk must ensure that each Coordinator has a copy of the current NAEIP and the Amended Joint Stipulation and other materials that would ensure their compliance with the NAEIP. The County Clerk shall notify tribal leaders from Acoma, Laguna, and Ramah and attorneys from the Department of Justice of County-sponsored training sessions at least seven days before the training and shall invite the participation of these tribal leaders and Department of Justice attorneys.

E. The Coordinators shall, under the supervision of the County Clerk, oversee the NAEIP generally and regularly attend meetings of their respective communities. In years with federal elections, the Coordinators shall attend at least two events or meetings in their respective communities where 30 or more voting-age members of the reservation are likely to be in attendance. These events or meetings may include, but are not limited to, tribal council or tribal officers meetings, public gatherings, tribal fairs, events at the local high schools or centers that serve elderly citizens, and other public functions. During any event or meeting attended by the Coordinator, he shall, as appropriate: (1) announce the date of the next scheduled election, the offices, if any, open for election, and any non-candidate provisions which shall appear on the ballot; (2) announce the availability of and deadlines for voter registration; (3) provide an opportunity to register to vote by making voter registration applications available and offering language assistance in filling out the applications; and (4) announce any scheduled training for election translators and invite the public to attend.

F. The Coordinator for the Ramah Navajo Chapter shall post the election schedule and all other election-related information at the Chapter House; the Coordinators for the Acoma Pueblo and the Laguna Pueblo shall post the election schedule and other election-related

15

information at the relevant tribal office building. The Coordinators shall ensure that voter registration applications are available in plain view at each location.

      G.    Beginning sixty days before any election and continuing through election day, the Coordinators shall ensure that at least three announcements a day in are made on weekdays on the radio station KTDB, in the Navajo language, and radio station KUNM, for the Keresan language, or other comparable stations. These radio announcements shall be prepared by the Coordinators and shall provide voters with information regarding (1) the date and time of the next election; (2) the offices on the ballot; (3) opportunities to register to vote and the deadline for registering before the election; (4) the availability of absentee balloting; (5) the availability of trained translators at the polls on election day; and (6) the right of each voter to oral assistance in their native language from either the County's translators or a person of the voter's choice provided that person is not the voter's employer, an agent of that employer, or officer or agent of the voter's union (42 U.S.C. § 1973aa-6); and (7) the name(s) and telephone number(s) of the Coordinator(s) who can be contacted to receive more detailed information about the election. In addition, the Coordinators shall ensure that at least once a day during this period taped translations of the ballot made by either the New Mexico Office of the Secretary of State or the Coordinator are broadcast on radio station KTDB, for the Navajo language, and radio station KUNM, for the Keresan language, or other comparable stations.

      H.    The Coordinators, under the supervision of the County Clerk shall conduct the language assistance training in the Coordinator's respective American Indian language for all bilingual poll officials and other election-related personnel. This training shall be in addition to any election training provided by the County. The training shall be held at least nine days before any election and shall be held at an appropriate location within each Coordinator's community.

At a minimum, the training must cover: (1) translating the entire ballot into the appropriate language, (2) practicing the translation of the ballot with each translator, and (3) correcting any errors in translation. In addition, the training must cover the procedures for identifying and assisting voters who may need language assistance, instructions for casting a ballot on a voting machine, and assisting voters who need to cast a provisional ballot. The translation of the ballot by each translator shall be made according to the taped translations made by the Office of the New Mexico Secretary of State, if such tapes are available. If standardized translations by the Office of the Secretary of the State are not available or will not be available, the Coordinator shall record a taped translation of the entire ballot, make the tape available to the translators, and train them in this translation at the training session. If the ballot contains offices or ballot proposition(s) specific to Cibola County for which the Office of the Secretary of State has not provided a Navajo or Keresan language translation, the Coordinator shall record a taped translation of the offices and/or proposition(s), make the tape available to the translators and train them in this translation at the training session. The County shall notify tribal leaders from Acoma, Laguna, and Ramah and attorneys from the Department of Justice of County-sponsored training sessions at least seven days before the training and shall invite the participation of these tribal leaders and Department of Justice attorneys.

I. The Coordinator shall be available as needed at the Ramah Chapter House, in the case of the Navajo Coordinator, and the appropriate tribal offices in the case of the Keresan Coordinators, to assist in voter registration or to answer election-related questions when not engaged in the other activities required under this NAEIP.

J. Cibola County shall establish a separate travel budget for the Coordinators which shall be sufficient to cover their travel expenses incurred in carrying out their duties, obligations

and responsibilities to effectively implement the NAEIP. Coordinators shall be reimbursed for expenses incurred for travel incident to bona fide NAEIP business, including but not limited to visits to Pueblos or Navajo Chapters and to sites for training programs.

K.     In each year with federal elections, the Coordinators shall prepare a Monthly Coordinator Report, as set forth in Schedule 1, *infra*.  The Report requires a detailed, paragraph-by-paragraph recitation of the specific efforts made by the Coordinators to comply with each provision of the NAEIP.  For example, the report must detail the various community centers or events attended by the Coordinator, the dates and times of those visits, detailed information regarding any training session attended or given by the Coordinator, dates and times for any election-related radio announcements made by a Coordinator, and/or any other information that demonstrates the County's compliance with the NAEIP.  To the extent that any written materials are distributed at any training session, those written materials should be included as part of the report required herein.  These reports must be provided to the United States within fourteen days after the end of the month in which the reports were compiled.

II.     <u>Intergovernmental Coordination</u>

In administering the NAEIP, Cibola County and its Coordinators shall:

A.     Request and accept all training, materials, and services available from the State of New Mexico in furtherance of the implementation of this NAEIP.  The Coordinators shall attend all election-related seminars or training sessions conducted by the New Mexico Office of the Secretary of State, including the Coordinator and/or County Clerk meetings sponsored by the New Mexico Native American Election Information Program.  As set forth in I.B., <u>supra</u> the

County must compensate the Coordinators for their services and cover any reasonable expenses that result from such training.

B.     Encourage contact and collaboration with other counties engaged in similar language assistance programs.

C.     Invite assistance of tribal officials and by the Navajo Election Administration and the All Indian Pueblo Council as needed to administer effectively the NAEIP.

D.     The parties recognize the separate powers and authority of the tribal governments, and nothing in this NAEIP limits or infringes tribal powers or authority.  Accordingly, where this NAEIP requires Cibola County to perform acts in consultation and cooperation with tribal governments, the County is obligated to undertake its obligations using all good faith efforts. The County shall not be required to perform such acts if a tribal government refuses the County's efforts.  In the event of any such refusal, the County shall promptly, and prior to the date for performance of the act or event to be performed by the County, notify counsel for the United States of the refusal or noncooperation.

III.     Satellite Election Offices

A.     Within ten days of the effective date of this NAEIP, the County shall contact tribal officials at the Acoma and Laguna Pueblos and the Ramah Chapter to discuss the possibility of establishing Satellite Election Offices convenient to the populations of the respective communities.

B.     Each Satellite Election Office shall serve as the principal place for office hours for the Coordinators, as a distribution point for the dissemination of election-related information, and as a site for the performance of functions related to the election process that can be

performed at the County courthouse, including, but not limited to, registering to vote or updating voter registration information, early voting, and the casting of absentee ballots.

C.    The Coordinators also may conduct the election and registration related functions in Paragraph III.B., _supra_, by using their personal vehicles to visit members of their respective communities, especially those members who may not have transportation or may not be capable of traveling to the Satellite Election Office.

D.    Delivery of a voter registration application or performance of any other election-related task at a Satellite Election Office or delivery of any election-related application to a Coordinator shall be effective in terms of all time deadlines and requirements as if the application had been delivered to, or the task performed at, the County courthouse.

E.    A supply of all forms and materials necessary to complete these functions shall be maintained at each Satellite Election Office.

IV.    Translations

A.    The County shall ensure that taped versions of the Navajo and Keresan language translations of the statewide offices and ballot propositions to appear on the ballot provided by the Office of the New Mexico Secretary of State are delivered to the Coordinator as soon as they are available.  Taped versions of the translations and playback equipment shall be made available to the translators during their translation training and on election day at the Acoma, Laguna and Ramah polling places.

B.    The County shall provide each Coordinator with tape recording and playback equipment and a sufficient supply of blank tapes for use in translator training.

20

C.     During elections, translations of the ballot into Navajo and Keresan shall be provided according to the written and/or taped translations made by the Office of the New Mexico Secretary of State, to the extent such translations are available.

V.     Election Day Procedures

A.     The County shall assign at least one trained translator to the polling places at the Acoma and Laguna Pueblos and the Ramah Chapter for every voting machine.

B.     Polling place translators shall orally advise voters of the availability of language assistance.

C.     Any voter who needs language assistance in Navajo or Keresan from polling place translators shall be provided a full and complete translation of each office, the party (when appropriate) of each candidate, all ballot propositions, and relevant instructions on how to cast a ballot and the use of the voting machine (including, when appropriate, instructions on write-in votes), and shall be read all candidates' names for each office.  In addition, any voter who needs language assistance in Navajo or Keresan will be provided instructions in their respective language regarding other voting procedures as necessary, including, for example, instructions for casting a provisional ballot.

VI.     Voter List Maintenance

At least 30 days before any registrants from the Ramah Chapter or the Acoma or Laguna Pueblos, are sent notice of the potential cancellation of their registration in accordance with Section 8(d)(2) of the National Voter Registration Act of 1993, 42 U.S.C. 1973gg-6(d)(2), a list of the names of these registrants shall be provided to the

appropriate Coordinator.  If the Coordinator or tribal officials identify any registrant on the list within the thirty day period who remains eligible to vote in Cibola County and that registrant completes a new registration application or change of address application, the registrant shall not be sent a notice of potential cancellation and shall be maintained on the list of eligible voters.  The NAEIP does not otherwise prohibit the proper authorities from removing from the voter list those ineligible to vote by reason of a change of address, conviction of a felony, or death, provided that the requirements of the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg, et seq., are met.

VII.    Adjustments to the NAEIP

Before making any adjustments to the NAEIP, the County shall endeavor to safeguard future compliance with Sections 2 and 203 of the Voting Rights Act, 42 U.S.C. §§ 1973 and 1973aa-1a, and the Fourteenth and Fifteenth Amendments to the Constitution, shall consult in good faith with tribal officials from the Acoma and Laguna Pueblos and the Ramah Chapter, and shall provide notice to counsel for the United States of any proposed changes.

**Schedule 1**

**Monthly Coordinator Report**

Coordinator: _____

Community: _____

Date: _____

Presentations of election and registration information (*see* Para. I.E.):

| Date | Location | Number of Persons who Attended | Topic(s) Covered |
|------|----------|-------------------------------|------------------|
|      |          |                               |                  |
|      |          |                               |                  |
|      |          |                               |                  |
|      |          |                               |                  |
|      |          |                               |                  |

Radio announcements (*see* Para. I.G.):

| Date | Times Aired | Topic(s) Covered |
|------|-------------|------------------|
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |

| Date | Times Aired | Topic(s) Covered |
|------|-------------|------------------|
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |
|      |             |                  |

Posting or distribution of election materials (*see* Para. I.F.):

| Date | Location | Describe Materials Posted |
|------|----------|---------------------------|
|      |          |                           |
|      |          |                           |
|      |          |                           |

State and County Training attended by Coordinator (*see* Para. I.D.):

| Date | Location | Topics Covered in Meeting |
|------|----------|---------------------------|
|      |          |                           |
|      |          |                           |
|      |          |                           |
|      |          |                           |

Training of poll workers organized and conducted by Coordinator (*see* Para. I.H.):

| Date | Location | PW* | O** | Description of training (attach copies of all written material used during training) |
|------|----------|-----|-----|-------------------------------------------------------------------------------------|
|      |          |     |     |                                                                                     |
|      |          |     |     |                                                                                     |

\* Number of poll workers who attended training (attach sign-in sheet).

\*\* Number of other persons, such as members of the public, who attended training (attach sign-in sheet).

Number of voters registered by the Coordinator this month: _____

Other activities of the Coordinator, including voter registration drives:

| Date | Location | Description of activity |
|------|----------|-------------------------|
|      |          |                         |
|      |          |                         |
|      |          |                         |
|      |          |                         |
|      |          |                         |

# Attachment 8

FILED

Nov 2  10 56 AM '95

RICHARD
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA, S.J.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETE WILSON, Governor of the State of California; STATE OF CALIFORNIA, | Case No. C 95-20042 JW<br>Case No. C 94-20860 JW<br>(Related Action) |
| Plaintiffs, | |
| vs. | ORDER GRANTING<br>IN PART AND DENYING<br>IN PART PLAINTIFFS<br>VOTING RIGHTS |
| UNITED STATES OF AMERICA;<br>JANET RENO, Attorney General;<br>TREVOR POTTER, Chairman,<br>Federal Elections Commission;<br>FEDERAL ELECTIONS COMMISSION, | COALITION AND UNITED<br>STATES' MOTION FOR<br>FURTHER RELIEF |
| Defendants. | |

## I. INTRODUCTION

Plaintiffs Voting Rights Coalition, et al. and the United States of America's (collectively, "Plaintiffs") motion for further relief was heard by the Court on Friday, October 20, 1995. Robert Rubin appeared on behalf of the Coalition and Holly Wiseman appeared on behalf of the United States Department of Justice. Cyrus Rickards appeared on behalf of Governor Pete Wilson and the named state agencies. In addition, Ms. Darlene Marquez, Co-Chairperson of the Voting

Rights Coalition, appeared and testified on behalf of Plaintiffs and Mr. John

Mott-Smith, Chief of the Elections Division of the Office of the Secretary of State

of the State of California testified on behalf of the Governor and state agencies.

Based upon all pleadings filed to date, the testimony of the witnesses

presented at the hearing and upon the oral argument of counsel, the Court

GRANTS in part and DENIES in part Plaintiffs' motion, as discussed below.

## II. BACKGROUND

On March 2, 1995, the Court granted Plaintiffs' motion for entry of a

permanent injunction, finding that the National Voter Registration Act

("NVRA"), 42 U.S.C. § 1973gg is constitutional.   This finding was affirmed by

the Ninth Circuit Court of Appeals on July 24, 1995.  Voting Rights Coalition, et

al. v. Pete Wilson, et al., No. 95-15449 (9th Cir. July 24, 1995).  The Court

bifurcated the issue of implementation of the NVRA and ordered the State of

California and Governor Wilson to submit an implementation plan to the Court

for review.

On March 17, 1995, Defendants submitted a plan for implementation of the

NVRA.  On May 4, 1995, the Court ordered the State to implement the plan

within forty-five (45) days and prohibited the removal of names from the voter

rolls "in a manner inconsistent with the NVRA."  The parties then met and

conferred and attempted to resolve as many of the implementation issues as

possible without the intervention of the Court.  The parties were able to resolve

all of their differences, with the exception of the issues now presented to the

Court through Plaintiffs' motion for further relief.

Plaintiffs contend that the issues remaining for resolution are mandated by

the NVRA and must be implemented by Defendants.  The Governor and the

named state agencies contend that they are properly implementing the

2

requirements which are set forth in the NVRA. Defendants contend that the issues set forth in Plaintiffs' motion are simply not requirements which are mandated by the NVRA nor are such issues necessary to carry out the intent of Congress. These disputed issues are set forth and discussed separately below.

### III. LEGAL STANDARDS

The "starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Com'n v. GTE Sylvania, Inc., 100 S.Ct. 2051, 2056 (1980). In order to determine whether such a "clearly expressed legislative intention" exists, the Court looks to the legislative history of the statute. I.N.S. v. Cardoza Fonseca, 107 S.Ct. 1207, 1213, n. 12 (1987). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id at 1221, quoting U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, n. 9 (1984). Applying these standards, the Court finds as follows.

### IV. DISCUSSION

### A. DMV Voter Registration

Pursuant to the NVRA, "[A]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes." 42 U.S.C. § 1973gg-3(d). According to this section, a registrant's change of address is presumed to be for the purposes of both the DMV and voter registration, unless indicated otherwise by the applicant.

3

1  By this motion, Plaintiffs contend that the change of address form currently
2  used by the State of California reverses the presumption established by the
3  NVRA, so that an applicant's change of address is not presumed to be for both
4  purposes of DMV and voter registration, unless the applicant indicates otherwise.
5  The forms currently utilized by the California DMV facilities contains the
6  following options:
7      ___ I have moved to a new county and wish to update my voter record....
8      ___ I have moved within the same county and wish to update my voter
9      record....
10  As indicated by the Defendants in their implementation plan, if neither box
11  is checked, DMV will assume that the applicant does not wish to update his or her
12  voter record.  Plaintiffs contend that such an assumption violates the purpose and
13  intent of the NVRA.  Defendants argue that it "is the informed judgment of the
14  Secretary of State that the potential for error and harm is greater through a system
15  of automatic updating of registration records than with the present system."
16  (Declaration of John Mott-Smith, p. 2).  However, Defendants also state that the
17  new DMV forms, which will be available within six (6) months, will include a
18  separate box which indicates that the applicant does not want his or her voter
19  record updated.  In the interim 6 month period, Defendants request that they be
20  permitted to use the present forms and apply the presumption that if neither box is
21  checked, the applicant does not want his or her address updated for voting
22  purposes.
23  Based upon the clear statutory language as contained in the NVRA, the
24  Court finds that the NVRA mandates that any change of address for DMV
25  purposes also be presumed to be for voter registration purposes, unless the
26  applicant "states on the form that the change of address is not for voter
27

4

1   registration purposes." Therefore, if the State of California chooses to utilize

2   forms which do not provide a space within which an applicant may indicate that

3   he or she does not wish an address change to apply for purposes of voter

4   registration, then the State must apply the presumption that all changes of

5   addresses apply for both DMV and voter registration purposes. Accordingly, the

6   Court will permit the DMV to use the present forms only during the interim

7   period between now and the time that the new forms are ready for use. If no box

8   is checked, the State must assume that the applicant wishes to update his or her

9   voter record.

10                  B. Annual Residency Confirmation

11          The NVRA prohibits the removal of the name of any person from the list of

12  official voters for failure to vote. 42 U.S.C. § 1973gg-6(b)(2). Through its

13  "Annual Residency Confirmation and Outreach Procedure"("ARCOP"), the State

14  of California sends a postcard to voters inquiring whether such voter still lives at

15  the present address. If the card is returned as undeliverable AND the voter does

16  not vote in two (2) subsequent federal elections, then the voter's name is purged

17  from the list. Plaintiffs contend that this procedure violates the NVRA because it

18  impermissibly drops registrants from the list for failure to vote. Defendants

19  contend that the method is permissible because the voter is not dropped simply

20  due to a failure to vote, but also because there is not a current address for such

21  voter.

22          The Court disagrees with Plaintiffs that the State's procedure, although not

23  directly based on a voter's failure to vote, results in a voter being dropped from

24  the list for his or her failure to vote. Since the State receives a card which states

25  that the card is undeliverable and then the addressee fails to vote in subsequent

26  elections, the Court finds that the State's current "Residency Confirmation and

27

5

1  Outreach Program" does not violate the NVRA.  Accordingly, the Court DENIES
2  Plaintiffs' motion to discontinue such program.

3          C. California Elections Code Sections Preempted by the NVRA
4          Plaintiffs contend that 16 sections of the California Election Code are
5  preempted by the NVRA and should be enjoined by the Court.  The State does not
6  argue that such sections are preempted, but requests that the Court refrain from
7  enjoining specific statutes until all implementation issues are resolved since the
8  State is operating under this Court's Order to comply with the NVRA and is not,
9  therefore, implementing any state election codes which conflict with the NVRA.

10          The Court considers, however, that all implementation issues are now
11  resolved as a result of this hearing.  However, the Court is concerned that the
12  statutes which Plaintiffs contend are preempted by the NVRA may contain
13  subsections or subparts that are not preempted.  Therefore, the Court orders that
14  the parties review all Elections Code Sections and submit a list to the Court
15  within twenty (20) days of the date of this Order indicating which specific
16  Sections, including subsections and/or subparts, are preempted by the NVRA.
17  Until further order of the Court, all California Elections Code Sections which are
18  preempted by the NVRA may not be enforced by the State of California.

19          D. Compliance Reports
20          Plaintiffs finally request that the Court establish a reasonable reporting
21  mechanism whereby it may monitor the State's compliance with the NVRA.
22  Plaintiffs suggest that the Court require the State to submit a 30-day status report
23  to be followed by quarterly reports as to its compliance with the implementation
24  issues.  Defendants argue that such a requirement is burdensome, expensive and
25  unnecessary in light of the requirements of the NVRA.
26          At the hearing, the parties agreed to meet and confer and that the
27

1   Department of Justice would submit a list to the Court indicating exactly what
2   type(s) of report it would like from the State to ensure compliance with the
3   NVRA. The State then agreed to respond to the Department's list and the matter
4   would be deemed submitted to the Court upon the State's response. The Court
5   therefore DEFERS Plaintiffs' request for compliance reports by the State until the
6   receipt of the State's brief. The Department of Justice shall submit a report
7   within twenty (20) days of the date of this Order. The State shall submit a
8   response to such report within five (5) days of the submission of the Department's
9   report. The matter will then be deemed submitted on the papers. In the interim,
10  the Court retains jurisdiction over any and all implementation issues in this
11  action. If Plaintiffs discover that Defendants are not complying with the
12  provisions of the NVRA, or of this Order, they may request emergency relief by
13  filing an ex parte application with the Court requesting appropriate relief.
14  Therefore, the Court DEFERS Plaintiffs' request that the State submit compliance
15  reports on a quarterly basis.

### E. Equitable Relief

17          Finally, Plaintiffs request that the Court enter an Order which provides
18  equitable remedial relief on behalf of those persons who entered social service
19  agencies between January 1, 1995 until the effective date of the Court's Order of
20  Implementation filed on May 4, 1995 and were deprived of the right to register to
21  vote at the agency due to the Governor's failure to timely implement the NVRA.
22  Plaintiffs' request does not include any Department of Motor Vehicles ("DMV")
23  since the parties entered a separate agreement regarding a remedial remedy for
24  such agency. Plaintiffs contend that the Court should order that the Defendants
25  send each and every person who contacted a social service agency during the
26  relevant time period a voter registration application.

27

1     The Defendants argue that such a request is extremely costly and

2     unwarranted given the fact that many of the people who contacted a social service

3     agency during the relevant time period are people who continue to have contact

4     with the agency and have since been afforded an opportunity to register to vote at

5     the agency. Therefore, Defendants assert that they should be required only to

6     contact those people who did not and will not return to the agency and inform

7     such people that they may call and request that a voter registration application be

8     sent to them.

9     Based upon all pleadings filed to date, as well as on the oral argument of

10     counsel, the Court orders that the Defendants send each and every person who

11     visited a social service agency between January 1, 1995 through June 10, 1995

12     AND who will not return to a social service agency again within the next six (6)

13     months a voter registration application. Such application must be sent within

14     sixty (60) days of the date of this Order. Defendants shall also file with the Court

15     and serve upon Plaintiffs a copy of the list of applicants to whom a voter

16     registration application is being sent as soon as such list is available to

17     Defendants but no later than forty-five (45) days from the date of this Order.

18                                  V.  CONCLUSION

19     Based upon the foregoing, the Court GRANTS Plaintiffs' motion for

20     further relief as to the DMV Voter Registration change of address forms, the

21     California Elections Code Sections and remedial equitable relief as set forth

22     herein and DENIES and/or DEFERS Plaintiffs' motion for further relief as to all

23     other issues discussed herein.

24     95102501.civ

25     IT IS SO ORDERED.

26

27

8

DATED: October 30, 1995

JAMES WARE
United States District Judge

9

1    This is to certify that copies of this order have been mailed to:

2    Robert Rubin
3    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
       OF WITH THE SAN FRANCISCO BAY AREA
4    301 Mission Street, Suite 400
     San Francisco, CA 94105
5

6    Mark D. Rosenbaum
     ACLU FOUNDATION OF SOUTHERN
7       CALIFORNIA
     1616 Beverly Drive
8    Los Angeles, CA 90026
9
     Alan L. Schlosser
10   ACLU FOUNDATION OF NORTHERN
        CALIFORNIA
11   1663 Mission Street, Suite 460
     San Francisco, CA 94103
12

13   Kathryn K. Imahara
     ASIAN PACIFIC AMERICAN LEGAL
14      CENTER OF SOUTHERN CALIFORNIA
     1010 South Flower Street, Suite 302
15   Los Angeles, CA 90015
16
     William R. Tamayo
17   ASIAN LAW CAUCUS, INC.
     468 Bush Street, Third Floor
18   San Francisco, CA 94108
19
     Joaquin G. Avila
20   Voting Rights Attorney
     Parktown Office Building
21   1774 Clear Lake Avenue
     Milpitas, CA 95035
22

23   Harry Bremond
     WILSON, SONSINI, GOODRICH & ROSATI
24   650 Page Mill Road
     Palo Alto, CA 94304-1050
25

26

27

David H. Raizman
WESTERN LAW CENTER FOR
 DISABILITY RIGHTS
1441 W. Olympic Blvd.
Los Angeles, CA 90015

Elaine B. Feingold
DISABILITY RIGHTS AND EDUCATION
 DEFENSE FUND, INC.
2212 Sixth Street
Berkeley, CA 94710

Cyrus J. Rickards
OFFICE OF WITH THE ATTORNEY GENERAL
1515 K Street
P.O. Box 944255
Sacramento, CA 94244-2550

Pete Wilson
GOVERNOR OF WITH THE STATE OF CALIFORNIA
1st Floor, State Capitol
Sacramento, CA 95814

Bill Jones
SECRETARY OF STATE
1230 J Street, Suite 209
Sacramento, CA 95814

Brenda Premo
DEPARTMENT OF REHABILITATION
830 K Street, Room 307
Sacramento, CA 94244

Frank Zolin
DEPARTMENT OF MOTOR VEHICLES
2415 1st Avenue
Sacramento, CA 95818

Eloise Anderson
DEPARTMENT OF SOCIAL SERVICES
744 P Street
Sacramento, CA 95814

1  Holly Lee Wiseman
   U.S. DEPARTMENT OF JUSTICE
2  Civil Rights Division, Voting Section
   P.O. Box 66128
3  Washington, D.C. 20035-6128

4
   Lawrence E. Noble
5  FEDERAL ELECTIONS COMMISSION
   999 E Street, N.W.
6  Washington, D.C. 20463

7
   Michael J. Yamaguchi
8  UNITED STATES ATTORNEY
   450 Golden Gate Avenue
9  San Francisco, CA 94102

10

11  DATED: 16/2/95                    CLERK OF COURT

12

13                                    By:

14                                    Ronald L. Davis
                                      Deputy Clerk
15

16

17

18

19

20

21

22

23

24

25

26

27

JANET RENO, Attorney General
for the United States
DEVAL L. PATRICK, Asst. Atty General
ELISABETH JOHNSON
BARRY H. WEINBERG
HOLLY LEE WISEMAN
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
P.O. Box 66128
Washington, DC 20035-6128
Telephone: (202) 514-5686

Local counsel:
MICHAEL J. YAMAGUCHI
United States Attorney
No. Dist. of California
MARY BETH UITTI
Chief of Civil Division
WILLIAM MURPHY
South First Street
Suite 371
San Jose, CA 95113
(408) 291-6090

Attorneys for UNITED STATES
OF AMERICA and JANET RENO

ORIGINAL
FILED

NOV 13 1995

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

PETE WILSON, et al.,           )   CASE NO. C95-20042 JW
                               )   CASE NO. C94-20860 JW
        Plaintiffs,            )   (Consolidated)
                               )
        v.                     )   JOINT STIPULATION
                               )
UNITED STATES OF AMERICA,      )
et al.,                        )
                               )
        Defendants,            )
                               )
_____/

JOINT STIPULATION TO SUBSTITUTE LANGUAGE

Come now all parties to the above-styled causes, by and

through their attorneys, and stipulate as follows:

That the following language shall be substituted for

paragraph 2 on page 5 of this Court's Order filed November 2,

1995 (which paragraph begins: "The NVRA prohibits the removal of

the name of any person from the list of official voters for

failure to vote."):

The NVRA prohibits the removal of the name of any

person from the list of official voters for failure to

Joint Stipulation

vote. 42 U.S.C. Sec. 1973gg-6(b)(2).  The United States
and Voting Rights Coalition contend that the state's
proposed list cleaning procedure ("RCOP," for Residency
Confirmation Outreach Procedure) violates this section
of the Act because the process begins by sending postal
inquiries to non-voters.

As outlined in the state's implementation plan
(Chapter 5, pp. 5-12), RCOP would function as follows:
Approximately 6 months prior to the primary election in
even-numbered years and approximately six months after
the general election in odd-numbered years, county
registrars would send out a nonforwardable residency
confirmation postcard to those voters who had not voted
within the past six months (in the case of pre-primary
RCOP) or in the last general election (in the case of
post general election RCOP).

If the postcard were returned as undeliverable
without forwarding address information, a forwardable
confirmation notice would be sent out pursuant to 42
U.S.C. 1973gg-6(d)(2) of the NVRA.  If this notice were
not returned and the voter did not vote in the next two
federal elections, the voter would be removed from the
registration list.

Joint Stipulation                    2

Respectfully submitted,

Dated: November 9, 1995

DANIEL E. LUNGREN
Attorney General

CYRUS J. RICKARDS
Deputy Attorney General
Attorneys for Governor
        Pete Wilson, et al

ROBERT RUBIN
NANCY STUART
Lawyers' Committee for
        Civil Rights of the
        San Francisco Bay Area
Attorneys for Voting Rights
        Coalition

DEVAL L. PATRICK
Assistant Attorney General
ELISABETH JOHNSON
BARRY WEINBERG
HOLLY LEE WISEMAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Attorneys for United States
        and Janet Reno

Joint Stipulation            3

# Attachment 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

2006 JUN 27 PH 3: 07

SOUTH...   ...STRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
       v.                      )       Civil Action No. _____
                               )
STATE OF INDIANA; and KRISTI   )
ROBERTSON and J. BRADLEY KING, )       **1 :06 -cv- 1000 -RLY -TAB**
Co-Directors of the Indiana Election )
Division, in their official capacity, )
                               )
              Defendants.      )
_____ )

## CONSENT DECREE AND ORDER

The United States of America filed this action pursuant to Section 8 of the National Voter

Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-6, to enforce the State of Indiana's

obligations concerning voter registration list maintenance in elections for Federal offices.  The

Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §

1973gg-9.

The State of Indiana is covered by the requirements of Section 8 of the NVRA with

respect to elections for Federal office.  *See* 42 U.S.C. §§ 1973gg-1(4), 1973gg-2(b).  Section

8(a)(4) of the NVRA requires that "[i]n the administration of voter registration for elections for

Federal office, each State shall  . . . conduct a general program that makes a reasonable effort to

remove the names of ineligible voters from the official lists of eligible voters by reason of - (A)

the death of the registrant; or (B) a change in the residence of the registrant . . . ."  42 U.S.C. §

1973gg-6(a)(4).  Section 8 allows for the immediate removal of a voter from a registration list

1

when the voter has died, been convicted of a disqualifying crime, or when the voter requests to be removed. *See* 42 U.S.C. § 1973gg-6(c)(2)(B). Section 8 of the NVRA sets forth specific notice procedures and time frames for removing a voter when the State or local county registrar obtains information that a voter no longer lives at his/her registration address of record (*i.e.*, when the State receives undeliverable election mail or returned jury notices). *See* 42 U.S.C. §§ 1973gg-6(b)-(f). The State must comply with these notice provisions and time lines before removing such voters from its registration list.

Notwithstanding these list maintenance obligations, Indiana has failed to conduct an adequate general program of list maintenance that makes a reasonable effort to identify and remove the names of ineligible voters from the voter registration list in elections for Federal office, to remove such ineligible voters, and to engage in oversight actions sufficient to ensure that local election jurisdictions identify and remove such ineligible voters. As a result, the State has violated the registration list maintenance obligations under Section 8 of the NVRA, 42 U.S.C. § 1973gg-6.

The United States and Defendants, through their respective counsel, have conferred and agree that this action should be settled without the delay and expense of litigation. The parties negotiated in good faith and hereby agree to the entry of this Consent Decree ("Decree") as an appropriate resolution of the claims alleged in the United States' complaint. The parties agree to waive a hearing and, thus, stipulate that each provision of this Decree is appropriate and necessary.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that:

1.    *Deceased Voters and Duplicate Registrations.* On or before June 30, 2006, the

2

Indiana Election Division shall distribute notices regarding the more than 29,000 registrants who may be deceased and 290,000 registrations which may be duplicates, which were identified by the State when it implemented the new statewide, computerized database under the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15483(a), to each county voter registration office for appropriate action.  The State shall require each county voter registration office to make a determination, consistent with all notice requirements mandated by law, on these potentially invalid registrations by August 2, 2006, including the removal from the list of eligible voters of any voter registration that has been positively identified as being from a deceased voter or as a duplicate registration.  The State shall provide a report to counsel for the United States on or before August 16, 2006, on a county by county basis, regarding the total number of ineligible voters identified as duplicate or deceased in each county, the total number of voters removed in each county, the total number of voters placed on the inactive list in each county, and the number of dead or duplicate registrations where the county took no action.

2.    *Statewide Mailing.*  On or before June 30, 2006, the Co-Directors shall take reasonable efforts to identify voters who are ineligible to vote by conducting a statewide mailing of election-related materials, via first class non-forwardable mail, to all registered voters.  The program must comply with the requirements of Section 8(b) of the NVRA, 42 U.S.C. § 1973gg-6 and Indiana Code § 3-7-38.2-16.  To the extent that any mailing is returned as undeliverable with no forwarding address or a forwarding address outside the registrar's jurisdiction, the State shall send a follow-up notice letter by forwardable mail to the voter and a postage prepaid address verification card, as set forth in 42 U.S.C. § 1973gg-6(c)-(d) and Ind. Code § 3-7-38.2-2, whereby the voter can confirm his or her address.  Where the mailing is returned as undeliverable

3

with a forwarding address inside the registrar's jurisdiction, the State shall ensure that voter

records are updated in accordance with Section 8(f) of the NVRA. 42 U.S.C. § 1973gg-6(f). The

State shall ensure that each county processes returned and undeliverable address verification

cards in accordance with State and Federal law. This program must be completed on or before

August 10, 2006.

     3.    *Report on Statewide Mailing.* On or before August 25, 2006, the State shall

provide counsel for the United States with a report that identifies, on a county by county basis,

the number of voters who were identified as potentially ineligible through use of the measures set

forth in Paragraph 2, *supra*, the number of voters actually removed from the registration database

and the total number of voters placed on inactive status after confirmation mailings. In addition,

the State will provide the total number of active and inactive voters in each county in the State as

of August 25, 2006.

     4.    *Written Plan for Compliance.* During 2007, the Co-Directors shall develop a

written plan for identifying and deleting ineligible voters on the State's computerized database,

as required in Section 303(a)(2) of HAVA, 42 U.S.C. § 15483(a)(2). In addition, the plan shall

set forth the State's procedure for tracking whether each county voter registration office is

complying with the list maintenance requirements of Section 8 of the NVRA, including whether

the registration office is identifying and removing voters who have died, been convicted of a

disqualifying crime, or who have moved. This plan must include a means of tracking whether

county voter registration offices are properly: (1) acting on State-provided information obtained

from the statewide voter registration database regarding voters who may have become ineligible

(such as potential deaths or duplicates); (2) researching and acting on other specific information

provided in writing by voters that calls into question those voters' continued eligibility to vote at their currently registered addresses, such as jury declinations or county or state tax filings which claim non-resident status; (3) canvassing their registered voter lists to locate voters who have died or moved; (4) using canvass information to update voter registration rolls for voters who have moved within the election jurisdiction consistent with Section 8(f) of the NVRA; (5) sending a forwardable confirmation notice under Section 8(d) of the NVRA to voters who may have moved outside of an election jurisdiction or for whom there is no forwarding information; (6) placing voters who do not respond to the confirmation notice into an inactive status that will indicate the date they were placed in such status; (7) removing inactive voters who do not vote or appear to vote during the two Federal general election cycles following the date the confirmation notice is sent or who indicate in writing that they have moved outside of the jurisdiction; (8) ensuring that eligible voters on inactive status remain on the voter registration list during the period of the two Federal general election cycles following the date the confirmation notice is sent, and that they can cast valid ballots on election day during that period, upon proper assertion of eligibility, if required under state law; and (9) returning eligible inactive voters to active status if they properly reactivate their registration. Where this tracking information indicates that a county voter registration office is not conducting list maintenance activity in accordance with the NVRA and State law, the Co-Directors shall contact the county voter registration office to ensure compliance with the law and, if necessary, take appropriate action against the county, including litigation, if it fails to comply with Federal and State law.

     5.    *Training.*  The Co-Directors, in concert with regularly scheduled training programs conducted by the Indiana Secretary of State, shall develop training manuals and

conduct regular training of local election officials at least once each year on the proper conduct of list maintenance under Section 8 of the NVRA and State law.

6.    *Copies of Materials to Counsel for the United States*.  The Secretary and/or the Co-Directors shall provide copies of the following to counsel for the United States for review and comment prior to dissemination or implementation: (1) the written plan for tracking county compliance with the NVRA referred to in Paragraph 4, *supra*; and (2) the written training materials discussed in Paragraph 5, *supra*.  Both parties agree to confer during development of the materials discussed in this paragraph to ensure potential disagreements are minimized.

7.    *Annual Reporting Requirements*.  On or about January 31 of each year, the Secretary and/or the Co-Directors shall provide a report to counsel for the United States that sets forth the total number of active and inactive voters in each county in the State, as well as the number of registrants removed by each county in the previous year.

8.    *Retention of Records*.  The State shall retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided in 42 U.S.C. §§ 1973gg-6(I) and 1974.  This shall include training materials and other documents related to the State's and counties' list maintenance obligations under the NVRA and State law. The State shall make these records available to counsel for the United States upon request.

9.    *Costs*.  Each party shall bear its own costs with regard to actions taken by the parties up to and including the entry of this decree.

10.    *Binding Nature of Decree*.  This Decree is binding on the Co-Directors, their successors in office, employees, representatives, delegates, agents, assigns, and all persons acting on their behalf.

11.    *Termination Date.*  This Agreement shall remain in effect until June 30, 2009.

Agreed to:

For the United States of America:

SUSAN BROOKS
United States Attorney


TIM MORRISON
Ind. Bar No. 9268-53
Assistant United States Attorney
10 West Market Street Suite 2100
Indianapolis, Indiana 46204
Phone: (317) 226-6333
Fax: (317) 226-5002


JOHN TANNER
ROBERT POPPER
M. ERIC EVERSOLE
Ind. Bar No. 21190-49
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0566
Facsimile: 202-307-3961

For the Defendants:

APPROVED as to Form and Legality:
Office of the Attorney General


STEVE CARTER
Attorney General of Indiana
Ind. Bar No. 1958-98
Indiana Government Center South
302 W. Washington Street
Indianapolis, Indiana
Phone: (317) 232-6201
Fax: (317) 232-7979


KRISTI ROBERTSON
Co-Director, Indiana Election Division
302 W. Washington, Room E204
Indianapolis, Indiana 46204
Phone: (317) 232-3939
Fax: (317) 233-6793


BRADLEY KING
Co-Director, Indiana Election Division
302 W. Washington, Room E204
Indianapolis, Indiana 46204
Phone: (317) 232-3939
Fax: (317) 233-6793

7

SO ORDERED this _____ day of _____, 2006

_____
United States District Judge

8

# Attachment 10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:06cv4592 |
| | ) | |
| THE CITY OF PHILADELPHIA; | ) | |
| MARGARET TARTAGLIONE, EDGAR A. | ) | |
| HOWARD, JOSEPH J. DUDA, in their | ) | |
| official capacities as Philadelphia City | ) | |
| Commissioners; and THE PHILADELPHIA | ) | **AMENDED COMPLAINT** |
| COUNTY BOARD OF ELECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff, the United States of America, alleges:

1.      The Attorney General of the United States hereby files this action to enforce the

provisions of:

   a)      Sections 2, 3(a), 4(e), 203, and 208 of the Voting Rights Act of 1965, as amended,

   42 U.S.C. §§ 1973, 1973a(a), 1973b(e), 1973aa-1a, and 1973aa-6, with respect to

   the conduct of elections in the City of Philadelphia;

   b)      Sections 301(a)(3), (4) and 302(b) of the Help America Vote Act of 2002

   ("HAVA"), 42 U.S.C. §§ 15481(a)(3), (4) and 15482(b), with respect to the

   conduct of elections for Federal office in the City of Philadelphia; and

   c)      Section 8(a)(4) of the National Voter Registration Act of 1993 ("NVRA"), 42

   U.S.C. § 1973gg-6, with respect to the conduct of elections for Federal office in

   the City of Philadelphia.

- 2 -

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, 42

U.S.C. § 1973j(f), and 42 U.S.C. § 15511. The claim pursuant to Section 203 of the

Voting Rights Act requires that the action be heard and determined by a court of three

judges in accordance with the provisions of 42 U.S.C. § 1973aa-2 and 28 U.S.C. § 2284.

3.    Venue for this action is proper in the United States District Court for the Eastern District

of Pennsylvania, pursuant to 28 U.S.C. §§ 118 and 1391(b).

## PARTIES

4.    Plaintiff United States of America seeks declaratory and injunctive relief pursuant to

Sections 12(d) and 204 of the Voting Rights Act, 42 U.S.C. §§ 1973j(d) and 1973aa-2,

which authorize the Attorney General to bring this suit to enforce the Voting Rights Act;

Section 401 of HAVA, 42 U.S.C. § 15511, which authorizes the Attorney General to

bring this suit to enforce HAVA; Section 11(a) of the NVRA, 42 U.S.C. §1973gg-9(a)

which authorizes the Attorney General to bring this suit to enforce the NVRA; and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

5.    Defendant City of Philadelphia ("City" or "Philadelphia") is a political and geographical

subdivision of the Commonwealth of Pennsylvania, and is subject to the laws of the

Commonwealth, the Voting Rights Act, HAVA, and the NVRA, as discussed below.

6.    Defendants Philadelphia City Commissioners are vested with the statutory powers,

duties, and responsibilities concerning the registration of voters and the conduct of

Federal, state and local elections in the City. PHILADELPHIA CODE § 2-112. The

- 3 -

Philadelphia City Commissioners include Joseph J. Duda, Edgar A. Howard and Chairwoman Margaret M. Tartaglione, who are sued in their official capacities.

7.    Defendant Philadelphia County Board of Elections consists of the Philadelphia City Commissioners when they serve in their capacity as the Philadelphia County Board of Elections. The Philadelphia County Board of Elections is generally responsible for the conduct of elections in Philadelphia and the training of election officers.

## FIRST CAUSE OF ACTION

8.    Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 7 of this Complaint.

9.    According to the 2000 Census, the City of Philadelphia had a total population of 1,517,550 persons, of whom 128,928 (8.5%) were Hispanic. By 2004, the Census estimates that Philadelphia's total population decreased by 103,305 (6.8%) to 1,414,245. The Hispanic community, however, grew by an estimated 11,546 (9%) to a total of 140,474, or approximately ten percent of Philadelphia's population.

10.    The 2000 Census further indicates that the total citizen voting age population of Philadelphia was 1,071,785, of whom 70,980 (6.6%) were Hispanic. Among Philadelphia's Hispanic citizens of voting age, 25,660 (36.2%) are limited English proficient.

11.    The City of Philadelphia is subject to the requirements of Section 203 of the Voting Rights Act ("Section 203") for the Spanish language, pursuant to the designation by the Director of the Census; this determination of the Census Bureau is final and non-reviewable. 42 U.S.C. § 1973aa-1a(b)(2), (b)(4). The City has been continuously

- 4 -

subject to the bilingual election requirements of Section 203 since September 18, 1992. See 57 Fed. Reg. 43,213 (Sept. 18, 1992) and 67 Fed. Reg. 48,871 (July 26, 2002).

12. The Department of Justice has directly notified Philadelphia officials regarding the bilingual election requirements of the Voting Rights Act, including in letters dated July 26, 2002, and August 31, 2004.

13. Because the City of Philadelphia is subject to the requirements of Section 203, "any registration or voting notice, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots" that Defendants provide in English must also be furnished in Spanish. 42 U.S.C. § 1973aa-1a.

14. In conducting elections in Philadelphia, Defendants failed to provide in an effective manner election-related materials, information and/or assistance in Spanish to limited English proficient Hispanic voters as required by Section 203, including, but not limited to, the following:

   a. Failing to recruit, appoint, train, and maintain an adequate pool of bilingual poll workers capable of providing the same election information and assistance in Spanish to limited English proficient Hispanic voters that it provides in English;

   b. Failing to provide the same election-related materials and information in Spanish that it provides in English, such as information publicizing elections, or to provide an effective alternative method of disseminating such information so that limited English proficient Hispanic voters are assured an effective opportunity to be informed about election-related activities; and

   c. Failing to translate accurately into Spanish election materials and instructions.

- 5 -

15.  As a result of Defendants' practices, limited English proficient Hispanic voters have had difficulty understanding the election process and have been prevented from voting.

16.  Defendants' failure to provide Spanish language materials, information and assistance, as described above, constitutes a violation of Section 203.

17.  Unless enjoined by this Court, Defendants will continue to violate Section 203 by failing to provide limited English proficient Hispanic voters of the City of Philadelphia with the Spanish language materials, information, and assistance necessary for their effective participation in the political process.

## SECOND CAUSE OF ACTION

18.  Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 17 of this Complaint.

19.  Section 4(e) of the Voting Rights Act ("Section 4(e)") prohibits Defendants from "conditioning the right to vote . . . on the ability to read, write, understand, or interpret" the English language by persons educated in American-flag schools, including the Commonwealth of Puerto Rico, where the predominant classroom language is Spanish. See 42 U.S.C. § 1973b(e)(1).

20.  The Puerto Rico Department of Education has promulgated regulations that specify that the language of classroom instruction will be Spanish, the vernacular of the Commonwealth of Puerto Rico.

21.  According to the 2000 Census, 91,527 (71%) of Philadelphia's Hispanic population is of Puerto Rican descent.  Almost half of that Puerto Rican population, 40,363 (44%), was born in Puerto Rico.  Based on information and belief, a significant percentage of these

- 6 -

persons were educated in American-flag schools in the Commonwealth of Puerto Rico where the predominant classroom language was Spanish.

22.    For the November 2004 general election, the City of Philadelphia established 250 polling places, which according to the 2000 Census, were located in Census tracts with 5 percent or more persons of Puerto Rican descent. The City of Philadelphia failed to provide a bilingual interpreter or Spanish-speaking poll worker in at least 100 of the 250 polling places during the November 2004 election.

23.    For the November 2005 general election, the City of Philadelphia established 250 polling places, which according to the 2000 Census, were located in Census tracts with 5 percent or more persons of Puerto Rican descent. The City of Philadelphia failed to provide a bilingual interpreter or Spanish-speaking poll worker in at least 107 of the 250 polling places during the 2005 general election.

24.    The City is aware of its obligation to ensure that its Puerto Rican citizens, who were educated in American-flag schools, receive bilingual language assistance. In Arroyo v. Tucker, 372 F. Supp. 764 (E.D. Pa. 1974), a United States district court considered a Section 4(e) claim raised by Philadelphia voters who were born in or extracted from Puerto Rico. In Arroyo, the Court ordered the City to prepare all written election materials in both English and Spanish, and to provide bilingual personnel at all polling places falling within a census tract containing five percent or more persons of Puerto Rican birth or parentage pursuant to the most recent census report. Arroyo, 372 F. Supp. at 768.

- 7 -

25.    Notwithstanding these obligations, Defendants have continuously failed to provide
       adequate bilingual assistance and accurately translated bilingual election materials and
       information to citizens of Puerto Rican descent educated in American-flag schools in
       Puerto Rico in violation of Section 4(e).

26.    Unless enjoined by this Court, Defendants will continue to violate Section 4(e) by failing
       to provide election materials, information, and assistance to limited English proficient
       persons educated in American Flag schools in the Commonwealth of Puerto Rico.

                              **THIRD CAUSE OF ACTION**

27.    Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 26 of
       this Complaint.

28.    Section 208 of the Voting Rights Act ("Section 208") provides that "[a]ny voter who
       requires assistance to vote by reason of blindness, disability, or inability to read or write
       may be given assistance by a person of the voter's choice, other than the voter's
       employer or agent of that employer or officer or agent of the voter's union." 42 U.S.C.
       §1973aa-6.

29.    In violation of Section 208, Defendants and their employees and agents failed to allow
       voters their assistors of choice by:

       a)    Prohibiting family members, friends, and other assistors of choice from providing
             assistance to limited English proficient Hispanic voters;

       b)    Requiring limited English proficient Hispanic voters to be assisted by poll
             workers who either did not speak Spanish or did not speak Spanish fluently; and

- 8 -

      c)     Failing to instruct poll workers accurately and adequately on their duty to permit eligible voters to receive assistance from any person of their choice, other than their employers or union officials.

30.    Defendants' failure to allow eligible voters to receive necessary assistance from any person of their choice, other than their employers or union officials, as described herein, is a violation of Section 208.

31.    Unless enjoined by this Court, Defendants will continue to violate Section 208 by failing to provide eligible Philadelphia voters with the opportunity to receive assistance from persons of the voters' choice and by limiting the scope of assistance voters can receive from their chosen assistors.

## FOURTH CAUSE OF ACTION

32.    Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 31 of this Complaint.

33.    Section 2 of the Voting Rights Act ("Section 2") prohibits Defendants from applying or imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" which results in a denial or abridgment of the right to vote on account of race or color, or membership in a language minority group, including citizens of Spanish heritage.  42 U.S.C. § 1973.

34.    In conducting elections in Philadelphia, Defendants have abridged the right of Hispanic citizens to vote, by:

      a.     Treating Hispanic and limited English proficient Hispanic voters disrespectfully;

- 9 -

 b. Refusing to permit limited English proficient Hispanic voters to be assisted by an assistor of their choice;

 c. Failing to prevent poll workers, poll watchers, and other persons inside the polling places from improperly influencing, coercing or changing, or attempting to improperly influence, coerce or change the ballot choices of Hispanic voters;

 d. Failing to make available bilingual personnel to provide effective assistance and information required by limited English proficient Hispanic voters;

 e. Failing to provide provisional ballots to limited English proficient Hispanic voters; and

 f. Failing to prevent persons from blocking entrances to polling places.

35. Under the totality of the circumstances that exist in Philadelphia, Defendants' conduct has had the effect of denying Hispanic voters an equal opportunity to participate in the political process and to elect candidates of their choice on an equal basis with other citizens in violation of Section 2.

36. Unless enjoined by this Court, Defendants will continue to violate Section 2 by enforcing standards, practices, or procedures that deny Hispanic voters the opportunity to participate effectively in the political process on an equal basis with other members of the electorate.

- 10 -

## FIFTH CAUSE OF ACTION

37.    Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 36 of
this Complaint.

38.    On October 29, 2002, HAVA, 42 U.S.C. §§ 15301-15545, was signed into law by the
President.  Title III of HAVA (Sections 301 to 303) includes certain "uniform and
nondiscriminatory election technology and administration requirements" which apply in
elections for Federal office.  42 U.S.C. §§ 15481-15483.

39.    The City conducted an election for Federal office on May 16, 2006, and November 7,
2006.

40.    The City is next scheduled to conduct a Federal election in March 2008.

41.    Each state and jurisdiction was required to comply with Section 301 of HAVA for
Federal office by January 1, 2006.  42 U.S.C. § 15481.

42.    Among other things, Section 301 of HAVA requires that voting systems used in an
election for Federal office must provide for accessibility for voters with disabilities in a
manner that provides the same opportunity for access and participation (including
privacy and independence) as for other voters, 42 U.S.C. § 15481(a)(3) ("Section
301(a)(3)").

43.    The City of Philadelphia utilizes a voting system which requires poll workers to connect
an audio function in order for the voting system to be compliant with Section 301(a)(3) of
HAVA.  During the May 16, 2006 and November 7, 2006 elections, poll workers were
unable or unwilling to attach the audio function or informed blind and disabled voters
that the polling place did not have a disability accessible machine.  In addition, poll

- 11 -

workers discouraged and pressured blind and disabled voters against using the disability accessible machine.

44.    Without the audio function being made available to voters with disabilities such voters were not able to access the voting systems or vote privately and independently, as required by Sections 301(a)(3) of HAVA.

45.    Unless enjoined by this Court, Defendants will continue to violate Section 301(a)(3) of HAVA by failing to provide voting systems which are accessible to persons with disabilities and provide alternative language accessibility.

### SIXTH CAUSE OF ACTION

46.    Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 45 of this Complaint.

47.    Among other things, Section 301(a)(4) of HAVA requires Defendants to "provide alternative language accessibility pursuant to the requirements of section 203 of the Voting Rights Act of 1965," 42 U.S.C. § 15481(a)(4) ("Section 301(a)(4)").

48.    Section 301(a)(4) requires, among other things, that any signage or information posted to comply with HAVA comply as well with the requirements of Section 203.

49.    During the May 16, 2006, primary and November 7, 2006, general election, Defendants failed to cause voting information required by Section 302(b) of HAVA to be posted in polling places in Spanish.

50.    Defendants' failure to provide Spanish language signage and information, as described above, constitutes a violation of Section 301(a)(4).

- 12 -

51. Unless enjoined by this Court, Defendants will continue to violate Section 301(a)(4) of HAVA by failing to ensure that required voting information is posted in all polling places in Spanish during Federal elections.

## SEVENTH CAUSE OF ACTION

52. Plaintiff restates and incorporates herein the allegations in Paragraphs 1 through 51 of this Complaint.

53. Section 8(a)(4) of the NVRA requires that "[i]n the administration of voter registration for elections for Federal office, each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in address of the registrant." 42 U.S.C. § 1973gg-6(a)(4).

54. The Commonwealth of Pennsylvania delegated many of these responsibilities to the Philadelphia City Commissioners. 25 PA. CONS. STAT. ANN. § 1901; PHILADELPHIA CODE § 2-112. The City's program not only must identify registrants who have died, 25 PA. CONS. STAT. ANN. §§ 1505, 1901, it must take reasonable steps to identify registrants who have changed their address, 25 PA. CONS. STAT. ANN. § 1901(b).

55. Despite the list maintenance requirements of Federal and state law, the City fails to conduct a meaningful general program of voter registration list maintenance in elections for Federal office, in violation of Section 8(a)(4) of the NVRA.

56. The City does not conduct a program that makes a reasonable effort to remove the names of ineligible voters, as the City's voter registration list used in elections for Federal office

- 13 -

contains numerous ineligible voters, and as information about such individuals has been provided to the City.

57.    Unless enjoined by this Court, Defendants will continue to violate Section 8(a)(4) of the NVRA by failing to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that this Court:

1.    With respect to Plaintiff's First Cause of Action:

   a.    Declare that Defendants have failed to provide Spanish language election information and assistance necessary to those who require it in Spanish in violation of Section 203 of the Voting Rights Act, 42 U.S.C. § 1973aa-1a;

   b.    Enjoin Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from failing to provide Spanish language election information and assistance to persons with limited English proficiency as required by Section 203, 42 U.S.C. § 19733aa-1a; and

   c.    Require Defendants to devise, publicize and implement a remedial plan to ensure that Hispanic citizens are able to participate in all phases of the electoral process as required by Section 203, 42 U.S.C. § 19733aa-1a.

2.    With respect to Plaintiff's Second Cause of Action:

   a.    Declare that Defendants violated Section 4(e) of the Voting Rights Act, 42 U.S.C. § 1973b(e) by failing to provide election material, information and assistance

- 14 -

necessary for Spanish language minority citizens educated in Puerto Rico and currently residing in the City to participate effectively in the political process;

b.  Enjoin Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from failing to provide election material, information, and assistance to Spanish language minority citizens educated in Puerto Rico and currently residing in the City;

c.  Require Defendants to devise, publicize, and implement a remedial plan to ensure that Spanish language minority citizens educated in Puerto Rico and currently residing in the City are provided election materials, information, and assistance in compliance with Section 4(e) of the Voting Rights Act, 42 U.S.C. § 1973b(e).

3.  With respect to Plaintiff's Third Cause of Action:

a.  Declare that Defendants' practices set forth above violate Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa-6;

b.  Enjoin Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from engaging in any act or practice that denies the rights secured by Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa-6;

c.  Require Defendants to develop and implement a remedial plan to ensure that Philadelphia voters are permitted assistance from persons of their choice when they cast their ballots, in compliance with Section 208 of the Voting Rights Act, 42 U.S.C. § 1973aa-6;

4.  With respect to Plaintiff's Fourth Cause of Action:

- 15 -

    a.    Declare that Defendants have violated Section 2 of the Voting Rights Act, 42

          U.S.C. § 1973, because their actions have resulted in the denial or abridgement of

          the rights of Hispanic and limited proficient Hispanic voters;

    b.    Enjoin Defendants, their employees, agents, and successors in office, and all

          persons acting in concert with them, from implementing practices and procedures

          that deny or abridge the rights of Hispanic and limited proficient Hispanic citizens

          in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973; and

    c.    Require Defendants to devise and implement a remedial program that provides

          Philadelphia's Hispanic and limited proficient Hispanic citizens the opportunity

          to participate fully in the political process consistent with Section 2 of the Voting

          Rights Act, 42 U.S.C. § 1973.

5.    With respect to Plaintiff's Fifth Cause of Action:

    a.    Declare that Defendants are not in compliance with Section 301(a)(3) of HAVA,

          42 U.S.C. §§ 15481(a)(3), with respect to implementation of HAVA's voting

          system standards for the voters with disabilities and voters with alternative

          language needs in elections for Federal office;

    b.    Enjoin Defendants, their employees, agents, and successors in office, and all

          persons acting in concert with any of them, from failing or refusing to comply

          promptly with the requirements of Section 301(a)(3) of HAVA;

    c.    Require Defendants, their employees, agents and successors in office and all

          persons acting in concert with any of them, to develop promptly a plan to remedy

          the demonstrated violations of Section 301(a)(3) of HAVA.

- 16 -

6.  With respect to Plaintiff's Sixth Cause of Action:

    a.  Declare that Defendants are not in compliance with Section 301(a)(4) of HAVA, 42 U.S.C. §§ 15481(a)(4), with respect to implementation of HAVA's voting system standards for the voters with disabilities and voters with alternative language needs in elections for Federal office;

    b.  Enjoin Defendants, their employees, agents, and successors in office, and all persons acting in concert with any of them, from failing or refusing to comply promptly with the requirements of Section 301(a)(4) of HAVA;

    c.  Require Defendants, their employees, agents and successors in office and all persons acting in concert with any of them, to develop promptly a plan to remedy the demonstrated violations of Sections 301(a)(4) of HAVA.

7.  With respect to Plaintiff's Seventh Cause of Action:

    a.  Declare that Defendants are in violation of Section 8(a)(4) of the NVRA, 42 U.S.C. § 1973gg-6, by failing to conduct an adequate general program of list maintenance that makes a reasonable effort to remove the names of ineligible voters from the voter registration list in elections for Federal office according to the requirements of Section 8(a)(4) of the NVRA.

    b.  Enjoin Defendants, their employees, agents, and successors in office, and all persons acting in concert with any of them, from failing or refusing to comply with the voter registration list maintenance requirements of Section 8(a)(4) of the NVRA.

c.  Require Defendants, their employees, agents, and successors in office and all persons acting in concert with any of them, to develop promptly a plan to remedy the demonstrated violations of Section 8(a)(4) of the NVRA.

8.  Plaintiff further requests that this Court:

a.  Authorize the appointment of Federal observers for elections held in Philadelphia pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a(a), until December 31, 2009;

b.  Award Plaintiff the costs and disbursements associated with the filing and maintenance of this action; and

c.  Award such other equitable and further relief as the Court deems just and proper.

- 18 -

Dated: April 26, 2007


ALBERTO GONZALES
Attorney General

WAN J. KIM
Assistant Attorney General
Civil Rights Division

JOHN K. TANNER
Chief, Voting Section

VIVECA D. PARKER
Assistant United States Attorney

By: _____

M. ERIC EVERSOLE
Trial Attorney
SUSANA LORENZO-GIGUERE
ROBERT POPPER
Special Litigation Counsels
SEAN W. O'DONNELL
VERONICA SEUNGWON JUNG
DONALD L. PALMER
PUJA A. LAKHANI
Trial Attorneys, Voting Section
Room 7254 – NWB
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 307-2767 (telephone)
(202) 307-3961 (facsimile)
susana.lorenzo-guigere@usdoj.gov

# Attachment 11

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") is entered into as of April 26, 2007 (the "Effective Date") by and between THE UNITED STATES OF AMERICA (the "Department") and THE CITY OF PHILADELPHIA, MARGARET TARTAGLIONE, EDGAR A. HOWARD, JOSEPH J. DUDA, in their official capacities as Philadelphia City Commissioners, and THE PHILADELPHIA COUNTY BOARD OF ELECTIONS (collectively, the "Defendants"). Plaintiff and Defendants (together, the "Parties") are parties to the litigation captioned, or otherwise referred to, as *United States of America v. City of Philadelphia and Philadelphia City Commission,* C.A. No. 06-4592, which was filed in the United States District Court for the Eastern District of Pennsylvania on October 13, 2006 and which will subsequently be modified by an amended complaint, the stipulation as to which will be filed on April 26, 2007 (the "Litigation").

## RECITALS

WHEREAS, pursuant to Pennsylvania law, the Philadelphia County Board of Elections (the "Board") is the elected body responsible for the conduct of elections in the City of Philadelphia (the "City") and is bound, *inter alia,* by the Pennsylvania Constitution, including Art. 6, § 7; the Pennsylvania Election Code, 25 Pa. Stat. Ann. § 14 *et seq.*; federal election law including the statutes referenced in this Agreement; and the U.S. Constitution.

WHEREAS, since 1992, the City has been covered under Section 203 of the Voting Rights Act, 42 U.S.C. § 1973aa-1a, and has been required to provide election information and assistance to limited English proficient Hispanic voters.

WHEREAS, the Board has used bilingual ballots and provided voting materials in Spanish since the 1970s and Arroyo v. Tucker, 372 F. Supp. 764 (E.D. Pa. 1974);

WHEREAS, pursuant to applicable law, each election division in Philadelphia is staffed on each Election Day by (i) a Judge of Elections, (ii) a Majority Inspector, (iii) a Minority Inspector, each of whom are popularly elected, (together, the "Elected Polling Place Officials"), (iv) a Clerk appointed by the Minority Inspector, (v) a Machine Inspector appointed by the Board, and (vi) where appropriate, interpreter(s) appointed by the Board (together, the "Appointed Polling Place Officials"). The Elected Polling Place Officials and the Appointed Polling Place Officials comprise the "Polling Place Officials" as such term is used in this Agreement.

WHEREAS, Philadelphia has provided Spanish-language interpreters at certain polling places since the 1970s, including in response to reasonable and timely requests by the local elected leaders or community organizations;

WHEREAS, the United States, on October 13, 2006, filed an action against the City and the Board, pursuant to Sections 203 and 208 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973aa-1a and 1973aa-6.

WHEREAS, the Parties, on April 26, 2007, will file a stipulation to amend the United States's complaint to include as defendants in this case the Philadelphia City Commissioners in their official capacity, and the Philadelphia County Board of Elections (as opposed to the "Philadelphia City Commission"). In addition, the amended complaint asserts additional claims under Sections 2 and 4(e) of the Voting Rights Act, 42 U.S.C. §§ 1973 and 1973b(e); Sections 301(a)(3) and 301(a)(4) of the Help America Vote Act of

2002, 42 U.S.C. §§ 15481(a)(3) and (a)(4) ("HAVA"); and Section 8 of the National

Voter Registration Act, 42 U.S.C. § 1973gg-6 ("NVRA").

WHEREAS, in the November 2006 election, the Board enhanced the availability

of services to voters with limited English proficiency, including expanding the number of

Spanish-English interpreters to 195 polling places covering 235 divisions.

WHEREAS, the City disputes many of the allegations in the original and the

amended complaint, including all allegations of failure to comply with applicable law.

WHEREAS, in the November 2006 election, the Board made available and

widely publicized the availability of telephonic interpretation services in approximately

120 languages, including Spanish, at all polling places in Philadelphia under an

expansion of the City's Global Philadelphia program.

WHEREAS, for the November 2006 election, the Board created and advertised a

supplemental, dedicated Election Day help-line, staffed by Spanish speakers, to handle

issues related to language assistance.

WHEREAS, the Board in October 2006, initiated the establishment of a bilingual

advisory committee to advise it on the best methods of assisting voters with limited

proficiency in the English language.

WHEREAS, in March 2007, the Board and the advisory committee has conducted

and will conduct a series of town hall listening sessions, in affected communities with

simultaneous interpretation, to ensure that all citizen input on language assistance issues

is properly addressed.

WHEREAS, since at least 1998, the Board has used information from the Postal

Service's National Change of Address ("NCOA") Program, Pennsylvania's Five Year

Notice and Canvass Programs to detect registrants who have changed residence to update the addresses of more than 100,000 registrants who changed residence within the County and cancel the records of tens of thousands of registrants who moved outside the County or were not qualified to vote. The Board has also used these programs to designate hundreds of thousands of registrants as inactive and since December 2000 has cancelled hundreds of thousands of inactive registrants who have failed to appear to vote or update their records during the period beginning with the date of the NVRA 8(d) notice and ending after the second federal general election after the notice.

WHEREAS, since June 1995, the Board has also used change of address information from the Pennsylvania Department of Transportation to update the addresses of approximately 280,000 registrants who have changed residence within the County and to remove approximately 114,000 registrants who changed residence to an address in another Pennsylvania County and transferred these records to the Registration Commission of the registrant's new county.

WHEREAS, since 1995, the Board has used information provided by the Pennsylvania Department of Health to remove the names of approximately 120,000 deceased registrants from its files of eligible voters.

## **TERMS OF SETTLEMENT**

NOW, THEREFORE, in the spirit of cooperation and comity and to avoid the expense and time of litigating the matter, including the planned additional allegations in the amended complaint, the Parties desire to fully and finally settle the Department's claims. The Parties agree the Board shall continue and/or undertake the specific activities set forth in this Agreement to continue and/or enhance its activities to comply with state and federal election law.

4

In consideration of the mutual promises contained in this Agreement, good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties, intending to be legally bound, agree:

<u>Spanish Language Assistance</u>

1.   The Board shall make Spanish language assistance available at the Board's principal office at 520 North Delaware Avenue.  Trained bilingual election personnel shall be available to answer voting-related questions by telephone without cost (except as such assistance, such as duplication services, also may be at cost when provided in English) during normal business hours and while the polls are open on election days.

2.   The Board agrees to recruit, hire, and assign sufficient numbers of persons proficient in Spanish and English, so as to provide effective assistance in the Spanish language, to serve as interpreters during election days, and, to that end, shall, among other outreach efforts, invite recommendations of interpreters from community leaders and from each major political party, and shall urge members of the Advisory Group, as discussed below, to help recruit interpreters.

3.   The Board agrees to provide at least one Spanish-language interpreter on election days at each polling place where the Board determines there to be a need for such interpreters through the process set forth in Paragraphs 4-6 of this Agreement.

4.   For the May 15, 2007 election, the Board will make at least one interpreter available on election day at each of the divisions listed on the attached Exhibit A.  For each of the divisions listed on the attached Exhibit B, except for the May 15, 2007 election and elections that are not expected to have high turnout (see Paragraph 6 below), the Board will make available at least two interpreters on election day.  The Parties recognize, however, that it may be difficult to assure that two interpreters are

available at each of the divisions listed on Exhibit B for the May 15, 2007 election; for that election, best efforts will satisfy the Board's obligations to provide two interpreters at the divisions listed on Exhibit B. For the consolidated divisions listed on the attached Exhibit C, the Board will make available at least one interpreter on election day for each two consolidated divisions.

5.  Starting in June 2007, and thereafter on an annual basis, the Board will request that the Philadelphia School District, the Philadelphia Department of Human Services ("DHS"), and the Philadelphia City Planning Commission identify geographic areas in the City where there has been a material increase in services for Spanish-speaking persons or migration of Spanish-speaking persons. The Board will review and discuss with the Advisory Group information, to the extent available and useful, provided by the Philadelphia School District, DHS, the Planning Commission, the Department, the U.S. Census, voter registration records, local elected leaders, and local community leaders, and will make appropriate adjustments based upon reliable information.

6.  The Board may adjust bilingual assistance at specific polling places in light of reliable information that the actual need for language assistance in such polling place is lesser or greater than as enumerated by the above standards. For the duration of this Agreement, a determination to eliminate or reduce interpretation at a polling place shall only be made with the consent of the Department or, in the event the Department objects, the Court. The Parties recognize that the need for the assistance of a second interpreter at the polling places identified on Exhibit B will vary according to turnout and the Department will consent to reduce the number of interpreters from two to one at

the polling places listed on Exhibit B for elections that are not expected to have high turnout, and to increase the number where there is reliable information that additional assistance is needed.

7.   The Board shall develop a policy to assure that Polling Place Officials who are assigned by the Board to satisfy its obligations under Paragraph 3 of this Agreement are able to understand, speak, write, and read Spanish proficiently.  Within 30 days of the date of this Agreement, the Board shall provide the Department with a detailed draft of such policy, which shall include the process to assure that Polling Place Officials who are assigned by the Board to satisfy its obligations under Paragraph 3 of this Agreement are familiar with Spanish language election terms.  The Department shall have seven days to review the draft and provide comments to the Board.  If the Board and the Department are unable to agree within seven days thereafter on the contents of the policy, either party may approach the Court for resolution.

8.   The Board shall instruct Polling Place Officials to post signs prominently in both English and Spanish at all polling places stating that Spanish language assistance is available and, where such assistance is by other than a Spanish-proficient Polling Place Official, how such assistance can be obtained.

Translation and Dissemination of Election-Related Materials

9.   The Board shall employ its best efforts to use materials in English and Spanish provided by the Commonwealth of Pennsylvania to the extent such signage is available.  To the extent such election-related materials are not provided by the Commonwealth, the Board shall have all election-related materials, such as registration or voting applications and notices, voting instructions, notices of availability of assistance, and ballots, professionally translated into Spanish, or, where appropriate,

7

develop comparable Spanish-language equivalents reasonably calculated to achieve specific goals in a manner comparable to that provided to the English-speaking population.

10. The Board shall update the checklist used to identify each written or printed item of election information that the Board makes available to the public at each polling place, including each item that the Help America Vote Act requires to be posted. The Judge of Elections for each polling place shall be instructed to complete and sign this checklist or, where appropriate, provide written explanation for a failure to do so. The Board agrees to maintain for 22 months a record of each completed and signed checklist.

11. The Board shall, in consultation with the Advisory Group, design and implement a program to ensure that Spanish language election information, materials, and announcements shall be distributed to the media and in paid media placements in the appropriate Spanish-language venues. These announcements need not be identical in all respects to English language announcements, but shall provide substantially the same information and be in the form, frequency, and media reasonably calculated to achieve effective notice and understanding comparable to that provided to the English-speaking population.

Assistors of Choice

12. The Board shall provide training and information to Polling Place Officials that they must allow any voter who requires assistance to vote by reason of blindness, disability or inability to read or write to be given assistance by a person of the voter's choice, other than a Judge of Election, the voter's employer or agent of that employer or officer or agent of the voter's union.

13. The Board shall train and provide information to Polling Place Officials that, when any limited English proficient Spanish-speaking voters, who are either blind, disabled, or cannot read or write English, select a Polling Place Official as their assistor of choice, the voters should receive assistance from a Spanish-proficient Polling Place Official if one is available at that location.

Registration List Maintenance

14. The Department shall share with the Board information from the Death Master File of the Social Security Administration ("SSA") concerning deceased persons having a Philadelphia County address. The Department shall provide this information in an electronic text format on a CD or DVD. To the extent available, the information from the Social Security file shall include the last name, first name, middle initial, and suffix; date of birth; Social Security number; the date of death; the SSA address of record for the individual at the time of death; the last SSA Philadelphia address of record for the individual; the last SSA Pennsylvania address of record for the individual; and the address from the Philadelphia files of eligible voters for each person the Department contends is deceased yet still on the Philadelphia voter rolls. The Parties agree that, to the extent the requested data items are unavailable, such unavailability may limit the data's usefulness to the Board. The Board will use this previously unavailable and non-mandatory information to search its files of eligible voters. Within 90 days after the first election after receiving this information, the Board shall, in a manner consistent with Pennsylvania election law, review its files of eligible voters and attempt to confirm and remove any registrants found on the Board's files of eligible voters where the Board is able to confirm the registrant is deceased.

9

15. So long as the data referenced in Paragraph 14 is provided on or before May 31, 2007, the Board shall provide a report to the Department on or before November 1, 2007, with the names and appropriate identifying information of all registrants who were, by reason of being deceased, deleted from the registration list between January 1, 2007 and the date the report is generated.

16. It shall be the policy of the Board to use all mandatory and reasonably available optional voter update and removal programs and: (1) act on state-provided information obtained from the statewide voter registration database regarding voters who may have become ineligible, such as potential deaths; (2) research, confirm and act on other specific information provided in writing by Polling Place Officials, or a member of a voter's household who calls into question a voter's continued residency or eligibility to vote; (3) use information from non-forwardable Voter Identification Cards returned as undeliverable by the United States Postal Service to investigate a registrant's qualifications under Pennsylvania law, consistent with Section 8(f) of the NVRA and state law, by a canvass to identify and remove ineligible registrants by visiting buildings and other locations; (4) send a forwardable confirmation notice under Section 8(d) of the NVRA to all voters identified through the statewide voter registration database NCOA voter removal program who may have moved outside of the Board's election jurisdiction or for whom there is no forwarding information; (5) send a forwardable confirmation notice to any registered elector who has not voted nor appeared to vote during any election, or contacted the Board in any manner, and whose contact resulted in a change in his or her voter record; (6) place voters who do not respond to the confirmation notice into an inactive status that will indicate the date they were placed in such status; (7)

remove inactive voters who fail to appear to vote during the period beginning with the date of the confirmation notice and ending after the second federal general election following the date of the confirmation notice or who indicate in writing that they have moved outside of the jurisdiction; (8) ensure that eligible voters on inactive status (a) remain on the voter registration list during the period of the two federal general election cycles following the date the confirmation notice is sent, and (b) are able to cast valid ballots on election day during that period, upon completion of an affirmation, if required under state law; and (9) return eligible inactive voters to active status if they properly reactivate their registration. The Board shall notify the Department in writing of any change in the policy set forth in this paragraph.

<u>Polling Place Official Training and Oath of Undertaking</u>

17. The Board will encourage all Polling Place Officials to attend election training. That training must include detailed discussions and written materials regarding the Voting Rights Act, including: (i) the legal obligation and means to make Spanish language assistance and materials available to voters, (ii) the procedures and guidelines for providing such assistance, (iii) the requirement that Polling Place Officials be respectful and courteous to all voters regardless of race, ethnicity, color, or language abilities and to avoid inappropriate comments, and (iv) the requirement to allow voters, who are disabled, or cannot read or write English, to select any person of their choice, other than a Judge of Election, the voter's employer or an officer or agent of the voter's union, to assist them with the voting process. Moreover, the training must cover the right of each voter, pursuant to Section 301 of HAVA and the Pennsylvania Constitution, to vote privately and independently, and the procedures for setting up and operating accessible machines and the requirement to post all HAVA-required signs, in

English and Spanish, so that all voters can easily view such signs. The Board will retain a list of those who have attended training.

18. To be eligible to serve as a Polling Place Official in specific capacities, an individual must take the appropriate oath of office under 25 Pa. Stat. Ann. §§ 2677-80. Beginning with officials trained after May 1, 2007, for the May 15, 2007 election, and for all training provided thereafter, the Board shall require that Polling Place Officials also, at the time they receive training, swear or affirm on an appropriate form that they are aware of and will comply with all of their obligations under federal law, including the legal obligation and means to make Spanish language assistance and materials available to voters and the parameters of such assistance; that they will treat all voters equally and with respect; take any and all reasonable steps to ensure that the polling place is free from intimidation or coercion; honor the candidate and other ballot choices of all voters who receive assistance in marking their ballots and, allow voters requiring language assistance to choose any person to assist them, other than their employer or union representative, consistent with Section 208 of the Voting Rights Act.

Spanish Language Election Program Coordinator

19. The Board shall designate an individual to coordinate the Board's Spanish language election program (the "Spanish Language Coordinator") for all elections in the City. The Board shall provide the Spanish Language Coordinator with support sufficient to meet its goals for the program. The Spanish Language Coordinator shall be able to understand, speak, write, and read both Spanish and English fluently, or shall have subordinates with those abilities. The Spanish Language Coordinator shall work under the supervision of the Board and his or her responsibilities shall include, but are not

limited to: (i) coordinating efforts to ensure that all ballots and other election information are translated properly; (ii) developing and overseeing the bilingual Spanish language election publicity program, including the selection of appropriate Spanish language media for notices and announcements; (iii) identifying the need for, recruiting and assigning Spanish language interpreters for all elections; (iv) developing and overseeing the presentation in English of the bilingual-related elements of the Board's election training program for all Polling Place Officials to ensure compliance with the requirements of this Agreement and applicable federal and state law; and (v) managing any other aspect of the Spanish bilingual program that is required by this Agreement and applicable federal or state law.

20. The Spanish Language Coordinator shall keep, maintain for 22 months, and hold available for reasonable inspection and copying at the Board's office a record of information used to publicize Spanish-language election information, announcements and notices, including all materials that are provided to the Advisory Group pursuant to paragraph 23 of this Agreement.

Response to Complaints

21. The Board, upon receipt of complaints, whether oral or written, agrees to investigate expeditiously any allegations of Polling Place Officials' illegal or materially inappropriate conduct toward voters or failures to follow federal election law. Where there is credible evidence that a Polling Place Official has engaged in illegal or materially inappropriate treatment of voters, or failed to follow federal election law, the Board shall take reasonable efforts to prevent future offenses by such official. As appropriate under the circumstances of each case, such efforts may include counseling, in-person instruction, refusal to reappoint an Appointed Polling Place Official, seeking a

judicial order to remove an Elected Polling Place Official, and referral of potentially criminal acts to the District Attorney.

Advisory Group

22. The Advisory Group shall assist the Board in its Spanish language election program. There shall be open meetings of the Advisory Group at least quarterly through 2008, including one such meeting no less than 45 days in advance of each primary and general election. The Advisory Group will address at least the following issues: voter registration, conduct of Polling Place Officials/need for bilingual Polling Place Officials, and voter education and information. The Advisory Group will consider channels of communication and make recommendations to the Board regarding dissemination of election information. To further the purposes of the Advisory Group, it may establish subcommittees that are open to all interested individuals and organizations. The chairperson of the Advisory Group shall provide notice of all planned meetings, including the time and location for the meeting, at least seven days in advance of such meeting, although members of the Advisory Group may agree to waive or shorten this time period as necessary. Notices of open meetings shall be provided to the Department, and publicized to appropriate language media and community groups. The chairperson may fix the topics of such meetings and shall, where a topic is fixed, provide in advance a general agenda of such meetings. The chairperson shall regularly provide a written summary of the proceedings of the Advisory Group to all members of the Board.

23. The Board shall make available to all members of the Advisory Group copies, in English and Spanish, of all appropriate election information, announcements, and notices that are provided or made available to the electorate and general public.

14

Accessible Voting Machines

24. The Board shall ensure that each polling place has at least one voting machine designed for the use of those with accessibility needs in accordance with the 2002 Voluntary Voting System Standards adopted by the United States Election Assistance Commission ("Accessible Voting Machines"). The Board shall instruct its machine inspectors to assure that at least one such Accessible Voting Machine, including any feature intended to allow voters with disabilities to vote privately and independently, is fully operational at each polling place before the opening of the polling place. Training for Polling Place Officials shall include how to ensure the appropriate Polling Place Official provides effective assistance such that the appropriate Polling Place Official may assist voters. The Board shall instruct Polling Place Officials not to in any way specifically discourage, delay, or interfere with any voter who requests the use of an Accessible Voting Machine. To the extent that the Board is made aware that an Accessible Voting Machine is not fully operational when a polling place opens, the Board shall take prompt and appropriate measures to make the machine operational and will keep a record if no Accessible Voting Machine is available at any division for a period of 90 minutes or more during hours that such polling place is open.

Evaluation of Plan

25. The Parties recognize that regular and ongoing reassessment may be necessary to provide the most effective and efficient Spanish language election program. The Board shall reevaluate its election procedures and programs after each election to determine which aspects of the programs are functioning well, whether any aspects need improvement, and how to affect needed improvements. The Agreement may be adjusted by agreement of the Parties.

Dismissal of Action

26. The Parties stipulate and agree to the dismissal to of all of the Department's claims raised in the complaint and the amended complaint, and of all other claims related to the conduct of the polls that could have been brought, as of the date of this Agreement, under the Voting Rights Act of 1965, as amended, the Help America Vote Act of 2002, the National Voter Registration Act of 1993, and any other federal law to the extent such laws address conduct of elections; provided, however, that: (1) this Agreement does not resolve, limit, preclude or implicate any claims the Department may have regarding the physical accessibility of the Defendants' polling places under the Americans with Disabilities Act or other federal law; (2) this Agreement does not resolve, limit, preclude, or implicate any criminal charges; (3) nothing in this Agreement will prevent the Department from bringing new claims against anyone based on conduct in future elections during the term of this Agreement, so long as the Department first exhausts the dispute resolution procedures of Paragraph 28; and (4) nothing herein shall be interpreted to diminish or enhance the use of any evidence of events occurring before the date of this Agreement, which use is governed by the Federal Rules of Evidence.

27. Contemporaneous with the signing of this Agreement, the Department shall provide Defendants with a signed Stipulation of Dismissal with Prejudice in the form attached as Exhibit D. The amended complaint shall be filed within three business days of the Effective Date. Defendants shall promptly sign the Stipulation of Dismissal, and file it after the amended complaint has been filed.

Dispute Resolution

28. Before filing any complaint, motion, or other pleading concerning the Defendants' failure to conduct any activity, or to refrain from any activity, covered by

16

this Agreement, or sending any letter to the Court, the Department must take certain steps: (a) expeditiously investigate and verify such information and the Defendants will reasonably cooperate with and assist the Department as it does so (for the avoidance of doubt, reasonable cooperation does not include waiver of any claims to privilege or provision of any information requested in a broad and sweeping manner); (b) give specific written notice within 30 days to the Board of any credible allegation violation of the Voting Rights Act, HAVA, the NVRA, or any other applicable election-related law that the Department reasonably believes can be substantiated, including a detailed statement of the factual basis for any alleged violations or objections and all related information gathered by the Department; (c) make appropriately senior personnel reasonably available to participate in at least one face-to-face meeting in Philadelphia to attempt in good faith to resolve any differences; and (d) allow the Board 30 days to cure any purported violations (or in the case of past violations to take remedial or preventative efforts), or such other time as is reasonable and necessary in light of the imminence of an election day. The Board will provide information to the Department that has been reasonably requested to assist and cooperate with the Department in its investigation; provided, however, that the Board's alleged failure to provide such information shall not be grounds for the Department to fail to take the steps outlined in this provision before filing any complaint, motion, or other pleading, or sending any letter to the Court. Nothing in this paragraph, however, shall in any way bar the United States from pursuing appropriate criminal sanctions against any individual Polling Place Official for alleged wrong-doing in connection with the conduct of any election.

Department Assistance

29. The Department agrees to provide reasonable guidance to the Board, including but not limited to, guidance about model policies in other jurisdictions and demographic information to the extent that it is not otherwise reasonably available to the Board.

Other Provisions

30. The terms of this Agreement apply to all federal, state, and local elections that are administered by the Board to the extent it is consistent with the Voting Rights Act, HAVA and the NVRA and any other applicable election law.  Were the Board to enter into an election services contract with any other entity, the Board would require such entity to agree to abide by the terms of this Agreement as if such entity were a party to it, as consistent with applicable law.

31. This Agreement is final and binding between the Parties and their successors in office regarding the matters described in paragraph 23.  This Agreement shall expire on July 1, 2009.

32. The Parties shall jointly move the Court to retain jurisdiction over the case until July 1, 2009, and agree that the Court shall have the authority to enforce each of the terms of this Agreement.

33. The Parties agree that no Party shall be in breach of this Settlement Agreement due to causes beyond such Party's control, including acts of God, acts of terrorism, floods, fires, accidents, wars, or civil insurrection.

34. The Department may request federal monitors for any election during the term of this Agreement by providing a written request for such monitors to the City Solicitor of the City at least 30 days before such election or, for the May 15, 2007 election, within

five days of the Effective Date. The City anticipates that it will approve such monitors in a manner consistent with its historic practice.

35. Nothing in this Agreement shall be construed as an admission of liability by the Department, the Board, the City, or any of their employees, officers, directors, Board members or other elected or appointed officials, agents, or representatives.

36. This Agreement, including all attachments hereto, represents the entire Agreement and understanding between the Parties regarding the subject matter hereof and supersedes any and all prior and contemporaneous agreements, representations, understandings and negotiations between the Parties hereto, whether oral or written, with respect to the subject matter hereof.

37. The Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same document.

38. Any notice to the Department under this Agreement shall be directed to the Chief of the Voting Section of the United States Department of Justice. Any notice to the Board under this Agreement shall be directed both to the City Solicitor and to Abbe F. Fletman, Flaster/Greenberg, P.C., Eight Penn Center, 1628 JFK Blvd., 15th floor, Philadelphia, PA 19103.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives,

have executed this Agreement as of the Effective Date set forth above.

For Plaintiff:                                          For Defendants:


WAN J. KIM
Assistant Attorney General
Civil Rights Division

PATRICK MEEHAN
United States Attorney
VIVECA D. PARKER
Assistant United States Attorney


M. ERIC EVERSOLE
Trial Attorney
JOHN TANNER
Chief, Voting Section
SUSANA LORENZO-GIGUERE
ROBERT POPPER
Special Litigation Counsel
SEAN W. O'DONNELL
VERONICA SEUNGWON JUNG
DONALD L. PALMER
PUJA A. LAKHANI
Trial Attorneys
United States Department of Justice
Civil Rights Division,
Voting Section
950 Pennsylvania Avenue NW
Room NWB-7254
Washington, D.C. 20530
Telephone: (202) 305-0827
Facsimile: (202) 307-3961
susana.lorenzo-giguere@usdoj.gov
eric.eversole@usdoj.gov

ROMULO L. DIAZ, JR.
City Solicitor
MARK R. ZECCA
KEVIN GREENBERG
City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

ABBE F. FLETMAN
Flaster/Greenberg, P.C.
Eight Penn Center
1628 JFK Blvd., 15th floor
Philadelphia, PA 19103

DENISE J. SMYLER
Smyler & Gentile
109 South 22nd Street
Philadelphia, PA 19103

# EXHIBIT A

**Wards and Divisions Where One Spanish-Speaking Interpreter
Will Be Assigned Pursuant to Paragraph 4 of the Agreement**

| Ward | Divisions | Ward | Divisions |
|------|-----------|------|-----------|
| 1 | 6, 7, 10 | 33 | 1-6, 8-18, 20-24 |
| 5 | 13, 16, 23 | 35 | 9, 12, 18-19, 21-22, 30 |
| 7 | 2 – 21, 23 | 37 | 10, 13-15, 19-21 |
| 8 | 26 | 42 | 1-3, 5-6, 9-10, 12, 14-21, 23-24 |
| 14 | 7, 9, 10 | 43 | 3, 5-6, 13-22, 24-25 |
| 15 | 3, 10, 11, 16 | 45 | 8-11, 13-14, 16-19 |
| 18 | 1, 3, 8, 9, 13-17 | 49 | 1, 6, 9, 10, |
| 19 | 1-19 | 53 | 2 |
| 20 | 1, 2, 4, 5, 8, 10 | 54 | 4 |
| 23 | 1-3, 10-12, 15-16, 22-23 | 61 | 1, 3, 4, 7, 8, 12, 18 |
| 25 | 9, 13-21, 23 | 62 | 1, 5, 7, 9, 13, |
| 31 | 1-2, 8, 9, 11, 12 | | |

## EXHIBIT B

**Wards and Divisions Where Two Spanish-Speaking Interpreters
Will Be Assigned for Anticipated High-Turnout Elections
Pursuant to Paragraphs 4 and 6 of the Agreement**

| Ward | Divisions |
|------|-----------|
| 7 | 1, 22 |
| 23 | 11 |
| 33 | 7, 19 |
| 37 | 16, 17, 18 |
| 42 | 4, 8, 11, 13, 22 |
| 43 | 2, 4, 7, 8, 11, 12 |

**EXHIBIT C**

**Consolidated Precincts Where One Spanish-Speaking Interpreter
Will Be Assigned to Cover Multiple Divisions Pursuant to Paragraph 4
of the Agreement**

| <u>Ward</u> | <u>Divisions</u> | | | <u>Ward</u> | <u>Divisions</u> | | |
|---|---|---|---|---|---|---|---|
| 1 | 14 & 15 | | | 49 | 2 & 13; | 14 & 22 | |
| 5 | 15 & 17 | | | 53 | 1 & 3; | 4 & 6; | 7 & 8 |
| | | | | | 12 & 23; | 13 & 16 | |
| 23 | 4 & 8; | 6 & 7; | 20 & 21 | 54 | 2 & 3; | 6 & 7; | |
| | | | | | 9 & 13; | 11 & 12 | |
| 25 | 11 & 22 | | | 61 | 6 & 13; | 10 & 20; | 11 & 16; |
| | | | | | 14 & 15; | 19 & 26 | |
| 35 | 7 & 8; | 10 & 11; | 15 & 17 | 62 | 10 & 11; | 18 & 19; | |
| | 23 & 24; | 27 & 29 | | | 21, 23, & 24 | | |
| 41 | 1 & 2 | | | 65 | 5 & 6 | | |

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:06cv4592 |
| | ) | |
| THE CITY OF PHILADELPHIA; | ) | |
| MARGARET TARTAGLIONE, EDGAR | ) | |
| A. HOWARD, JOSEPH J. DUDA, in their | ) | |
| official capacities as Philadelphia City | ) | |
| Commissioners; and THE PHILADELPHIA | ) | |
| COUNTY BOARD OF ELECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**STIPULATION OF DISMISSAL WITH PREJUDICE**

It is hereby stipulated and agreed that claims of plaintiff, the United States of

America, against defendants, the City of Philadelphia, Margaret Tartaglione, Edgar A.

Howard and Joseph J. Duda, in their official capacities as Philadelphia City

Commissioners, and the Philadelphia County Board of Elections, are hereby

**DISMISSED WITH PREJUDICE** and without costs with the consent of all parties.

It is further stipulated and agreed that the Court shall retain jurisdiction over this matter until July 1, 2009, and shall have the authority to enforce the settlement agreement among the parties.

For Plaintiff:

WAN J. KIM
Assistant Attorney General
Civil Rights Division

PATRICK MEEHAN
United States Attorney
VIVECA D. PARKER
Assistant United States Attorney

_M. Sr. SCe_

M. ERIC EVERSOLE
Trial Attorney
JOHN TANNER
Chief, Voting Section
SUSANA LORENZO-GIGUERE
ROBERT POPPER
Special Litigation Counsel
SEAN W. O'DONNELL
VERONICA SEUNGWON JUNG
DONALD L. PALMER
PUJA A. LAKHANI
Trial Attorneys
United States Department of Justice
Civil Rights Division,
Voting Section
950 Pennsylvania Avenue NW
Room NWB-7254
Washington, D.C. 20530
Telephone: (202) 305-0827
Facsimile: (202) 307-3961
susana.lorenzo-giguere@usdoj.gov
eric.Eversole@usdoj.gov

For Defendants:

ROMULO L. DIAZ, JR.
City Solicitor
MARK R. ZECCA
KEVIN GREENBERG
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

_Abbe F. Fletman_

ABBE F. FLETMAN
Flaster/Greenberg, P.C.
Eight Penn Center
1628 JFK Blvd., 15th floor
Philadelphia, PA 19103

DENISE J. SMYLER
Smyler & Gentile
109 South 22nd Street
Philadelphia, PA 19103

SO APPROVED:

_____
                                    J.

25

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RECORD ENTRY NUMBER | DOCUMENT DESCRIPTION | PAGEID# RANGE |
|---|---|---|
| 1 | Complaint | 1-17 |
| 37 | Plaintiffs' First Amended Complaint | 230, 235-238 |
| 38 | Defendant's Initial Merits Brief | 257, 267-268 |
| 39 | Plaintiffs' Motion for Summary Judgment and Permanent Injunction | 1386, 1400-1401 |
| 49 | Defendant's Second Merits Brief | 22337-22339 |
| 56 | Defendant's Third Merits Brief | 22727-22730 |
| 66 | Order filed June 29, 2016 | 23007-23009, 23012, 23014-23026 |
| 67 | Judgment | 23027 |